UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| THE ALBERT FADEM TRUST, *et al,* | : | |
| | : | Consolidated Case No. C2-02-1045; |
| Plaintiffs, | : | C2-02-1060; C2-02-1076; C2-02- |
| | : | 1087; C2-02-1094; C2-02-1104; C2- |
| v. | : | 02-1113; C2-02-1132; C2-02-1141; |
| | : | C2-02-1261; C2-03-67 and C2-02- |
| AMERICAN ELECTRIC POWER COMPANY, | : | 1211 |
| INC., | : | |
| *et al.,* | : | Judge Algenon L. Marbley |
| | : | Magistrate Judge Mark R. Abel |
| Defendants. | : | |
| | : | |
| | : | |
| THIS DOCUMENT RELATES TO: | : | |
| | | |
| All Actions | | |

**MOTION OF  DEFENDANTS AMERICAN ELECTRIC POWER COMPANY, INC.,
E. LINN DRAPER, JR., THOMAS SHOCKLEY, III, SUSAN TOMASKY,
J.M. BUONAIUTO, E.R. BROOKS, DONALD M. CARLTON,
JOHN P. DESBARRES, ROBERT W. FRI, WILLIAM R. HOWELL,
LESTER A. HUDSON, JR., LEONARD KUJAWA, RICHARD SANDOR,
DONALD G. SMITH, LINDA GILLESPIE STUNTZ, AND KATHRYN D. SULLIVAN
TO DISMISS THE CONSOLIDATED AMENDED COMPLAINT**

Pursuant to Federal Rules of Civil Procedure 12(b)(6) and 9(b) and other

applicable rules and law, Defendants American Electric Power Company, Inc., ("AEP"), E. Linn

Draper, Jr., Thomas Shockley, III, Susan Tomasky, J.M. Buonaiuto, E.R. Brooks, Donald M.

Carlton, John P. DesBarres, Robert W. Fri, William R. Howell, Lester A. Hudson, Jr., Leonard

Kujawa, Richard Sandor, Donald G. Smith, Linda Gillespie Stuntz, and Kathryn D. Sullivan (the

"Individual Defendants," and collectively with AEP, the "Defendants") hereby move for

dismissal of the Consolidated Amended Complaint.  The arguments and reasons supporting this

Motion are set forth in the accompanying Memorandum of Law in Support of Defendants'

Motion to Dismiss the Consolidated Amended Complaint (and attached Exhibits).

WHEREFORE, Defendants respectfully request that the Court dismiss with

prejudice the Consolidated Amended Complaint, and enter judgment in favor of Defendants.

Respectfully submitted,

/s/ Alvin J . McKenna
ALVIN J. MCKENNA, Trial Attorney
(0023145)

FRED G. PRESSLEY, JR., Of Counsel
(0023090)
Porter Wright Morris & Arthur
41 South High Street
Columbus, Ohio 43215
(614) 223-1645

Of Counsel:

D. MICHAEL MILLER (0023117)
BARBARA A. BELVILLE (0012206)
American Electric Power Service
Corporation Legal Department
1 Riverside Plaza, 29th Floor
Columbus, Ohio 43215
(614) 223-1000

MICHAEL J. CHEPIGA
JOSEPH M. MCLAUGHLIN
GEORGE S. WANG
JENNIFER T. BARALL
Simpson Thacher & Bartlett LLP
425 Lexington Avenue
New York, New York 10017
(212) 455-2000

Counsel for Defendants American Electric
Power Company, Inc., E. Linn Draper, Jr.,
Thomas Shockley, III, Susan Tomasky, J.M.
Buonaiuto, E. R. Brooks, Donald M. Carlton,
John P. DesBarres, Robert W. Fri, William
R. Howell, Lester A. Hudson, Jr., Leonard

ii

Kujawa, Richard Sandor, Donald G. Smith,
Linda Gillespie Stuntz, Kathryn D. Sullivan

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| THE ALBERT FADEM TRUST, *et al,* | : | |
| | : | Consolidated Case No. C2-02-1045; |
| Plaintiffs, | : | C2-02-1060; C2-02-1076; C2-02- |
| | : | 1087; C2-02-1094; C2-02-1104; C2- |
| v. | : | 02-1113; C2-02-1132; C2-02-1141; |
| | : | C2-02-1261; C2-03-67 and C2-02- |
| AMERICAN ELECTRIC POWER COMPANY, | : | 1211 |
| INC., | : | |
| *et al.,* | : | Judge Algenon L. Marbley |
| | : | Magistrate Judge Mark R. Abel |
| Defendants. | : | |
| | : | |
| | : | |
| THIS DOCUMENT RELATES TO: | : | |
| | | |
| All Actions | | |

**MEMORANDUM OF LAW OF DEFENDANTS,
AMERICAN ELECTRIC POWER COMPANY, INC., E. LINN DRAPER, JR.,
THOMAS SHOCKLEY, III, SUSAN TOMASKY, J.M. BUONAIUTO, E.R. BROOKS,
DONALD M. CARLTON, JOHN P. DESBARRES, ROBERT W. FRI, WILLIAM R.
HOWELL, LESTER A. HUDSON, JR., LEONARD KUJAWA, RICHARD SANDOR,
DONALD G. SMITH, LINDA GILLESPIE STUNTZ, AND KATHRYN D. SULLIVAN,
IN SUPPORT OF THEIR MOTION TO DISMISS THE CONSOLIDATED
AMENDED COMPLAINT**

S.D. OHIO RULE 7.2(a)(3) TABLE OF CONTENTS AND SUMMARY

PRELIMINARY STATEMENT ................................................................................................ 1

This action is based on the theory that AEP, its upper management, and members of its Board of Directors misled investors by failing to disclose what they did not know – that certain traders working on behalf of AEP's natural gas trading subsidiary had reported inaccurate information to trade publications. Plaintiffs do not allege that AEP should have known about the inaccurate reporting, and they concede that AEP promptly disclosed and dealt with the improper conduct upon discovery. Besides the obvious danger of adopting such a theory, Plaintiffs have failed to adequately allege the essential elements of an action for securities fraud: scienter and material misstatements or omissions.

First, Plaintiffs do not plead any facts alleging that each Defendant knowingly or recklessly made a material misstatement. Instead, Plaintiffs impermissibly attempt to make upper management, members of the Board of Directors and the Company itself liable based on actions by lower-level employees of which the Defendants were not aware. Further, Plaintiffs do not allege a motivation that the Defendants might have had to engage in fraud other than generally aiding the Company as whole, from which scienter cannot be inferred.

Second, there are no material misstatements or omissions here. All of the statements that are allegedly false and/or misleading are allegedly so because AEP did not disclose in those statements the inaccurate reporting and AEP's procedures relating thereto. However, none of the statements in the Complaint relate in any way to either of those topics and, therefore, are not misleading because of their omission. In addition, Plaintiffs do not explain how the reporting of non-public information to trade publications would be material to the reasonable investor.

BACKGROUND ................................................................................................................... 7

    A.    The California Energy Crisis ................................................................... 8

    B.    Discovery Of Inaccurate Reporting Of Pricing Information To Platts ......... 9

    C.    The FERC Report ............................................................................... 11

    D.    The Complaint .................................................................................... 13

        (1)    Statements Forming The Basis Of The 1933 Act Claim ............. 13

        (2)    Statements Forming The Basis Of The 1934 Act Claim ............. 14

PROCEDURAL HISTORY ..................................................................................................... 16

ARGUMENT ....................................................................................................................... 17

I.   PLAINTIFFS' SECTION 10(B) CLAIM (COUNT III) MUST BE
     DISMISSED BECAUSE PLAINTIFFS HAVE FAILED TO ALLEGE
     SCIENTER WITH THE REQUIRED PARTICULARITY ............................... 17

To prevail on a claim under Section 10(b), Plaintiffs must allege with particularity facts giving rise to a strong inference of scienter as to each Defendant. However, here, Plaintiffs fail to plead scienter at all as to any Defendant. *See* 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5; *See, e.g., Helwig v. Vencor, Inc*., 251 F.3d 540 (6th Cir. 2001); *In re Comshare, Inc. Sec. Litig*., 183 F.3d 542 (6th Cir. 1999).

A.   Plaintiffs Fail To Plead Scienter With Particularity Against The
     Individual Defendants................................................................................ 21

     (1)   Plaintiffs Have Not Pled – Either With Particularity Or
           Even Conclusorily – That Any Of The Individual
           Defendants Made Statements That They Knew Were False........ 21

Plaintiffs merely plead fraud by hindsight, which cannot be the basis for a claim under the securities laws, instead of particularized facts showing that each Defendant intentionally or recklessly made allegedly untrue or misleading statements as is required. The only plausible inference that can be made from the allegations in the Complaint is that the Defendants remedied a problem as soon as it came to light, not that they engaged in securities fraud. *See, e.g., Helwig v. Vencor, Inc*., 251 F.3d 540 (6th Cir. 2001); *In re Comshare, Inc. Sec. Litig*., 183 F.3d 542 (6th Cir. 1999).

     (2)   Plaintiffs Have Not Pled Particularized Facts Establishing A
           "Strong Inference" Of Recklessness ........................................... 22

The Sixth Circuit has designated nine factors as probative of securities fraud, including insider trading. The Plaintiffs have not alleged that a single one of the factors is present here. The only possible motivation for fraud that can be gleaned from the Complaint is benefit to the company as a whole. Such a motivation does not raise the required strong inference of scienter. *See, e.g., Helwig v. Vencor, Inc*., 251 F.3d 540 (6th Cir. 2001); *Kalnit v. Eichler*, 264 F.3d 131 (2d Cir. 2001).

     (3)   Scienter Cannot Be Inferred From The Individual
           Defendants' Corporate Positions ................................................ 24

Scienter is not properly alleged by attempting to impute knowledge from non-management employees that are not named as defendants to the Defendant management of a corporation. As imputation is the only way to tie the Defendants to the activities complained of, Plaintiffs have failed to plead scienter. *See, e.g., In re Advanta Corp. Sec. Litig*., 180 F.3d 525 (3d Cir. 1999); *Rosenberg v. Adams, Scott & Conway, Inc*., 552 F.2d 1336 (9th Cir. 1977).

     (4)   Supposed Mismanagement Is Not Actionable Under The
           Securities Laws ........................................................................... 26

The federal securities laws do not regulate internal corporate mismanagement, which is, at most, all that is alleged in this Complaint. *See, e.g., Santa Fe Indus., Inc. v. Green*, 430 U.S. 462 (1977).

B.    Because Plaintiffs Have Failed To Plead The Scienter Of Any Of The Individual Defendants, They Are Unable, As A Matter Of Law, To Plead The Scienter Of AEP ................................................................ 27

In order to plead fraud as to the company, Plaintiffs must show that an individual responsible for the allegedly misleading statements had scienter. There are no facts alleged that any of the Individual Defendants had the requisite scienter, and as Plaintiffs have failed to meet their burden, the claim must be dismissed as to AEP. *See, e.g., Chill v. Gen. Elec. Co*., 101 F.3d 263 (2d Cir. 1996); *In re Baesa Sec. Litig*., 969 F. Supp. 238 (S.D.N.Y. 1997).

II.    PLAINTIFFS' SECTION 11 CLAIM (COUNT I) AND SECTION 10(B) CLAIM (COUNT III) MUST BE DISMISSED BECAUSE PLAINTIFFS HAVE FAILED TO PLEAD ANY MATERIAL MISSTATEMENT OR OMISSION ................................................................................................. 29

Sections 10(b) and 11 are only applicable where Defendants are alleged to have made a material misstatement or omission. By the plain language of the statutes, omissions are only actionable where they directly relate to the statements at issue. Here, there is no connection between the omissions and the statements made, nor are any statements affirmatively misleading. *See, e.g.*, 15 U.S.C. § 77k(a); 17 C.F.R. § 240.10b-5(b).

A.    Plaintiffs' Section 10(b) Claim (Count III) Must Be Dismissed For The Independent Reason That Plaintiffs Have Failed To Plead Any Material Misstatement Or Omission ....................................................... 30

(1)    Plaintiffs Do *Not* Contend That AEP's Financials Were Inaccurate In Any Respect ......................................................... 30

The lack of allegations that AEP's financial statements were inaccurate or were restated is evidence that the inaccurate reporting had no bearing on AEP's financials and would not have been material to the reasonable investor.

(2)    The Two Alleged Misstatements Are Each Completely True ..... 31

A statement must be either false or misleading to be actionable under the securities laws. Where, as here, Plaintiffs have not shown that they are either, the claims must be dismissed. Plaintiffs only provide the conclusion that they are false and misleading without any facts in support. In addition, the statements are not misleading because they do not relate to the specific issues of inaccurate reporting or the Company's specific procedures for reporting data to trade publications. *See, e.g., Sinay v. Lamson & Sessions Co*., 752 F. Supp. 828 (N.D. Ohio 1990).

(3)    Plaintiffs' Alleged Omissions Fail As A Matter of Law ............. 31

iv

An omission is only actionable if it directly relates to the statement complained of. Here the alleged omissions regarding inaccurate reporting to Platts and lack of procedures with respect to the reporting do not relate in any way to the public statements at issue and do not, therefore, make the statements misleading. If this principle is not adhered to, all statements that are otherwise accurate would be transformed into misstatements when a company discovers and remedies wrongdoing. *See, e.g., In re Boston Tech. Sec. Litig*., 8 F. Supp. 2d 43 (D. Mass. 1998); *In re Ford Motor Co. Sec. Litig*., 184 F. Supp. 2d 262 (E.D. Mich. 2001); *Stransky v. Cummins Engine Co., Inc*., 51 F.3d 1329 (7th Cir. 1995).

(4)       "Puffery" Is Not Actionable ....................................................... 34

It is well-established that statements that are nothing more than vague, optimistic "puffery" are not actionable under the federal securities laws because a reasonable investor would not rely upon them to make their investment decisions. A number of statements complained of fall into this category and are not actionable. *See, e.g., In re Royal Appliance Sec. Litig*., 64 F.3d 663, 1995 WL 490131 (6th Cir. 1995); *Raab v. Gen. Physics Corp*., 4 F.3d 286 (4th Cir. 1993).

B.      PLAINTIFFS' SECTION 11 CLAIM (COUNT I) MUST BE DISMISSED BECAUSE PLAINTIFFS HAVE FAILED TO ALLEGE ANY MATERIAL MISSTATEMENT OR OMISSION IN A REGISTRATION STATEMENT ................................................... 35

Plaintiffs point to only three statements in AEP's Registration Statement or documents incorporated therein as violating Section 11. As none of the three are false or misleading, the claim should be dismissed.

(1)       The Risk Factor Section Does Not Contain Any False Or Misleading Statements ............................................................... 36

The excerpt from the Risk Factor section of AEP's Registration Statement is not alleged to be inaccurate on its face and as it is not related to the inaccurate reporting by traders, it is not misleading for omitting information about the inaccurate reporting. Further, the statements highlighted by Plaintiffs are surrounded by cautionary language directly related to the statement. *See, e.g., In re Boston Tech. Sec. Litig*., 8 F. Supp. 2d 43 (D. Mass. 1998); *In re Ford Motor Co. Sec. Litig*., 184 F. Supp. 2d 262 (E.D. Mich. 2001).

(2)       The Platts Gas Daily Ranking Is Not Misleading........................ 38

The statement in AEP's filings that repeat its gas sales rankings from Platts are not alleged to be false and are not misleading as there is no indication of how the inaccurate reporting would have changed the ranking. The Plaintiffs conclusion that the statement is misleading without any facts to support it is insufficient for a securities fraud claim. *See, e.g., Oxford Asset Mgmt., Ltd. v. Jaharis*, 297 F.3d 1182 (11th Cir. 2002).

(3)       The FERC Responses Are Not False Or Misleading................... 39

AEP's statements regarding its responses to the inquiry by FERC is not false or misleading as Plaintiffs allege. AEP stated that, after internal investigation, it found that none of

its employees engaged in wash trades or other specific improper activities inquired into by FERC.  FERC did not inquire about inaccurate reporting to Platts, therefore, the statements are not false or misleading based upon AEP's omission of any information relating to inaccurate reporting to Platts.  Plaintiffs' allegations that AEP's statements are false and misleading are based upon an improper mischaracterization of the scope of FERC's inquiries.  *Mozes v. American Electric Power Co., et al.*, No. C2-01-006 (S.D. Ohio 2001).

C.      Any Misstatements or Omissions That May Be Alleged Are
        Immaterial As A Matter Of Law Under Sections 10(b) and 11 ................ 40

It is not enough that there is a false or misleading statement for securities fraud actions; the statement must also be material.  A misstatement or omission is only material if a reasonable investor would have viewed the information as significantly altering the total mix of information made available.  When a statement cannot meet this standard, it cannot be the basis for a securities fraud claim.  The statements at issue here, all of which relate to the inaccurate reporting of trade information to Platts and procedures with regard to the same, are not material to the reasonable investor because the reasonable investor would not have access to the information.  Moreover, Plaintiffs fail to explain how information about reporting to trade publications it would have altered any investment decisions.  *See, e.g., Oxford Asset Mgmt., Ltd. v. Jaharis*, 297 F.3d 1182 (11th Cir. 2002); *Greenapple v. Detroit Edison Co.*, 468 F. Supp. 702 (S.D.N.Y. 1979).

III.    PLAINTIFFS' CONTROL PERSON CLAIMS (COUNTS II AND IV)
        FAIL AS A MATTER OF LAW ....................................................................... 42

Where there is no underlying violation of Sections 10(b) or 11, as here, claims under Sections 20(a) and 15, respectively, cannot stand.  In addition to primary liability, claims for "control person" liability must also properly allege that the Defendants exercised control over the primary violators. In addition, Plaintiffs must plead these facts with particularity.  As Plaintiffs have not plead facts sufficient to meet any of the elements, the "control person" claims should be dismissed. *See, e.g., In re Empyrean Bioscience, Inc. Sec. Litig.*, 255 F. Supp. 2d 751 (N.D. Ohio 2003); *Sanders Confectionary Prods., Inc. v. Heller Fin. Inc*, 973 F. 2d 474 (6th Cir. 1992).

IV.     PLAINTIFFS SHOULD NOT BE PERMITTED TO AMEND THEIR
        COMPLAINT .................................................................................................... 43

The PSLRA does not contemplate repeated attempts by Plaintiffs to satisfy the requirements for pleading securities fraud.  Moreover, the Plaintiffs have already been granted leave to file an amended complaint once, and if they failed to include facts sufficient to withstand a motion to dismiss the amended complaint, they should not be given a third chance.  Therefore, leave to amend the Complaint once again should not be granted to the Plaintiffs.  *See, e.g., In re Champion Enters., Inc. Sec. Litig.*, 145 F. Supp. 2d 871 (E.D. Mich. 2001); *Mozes v. American Electric Power Co., et al.*, No. C2-01-006 (S.D. Ohio 2001).

CONCLUSION ....................................................................................................................... 45

American Electric Power Company, Inc. ("AEP") and E. Linn Draper, Jr., Thomas Shockley, III, Susan Tomasky, J.M. Buonaiuto, E. R. Brooks, Donald M. Carlton, John P. DesBarres, Robert W. Fri, William R. Howell, Lester A. Hudson, Jr., Leonard Kujawa, Richard Sandor, Donald G. Smith, Linda Gillespie Stuntz, Kathryn D. Sullivan (the "Individual Defendants," and collectively with AEP, the "Defendants") submit this memorandum of law in support of their Motion to Dismiss the Consolidated Amended Complaint (the "Complaint"), pursuant to Federal Rules of Civil Procedure 12(b)(6) and 9(b).

## PRELIMINARY STATEMENT

Plaintiffs' Complaint is a classic attempt to plead fraud by hindsight.  On October 9, 2002, AEP voluntarily announced that five traders employed by one of its subsidiaries – American Electric Power Service Corporation ("AEP Service Corp.") – had been terminated promptly after it was discovered that they had reported inaccurate natural gas trade data to Platts, a publisher of daily and monthly natural gas price indices.  Seizing upon this revelation, Plaintiffs assert that in the three years preceding October 9, 2002, Defendants repeatedly failed to disclose in public statements that these traders had reported inaccurate trade data to natural gas trade publications.  Plaintiffs' theory of liability would lead to the unjust result that every time a company discovers inappropriate behavior by an employee and takes appropriate corrective action, a securities class action claim could be brought asserting that the company's prior press releases were false and misleading because they failed to disclose the employee malfeasance while it was being committed.

What is lacking from Plaintiffs' Complaint is the crucial element of a securities fraud claim:  fraud.  It is not enough for Plaintiffs to show that a few employees of an AEP subsidiary engaged in some wrongdoing, or that its subsidiary instituted remedial measures after discovering such malfeasance.  It is also not enough to allege that the subsidiary's traders made

inaccurate reports to Platts.  There is no suggestion – nor could there be – that any statement made to Platts is actionable under the securities laws.  It bears emphasis that AEP investors would never have seen the allegedly inaccurate information given to Platts because Platts keeps this information confidential and only publishes **composites** based on information from unidentified industry sources.  Thus, on the face of the Complaint and judicially noticeable facts, Plaintiffs have failed to plead facts creating a strong inference that Defendants were trying to deceive AEP investors.

Further, Plaintiffs have sued Defendants for untold millions of dollars for allegedly misleading AEP investors through its public statements and disclosures, yet have not alleged a single fact – general or particularized – from which it can be inferred that, prior to October 2002, any Defendant knew (or even should have known) that anyone at an AEP subsidiary had reported inaccurate price information to Platts.

Plaintiffs have not cited any internal documents or meetings involving any of the Defendants in which the reporting of natural gas trade information was discussed.  And, Plaintiffs have not identified any red flags to which Defendants failed to respond.  Indeed, Plaintiffs concede that AEP took remedial actions (including termination of the traders who had engaged in the conduct in question) promptly after the disclosure of widespread inaccurate reporting at Dynegy caused AEP and other energy trading companies to investigate whether their employees had engaged in similar activities.

The Complaint also lacks any allegation concerning motive, *i.e.,* why any of the Individual Defendants would have knowingly attempted to mislead AEP investors.  The typical allegation in a securities fraud case is insider stock sales – *i.e.*, that an officer attempted to benefit personally at the expense of AEP investors.  Here, there is no allegation of insider sales

and no allegation of any other personal benefit – actual or anticipated – that could have motivated Defendants to risk their reputations and careers (and more) by engaging in fraud.

Further, Plaintiffs do not – and cannot – point to a single number in any AEP public disclosure and assert that the number is incorrect or in any way affected by anything reported to Platts.  Nor can Plaintiffs allege that a single one of the manifold agencies that regulate AEP – including the Securities Exchange Commission, the Nuclear Regulatory Commission, the Federal Energy Regulatory Commission, and various state agencies in at least nine states – have ever even suggested that AEP's public disclosures were fraudulent.

*        *        *

The most basic element necessary for all of Plaintiffs' claims is a misstatement or omission in a public disclosure that is material to investors.  Here, Plaintiffs cannot plead facts showing that any misstatement or omission was made by any Defendant.  Rather, Plaintiffs have engaged in an exercise of obfuscation by purposefully running together different "disclosures" and different issues.  We parse in detail the disclosures and issues that are, and are not, relevant to Plaintiffs' securities claims.

Section 11 of the Securities Act of 1933 (the "Securities Act" or the "1933 Act") regulates statements in registration statements and documents incorporated into registration statements.  Plaintiffs' 1933 Act claims are limited to three statements in a registration statement filed on April 12, 2002 and amended on May 16, 2002, and the documents incorporated by reference therein (collectively, the "Registration Statement").  Each of the three challenged statements is alleged to be false or misleading due to the failure to disclose that certain traders had reported inaccurate trade data to Platts and/or the purported lack of controls for ensuring the accuracy of reported trade data.

3

Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act" or the "1934 Act") makes actionable deliberate misstatements in any public disclosures. Plaintiffs' 1934 Act claims encompass the statements in AEP's SEC filings and press releases. Here again, the challenged statements are not themselves alleged to have been false, but instead to have contained an omission – specifically, the failure to disclose that certain traders had been reporting inaccurate information to Platts and/or the purported lack of controls for ensuring the accuracy of reported trade data.

**Importantly, the inaccurate reports to Platts are not alleged to be statements actionable under the 1933 Act or 1934 Act**. This is because the securities laws are intended to ensure the accuracy of **public** disclosures, and the data reports to Platts are not public disclosures. The securities laws were never intended to regulate the everyday conduct of businesses. For example, while it would almost certainly violate some law for an IBM salesman to falsely advertise a computer as "brand new" when it was really refurbished, such "misstatement" would not give rise to a claim under the securities laws, much less a securities class action by all IBM investors. Here, AEP investors never saw any information reported by AEP to Platts because Platts keeps all such information confidential and only publishes indices aggregating information provided by a number of companies.[1] Tellingly, Plaintiffs have **not** named as defendants in this litigation the traders who reported inaccurate pricing information to Platts. This is because the "misstatements" to Platts cannot be the basis for any securities law claims.

---

[1]     Indeed, even the Federal Energy Regulatory Commission does not have access to the data reported to Platts by any individual company because of the "publishers' concerns about revealing source data." Staff of the Federal Energy Regulatory Commission, *Final Report on Price Manipulation in Western Markets: Fact-Finding Investigation of Potential Manipulation of Electric and Natural Gas Prices*, March 2003 ("FERC Report"), at III-1 (Attached as Exhibit 1).

Plaintiffs nevertheless cloud the issue, pointing repeatedly to the inaccurate reporting to Platts as if that led, *ipso facto*, to the falsity of any statements that are relevant under the 1933 Act (*i.e.*, the Registration Statement) and the 1934 Act (*i.e.*, press releases and SEC filings). However, Plaintiffs have alleged no connection between (i) the information reported by certain natural gas traders to Platts and (ii) the information disclosed by AEP in public statements. There is no allegation in the Complaint that any of Defendants' **public** disclosures contained any inaccurate data on natural gas prices or trade volumes. And, the data reports sent to Platts did not discuss any of the many topics discussed in AEP's press releases and SEC filings and the Registration Statement. Plaintiffs do not and cannot allege either that (i) the natural gas traders had any role whatsoever in the preparation of the public disclosures that AEP investors would rely upon, or that (ii) any of the people who had a role in preparing AEP's financial statements and other public disclosures ever even saw, much less considered and incorporated, the natural gas price and volume data reported by AEP's natural gas traders. Quite simply, the data reports to Platts had absolutely nothing to do with the statements in AEP's Registration Statement, press releases or SEC filings.

Plaintiffs similarly strive to create confusion by mixing together unrelated issues, such as governmental investigations of "wash trades," "roundtripping," and price manipulation in the Western United States. But, Plaintiffs concede in the Complaint that **AEP was not involved in any of these practices**. Instead, Plaintiffs' contentions on this front are limited to allegations of omissions – specifically, that in truthfully disclosing its **non**-involvement in wash trades, roundtripping or price manipulation in the Western United States, AEP failed to disclose that certain of its traders had reported inaccurate data to Platts. However, what the Complaint ignores – indeed, hides – is the fact that natural gas data reporting has nothing to do with wash

5

trades, roundtripping, or price manipulation in the Western United States (except that all are things that companies are not supposed to do).

Plaintiffs' theory is contrary to the requirement under Section 11 and Rule 10b-5 that an omission is actionable only if it could be shown that investors would see a relationship between the statement and alleged omission.  Plaintiffs cannot establish any link between the subject matters of the challenged public statements and the subject matter of the alleged omission.  **Not one of the allegedly misleading statements touched upon the topic of reporting of trade information to Platts.**  Plaintiffs have pointed to nothing in any press release that would have caused any AEP investor to think that implicit representations were being made about reporting of price information to Platts.

*       *       *

In addition, because there were no principal violations, Plaintiffs' claims of control person liability against E. Linn Draper, Jr., Thomas Shockley, III, and others (the "Control Person Defendants") under Section 20 of the Exchange Act and Section 15 of the Securities Act fail as a matter of law.  *See* 15 U.S.C. § 78t(a); 15 U.S.C. § 77o.  Even assuming (*arguendo*) a principal violation, the Complaint lacks the requisite particularized factual allegations establishing that these individuals were "control persons", let alone the culpable participation of any of the Control Person Defendants.

*       *       *

In a previous securities fraud class action against AEP, this Court (Graham, J.) applied the requirements of the Private Securities Litigation Reform Act ("PSLRA") and Rule 9(b) and dismissed the lawsuit.  *Mozes v. American Electric Power Co.*, *et al.*, No. C2-01-006, 27-28 (S.D. Ohio Dec. 21, 2001) (Attached as Exhibit 2).  *Mozes* arose from allegations that

AEP misled the public about an investigation of safety procedures and systems at an AEP affiliate-owned nuclear plant conducted by the Nuclear Regulatory Commission.  This Court conducted a painstaking analysis of the plaintiffs' 104-page complaint, which resulted in a 98-page opinion dismissing the lawsuit and discussing the pleading standards applicable to securities fraud lawsuits under the PSLRA.  In its opinion, the Court meticulously analyzed each individual alleged misstatement to determine whether it was false or misleading.  *Id*. at 42-96. The Court concluded, after this thorough analysis of the complaint, that not one of the nearly one hundred alleged misstatements was sufficiently pled.  *Id.*  The Court further recognized that, in order to survive a motion to dismiss, plaintiffs must plead facts raising a strong inference of scienter with respect to each of the alleged misstatements.  *Id*. at 43.  In addition, the Court dismissed the Complaint with prejudice.  *Id*. at 97.  The same principles that mandated dismissal of *Mozes* require dismissal of the present action.

## BACKGROUND

AEP is a public utility holding company that owns various domestic utility companies throughout the midwestern and southwestern United States and is the country's largest generator of electricity.[2]  *See* Compl. ¶ 2; AEP Form 10-K for the fiscal year ended December 31, 2001, at 2 ("AEP 2001 Form 10-K") (Attached as Exhibit 3); AEP Press Release, *AEP Reports Ongoing 2000 Earnings of $2.70 per Share; Company Positioned for Significant Growth in 2001*, dated January 23, 2001 (Attached as Exhibit 4).  While generating, transmitting, and distributing electricity are AEP's main source of revenue, it owns subsidiaries involved in

---

[2]     Because the Complaint makes misleading allegations about documents that it relies upon or cites, the Court may properly consider the entirety of statements and documents relied on in the Complaint, whether or not Plaintiffs identify the source of the statement with particularity.  *See Jackson v. City of Columbus*, 194 F.3d 737, 745-46 (6th Cir. 1999); 5 Wright & Miller, *Federal Practice and Procedure* § 1327 (1989).  Each of the exhibits referenced herein is cited in the Complaint.

power engineering and construction services, energy management, wholesale energy trading and marketing, and operating natural gas pipelines, natural gas storage and coal mines.  *See* AEP 2001 Form 10-K.

AEP Energy Services Inc. ("AEPES"), a wholly owned subsidiary of AEP at the times relevant to the Complaint, is AEP's natural gas marketing and trading arm.  Compl. ¶ 3. Employees of AEP Service Corp., working on behalf of AEPES, were found to have engaged in the inaccurate reporting that Plaintiffs try to make the center of this action.  There are no allegations that employees of AEP, the holding company, and particularly none of the Individual Defendants, reported inaccurate data to any trade publications.

AEP is heavily regulated by numerous federal and state agencies, including the Federal Energy Regulatory Commission ("FERC"), the Environmental Protection Agency, the Nuclear Regulatory Commission, the Securities and Exchange Commission, and the appropriate commissions in every state in which it operates.  FERC primarily oversees the energy trading activities of AEPES.

A.    **THE CALIFORNIA ENERGY CRISIS**

In 2000-2001, California and the Western United States faced a major energy crisis with "[s]pot gas prices rising to extraordinary levels" and an "unprecedented price increase in the electricity market."  FERC Report, at ES-1.   Responding to the "California market meltdown," in February 2002, FERC began investigating whether any market participant – particularly energy traders – manipulated short-term energy prices in that region by engaging in so-called "round-trip" or "wash" trades[3] or other specific manipulative tactics engaged in by Enron.  FERC Report at ES-1 to ES-3.

---

[3]    "A wash trade is a transaction made without an intent to take a genuine, bona fide position in the market, such as a simultaneous purchase and sale designed to negate each

As part of its investigation FERC sent out data requests in May 2002 to over 100 companies, including AEP, asking for information about each company's involvement in "round-trip" or "wash" transactions and certain other specific transactions.  The request did not inquire about the companies' methods or history of reporting information to trade publications.

After an internal investigation in response to FERC's inquiry about round-trip trading, it was publicly reported on May 13, 2002 that AEP had concluded that AEP "didn't do round-trip trades."  Bradley Keoun, *et al.*, *"Round-Trip" Power Trades May Spur More Regulation*, Bloomberg, May 14, 2002 (Attached as Exhibit 5).  Shortly thereafter, on May 30, 2002, AEP issued a press release reiterating that it did not take part in "round trip" or "wash" transactions.  AEP Press Release, *AEP: Responses to FERC Will Show No Involvement In Questioned Activities*, dated May 30, 2002 (Attached as Exhibit 6).  The Complaint does **not** allege that any of AEPES's traders engaged in wash trading or any other of the trading tactics engaged in by Enron.

B.    DISCOVERY OF INACCURATE REPORTING OF PRICING INFORMATION TO PLATTS

Several months later, on September 25, 2002, Dynegy, a competing energy company with large natural gas trading operations, announced that it had discovered that 15 of its employees had reported inaccurate data to Platts, the publisher of *Inside FERC* and *Gas Daily*, monthly and daily publications of price indices and statistics on natural gas prices, trading volumes and other related information.   *See* FERC Report, at III-3 to III-5.  The Dynegy

---

other so that there is no change in financial position."  *Reddy v. CFTC*, 191 F.3d 109, 115 (2d Cir. 1999).  Wash trades "are a form of fictitious trading," *In re Sumitomo Copper Litig.*, 182 F.R.D. 85, 96 n.15 (S.D.N.Y. 1998), and can be used to "give the appearance of trading activity." *SEC v. United States Envtl., Inc.*, No. 94 Civ. 6608, 2002 U.S. Dist LEXIS 19701, at *10 n.4 (S.D.N.Y. Oct. 16, 2002) (Attached as Exhibit 7).  The Complaint **never once alleges** that any of the Defendants were involved in any wash trades, or that any such trades ever took place at AEP.

9

announcement prompted a new round of investigations into the specific issue of false reporting,

both internal and governmental.  On October 4, 2002, AEP initiated its own internal

investigation that swiftly uncovered that five natural gas traders working with its AEPES

subsidiary had reported inaccurate data to Platts between 1998 and 2002.  *Id.* at III-8.  On

October 9, 2002, AEP announced that the five traders had been dismissed.  *Id.*  Three other

major natural gas trading companies also disclosed that some of their traders had reported

inaccurate data to Platts. *Id.* at III-2.  AEP also announced on October 9, 2002 that it had

instituted new procedures to ensure the accuracy of the reporting, most notably requiring that the

Company's chief risk officer verify and report the information to the trade publications.  *See*

AEP Press Release, *AEP Dismisses Five for Providing Inaccurate Market Data for Indexes*,

dated October 9, 2002 (Attached as Exhibit 8).

　　　　As the inaccurate reporting was coming to light in October 2002, FERC expanded

its original investigation into price manipulation to encompass the issue of inaccurate reporting

of data to trade publications, and sent a data request to ten natural gas marketers, including AEP,

regarding reporting practices, internal procedures and controls, and internal investigations

relating specifically to the reporting of information to the trade publications.  FERC Report at

III-2, 19.

　　C.　　**THE FERC REPORT**

　　　　In March 2003, FERC released its "Final Report on Price Manipulation in

Western Markets:  Fact-Finding Investigation of Potential Manipulation of Electric and Natural

Gas Prices," FERC Docket No. PA02-2-000, a 300-plus page report that was "the culmination of

a yearlong effort by [the] Commission Staff to determine whether and, if so, the extent to which

California and Western energy markets were manipulated during 2000 and 2001."  FERC

Report, at ES-1.  In the report, one 55-page chapter addresses "Manipulations of Published

10

Natural Gas Price Indices." FERC Report at III-1 to III-55.  In that single chapter, the discussion of inaccurate price reporting within AEP merits slightly more than one page.  FERC Report at III-8 to III-9.

Throughout the Complaint, Plaintiffs purport to rely heavily on the FERC Report to frame their allegations and to allege an overall fraudulent scheme perpetrated on AEP's shareholders.  However, Plaintiffs misstate and distort FERC's findings to make it appear as if the **entire company** was involved in the inaccurate reporting and that the primary motivation of the five individual traders was to improve the position of **AEP as a whole**.  Indeed, even a cursory review of the FERC Report reveals the extent to which Plaintiffs mischaracterize its contents.  For example, Plaintiffs' statement that "FERC found AEP reported the false information . . . to enhance the value of its financial positions or purchase obligations and to increase reported volumes to create the illusion that AEP was a key player at particular locations" is simply false.  Compl. ¶ 49.  The FERC Report says nothing about AEP's motivation to enhance its financial positions or to "create the illusion that AEP was a key player at particular locations."

Most significantly, Plaintiffs suggest that FERC concluded that the inaccurate reporting of data by certain traders working with AEPES is imputable to the entire AEP company.  *See* e.g., Compl. ¶ 48 ("As revealed by [the FERC Report], AEP had systematically and deliberately reported false information concerning the natural gas market to the trade publications published by Platts."); *id.* ¶ 49 ("FERC found that AEP reported the false information to the trade publications. . .").  In fact, the FERC Report limits its findings of inaccurate reporting to five specific traders, none of whom was an officer or director of AEP, and all of whom had been dismissed.  FERC Report at III-8.

With respect to energy trading companies generally, the FERC staff concluded that traders provided false data to trade publications, and that they did so (i) to offset the perceived dominance of Enron's input to the process, (ii) to benefit traders' **own** positions or that of their trading desk, and (iii) to offset the inaccuracies that other companies were reporting." *Id.* at III-4 to III-5.  FERC also found that there were few, if any, internal controls throughout the industry to manage the reporting.  *Id.* at III-3.  The staff recommended a number of procedural changes, including requiring the reporting to go through the department of risk management, and that a number of companies, including AEP, be required to show the Commission that they fixed their internal reporting processes. FERC Report, at III-52 to III-53.

The FERC Report states that only five natural gas traders working with AEPES were found to have reported inaccurate data to Platts.  FERC Report, III-8.  The traders "claimed to have been instructed by their boss (the head of the trading desk)" to report inaccurate data.  *Id.* at III-8.  There are no allegations that the management of AEPES, much less the management of AEP, knew about or was involved in the inaccurate reporting.  Regarding why they inaccurately reported information, the traders stated that "they were doing this because they believed it was common practice in the industry, so their inaccurate reports were only intended to counteract false information reported by counterparties."  *Id*.

With regard to reporting mechanisms, the FERC Report recognized that while prior to October 2002 AEPES did not have an official process for reporting data to the trade publications, "[s]ince its internal investigation, AEP has instructed all traders not to provide any data to the Trade Press.  All trade data will go directly to the head of the Market Risk Oversight Group, who will verify that the data are accurate and then submit the data to the appropriate

publications as necessary." *Id*. at III-9.  The Staff found that the revised process was a
"significant improvement [over past practices] that gives credibility to the data." *Id*. at III-39.

       D.     **THE COMPLAINT**

       Plaintiffs bring this action now alleging that AEP should have disclosed in various
public statements between 2000 and 2002 that the inaccurate reporting – discovered by AEP in
October 2002 – was going on and that AEP lacked the proper internal controls to regulate the
reporting to Platts.

       Significantly, all of the allegedly misleading statements in the Complaint were
made by AEP or AEP management, yet neither AEP nor any of its management are alleged to
have reported inaccurate data to Platts.  Only certain employees working with AEPES were
found to be involved in the inaccurate reporting that the Plaintiffs complain about, yet none of
these employees is alleged to have made any of the allegedly misleading statements cited by the
Plaintiffs.

       **(1)**     **Statements Forming The Basis Of The 1933 Act Claim**

       Plaintiffs' claims under Sections 11 and 15 of the 1933 Act are based entirely on
alleged omissions from three statements in a registration statement filed by AEP on April 12,
2002 in connection with an offering of AEP stock.  The first allegedly misleading statement is an
excerpt from the "Risk Factor" section in the Registration Statement, which speaks generally
about AEP's trading business.  Compl. ¶ 54.  Second, Plaintiffs point to disclosures in the
prospectus and the 2002 First Quarter 10-Q about FERC's early 2002 inquiries into wash trades
and price manipulation in the Western United States as being false and misleading.  *Id.* ¶ 58.
Both sets of statements are alleged to have been misleading only because they failed to disclose
either (i) the inaccurate reporting of natural gas trade data to Platts and/or (ii) AEP's supposed
lack of procedures to ensure the accuracy of reported data.  *Id*. ¶¶ 55, 60.

Plaintiffs, however, never explain any connection between these disclosures and the issue of inaccurate reporting to Platts.  They do not offer any reason why any investor would have expected Defendants to discuss how they reported natural gas data to Platts in statements about wash trades and price manipulation in the Western United States.  Indeed, Plaintiffs concede, as they must, that all of AEP's actual statements on the two subjects of the initial FERC inquiry – *i.e.*, wash trades and price manipulation in the Western United States – were true and accurate.  Compl. ¶ 58.

The third allegedly misleading statement is found in the 2001 10-K and 2002 First Quarter 10-Q:  "Platts Gas Daily ranked AEP Nos. 14, 10, and 2 in gas sales for the first, second and third quarters, respectively, of 2001."  *Id.* ¶ 57.  Not only does this statement accurately convey what it purports to convey – *i.e.*, AEP's rankings as stated in Platts – but Plaintiffs also do not allege that the rankings themselves were inaccurate.

### (2)    Statements Forming The Basis Of The 1934 Act Claim

While Plaintiffs' claims under Section 10(b) and 20(a) of the 1934 Act encompass additional statements – primarily press releases – Plaintiffs' theory of liability remains the same: that AEP should have disclosed that some of its traders were providing inaccurate information to Platts.  Out of the twenty allegedly misleading statements, all but two are based entirely on alleged omissions.  *Id.* ¶¶ 62, 64, 66, 67, 68, 69, 70, 73, 75, 77, 80, 83, 85, 88, 91, 96,104, 107.  Here again, none of the statements that purportedly contain "omissions" actually discusses the issue of inaccurate reporting, but instead are about different and unrelated subjects.  The alleged misstatements and omissions set forth in the Complaint may be categorized as follows:

### (a)    General Statements About Internal Practices

The two affirmative misrepresentations alleged in the Complaint are generalized statements about AEP's "conservative approach to finance and reporting" and "prudent

accounting, financial disclosure and risk management practices." *See, e.g.*, *id.* ¶¶ 93-95.  On their face, these statements are, at most, inactionable puffery, and, in any case, Plaintiffs do not offer particularized facts showing how AEP's finance and accounting were not conservative or prudent.

**(b)     Statements About AEP's Earnings**

Many of the press releases cited in the Complaint are earnings reports that simply provide information about how much of AEP's total revenue was attributable to its energy trading operations.  *See, e.g.*, *id.* ¶¶ 68, 69, 77, 80, 88.  There is no allegation that the earnings reports were false.  There is no claim of any accounting restatement by AEP; that AEP's accountants ever demanded an accounting restatement; or that any governmental agency ever insisted upon an accounting restatement.  Nor is there any indication of how any inaccurate reporting – if AEP had been aware of it – would have changed any of AEP's financials.

**(c)     Statements About AEP's Growth Strategies And Management Changes**

The second group of press releases discusses AEP's growth strategies, *see, e.g.*, *id.* ¶¶ 6, 66, 67, 70, 91, and the role of certain employees in the growth of the company.  *See, e.g.*, *id.* ¶¶ 83, 85, 104.  What is notable about these press releases is that they only offer general, soft information about the Company's growth strategy, *i.e.*, not the sort of information relied upon by investors in their decisionmaking.  *See, e.g.*, *id.* ¶ 62 ("By using our rapidly expanding – and successful – electricity and gas marketing and trading operation, we have a unique ability to unleash the value of our generating assets in the competitive marketplace").

**(d)     Statements About FERC Investigations**

Plaintiffs claim that various AEP statements concerning investigations undertaken by FERC are misleading because they did not disclose the inaccurate reporting.  *See, e.g.*, *id.* ¶

15

107. Plaintiffs fault AEP for failing to disclose in its May 2002 statements about non-involvement in wash trades that certain of its traders had been engaged in the different and totally unrelated activity of inaccurate reporting to Platts. But, Plaintiffs ignore the complete lack of any relationship between wash trades and reporting to Platts. In other words, Plaintiffs cannot offer any reason why any investor would have expected AEP to discuss the issue of reporting to Platts in press releases about wash trades.

> **(e)     General Statements About AEP's Business In SEC filings**

Finally, Plaintiffs allege that general statements about AEP's energy trading business are misleading because of the supposed non-disclosure. *See, e.g.*, *id.* ¶¶ 64, 75. However, in these instances, these broad statements about business practices had nothing whatsoever to do with the specific issue of whether natural gas traders working with AEPES reported inaccurate information to trade publications.

## PROCEDURAL HISTORY

Ten separate actions were filed in the Southern District of Ohio, beginning on October 22, 2002, alleging claims under the 1933 Act and the 1934 Act. On April 23, 2003, Judge Algenon L. Marbley issued an order consolidating the actions and appointing lead plaintiffs and lead counsel. On July 23, 2003, Plaintiffs filed the Complaint.[4]

---

[4]     In addition, another action, styled *Phillip C. Kulinski, Jr. v. American Electric Power Company, et al.*, Case No. 03-CVH-01-813, was filed in the Court of Common Pleas, Franklin County, Ohio, on January 22, 2003 and removed to this federal district on May 7, 2003 pursuant to 28 U.S.C. § 1441. That action, which also alleges claims under the Securities Act, should be considered a part of this litigation, pursuant to the April 23, 2003 Order.

## ARGUMENT

**I.    PLAINTIFFS' SECTION 10(B) CLAIM (COUNT III) MUST BE DISMISSED BECAUSE PLAINTIFFS HAVE FAILED TO ALLEGE SCIENTER WITH THE REQUIRED PARTICULARITY**

To state a claim under Section 10(b) and Rule 10b-5, Plaintiffs must allege: (i) a misstatement or omission, (ii) of a material fact, (iii) made with scienter, (iv) in connection with the purchase or sale of securities, (v) upon which Plaintiffs relied, and (vi) that such reliance proximately caused Plaintiffs' injuries.  *See* 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5; *Helwig v. Vencor, Inc.*, 251 F.3d 540, 554 (6th Cir. 2001) (en banc); *In re Comshare, Inc. Sec. Litig.*, 183 F.3d 542, 548 (6th Cir. 1999); *Mozes* Order, at 20.  If Plaintiffs fail to allege any of these required elements, or if there is an insurmountable bar to the claim on the face of the Complaint, their claims must be dismissed.  *See Conley v. Gibson*, 355 U.S. 41, 45-46 (1957); *Davis v. DCB Fin. Corp.*, 259 F. Supp. 2d 664, 669 (S.D. Ohio 2003).

As a threshold matter, the Complaint fails to plead a key element of a Section 10(b) claim:  scienter.   The Supreme Court has held that scienter is a "mental state embracing intent to deceive, manipulate, or defraud."  *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976);  *Mozes* Order*,* at 20.  Section 10(b) proscribes "knowing or intentional misconduct."  *Ernst & Ernst*, 425 U.S. at 197.  Therefore, "[t]o establish a defendant's liability under Section 10(b), a plaintiff must, as a threshold matter, allege in his complaint that the defendant acted with sufficient scienter."  *Comshare*, 183 F.3d at 548.  The Sixth Circuit has clearly and repeatedly stated in this context that scienter requires either knowing or reckless conduct.  *See, e.g., Helwig*, 251 F.3d at 550.[5]

---

[5]    "Recklessness" as used in this context means "highly unreasonable conduct which is an extreme departure from the standards of ordinary care.  While the danger need not be known, it must at least be so obvious that any reasonable man would have known of it."  *Comshare*, 183 F.3d at 550 (internal quotations and citations omitted).

Further, Rule 9(b) and the Private Securities Litigation Reform Act ("PSLRA") subject scienter allegations to a heightened pleading standard. Rule 9(b) heightens the general pleading requirements, and requires that: "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Fed. R. Civ. P. 9(b). Allegations of fraudulent misrepresentations must include a sufficient factual basis to support an inference that they were knowingly or recklessly made. *See Stevelman v. Alias Research Inc.*, 174 F.3d 79, 84 (2d Cir. 1999). Plaintiffs must, at the very minimum, plead the circumstances supporting the alleged fraud in detail: the "who, what, when, where, and how: the first paragraph of any newspaper story." *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990); *Bender v. Southland Corp.*, 749 F.2d 1205, 1216 (6th Cir. 1984); *Mozes* Order, at 20-21.

The PSLRA, which was enacted in an effort to weed out "[u]nwarranted fraud claims," to stop continued "abuse of the securities law" generally, and to put an end to so-called strike suits, further heightens the pleading requirements for securities fraud claims. H.R. CONF. REP. NO. 104-369, at 41 (1995); *accord* 15 U.S.C. § 78u-4; *Helwig*, 251 F.3d at 547; *Comshare*, 183 F.3d at 548-49; *Mozes* Order, at 21-22. In the PSLRA, Congress required that the complaint state with particularity **facts** that support a "strong inference" of scienter. *See Comshare*, 183 F.3d at 553-54 (dismissing Section 10(b) claim where Plaintiffs failed to plead facts giving rise to a strong inference of fraudulent intent); *see also Oran v. Stafford*, 226 F.3d 275, 288-90 (3d Cir. 2000) (same). Mere negligence, departures from standards of ordinary care, and generalized allegations of motive and opportunity to commit fraud do **not** meet the PSLRA's enhanced pleading requirements. *See, e.g., Helwig*, 251 F.3d at 549-51; *Comshare*, 183 F.3d at 550-51 & n.7.

18

Thus, to state a claim for securities fraud under the PSLRA, Plaintiffs must allege "with particularity" facts that give rise to a "strong inference" of fraudulent intent.  15 U.S.C. § 78u-4(b)(2); Fed. R. Civ. P. 9(b); *Helwig*, 251 F.3d at 548.  In *Helwig*, the Sixth Circuit, sitting *en banc*, explained that the PSLRA's "strong inference" standard is a "significant strengthening of the pre-PSLRA standard under Rule 12(b)(6), which gave the plaintiff the benefit of **all** reasonable inferences."  *Id.* at 553 (internal quotations omitted) (emphasis in original).  In contrast, the PSLRA's "'strong inference' requirement means that plaintiffs are entitled **only to the most plausible of competing inferences**."  *Id.* (emphasis added); *Mozes* Order*, at 27.  As one district court in the Sixth Circuit recently described the most plausible of competing inferences standard:

> [W]eighing competing inferences is an improper exercise for courts when addressing the typical Rule 12(b)(6) motion to dismiss.  Such an exercise would be improper because, when considering motions filed under Rule 12(b)(6), all inferences are to be drawn in favor of plaintiffs.  This is not so however, where, as here, the PSLRA applies.  Under the PSLRA, the pleading standard is heightened; a court is placed in the unusual role of balancing competing inferences.

*Campbell v. Lexmark Int'l Inc.*, 234 F. Supp. 2d 680, 688 (E.D. Ky. 2002).  Accordingly, "[i]n determining whether plaintiffs have met their burden of raising a 'strong inference' of scienter, courts **can** and **should** consider contrary inferences."  *Id.* at 686 (emphasis in original).  Thus, the court in *Campbell* considered a variety of alternative possible inferences that could be drawn from the facts before it and dismissed the case concluding that the defendants "offer[ed] competing inferences that more than offset plaintiffs' own."  *Id*. at 688.

Furthermore, in order to satisfy the strict requirements of the PSLRA and Rule 9(b), Plaintiffs must plead specific facts demonstrating scienter with respect to each Individual Defendant.  *See, e.g., Ganino v. Citizens Utils. Co.,* 228 F.3d 154, 168 (2nd Cir. 2000)

("[C]ourt[s] should review the Complaint to determine whether it meets [the] pleading requirements for scienter as to **each of the defendants**.") (emphasis added); *In re SCB Computer Tech., Inc. Sec. Litig.*, 149 F. Supp. 2d 334, 345 (W.D. Tenn. 2001) ("[P]laintiffs must allege that each defendant made a material misleading statement or omission and . . . the complaint must plead scienter **as to each defendant**) (emphasis added) (internal citation and quotation omitted); *Weber v. Contempo Colours, Inc.,* 105 F. Supp. 2d 769, 772 (W.D. Mich. 2000) ("Where a plaintiff files federal securities law claims against multiple defendants, the court is obliged to go through the complaint allegation by allegation in order to determine if claims are specifically alleged against **each named defendant**.") (emphasis added).

Here, Plaintiffs' fail to plead particularized facts relating to **any** of the Individual Defendants. As a consequence, the **only** inference to be drawn is that Defendants were unaware of any inaccurate reporting of energy prices while the challenged public disclosures were made, and that Defendants disclosed the inaccurate reporting and took steps to remedy it as soon as they became aware of the problem. Plaintiffs offer nothing to support any alternative inference. Because Plaintiffs fail to allege facts sufficient to establish a strong inference that even one of the Defendants knowingly committed fraud, acted recklessly in making false statements, or even had the slightest motivation to mislead AEP investors, the Section 10(b) claim should be dismissed in its entirety.

A. **PLAINTIFFS FAIL TO PLEAD SCIENTER WITH PARTICULARITY AGAINST THE INDIVIDUAL DEFENDANTS**

(1) **Plaintiffs Have Not Pled – With Particularity Or Even Conclusorily – That Any Of The Individual Defendants Made Statements That They Knew Were False**

Although the Complaint spans 48 pages and 159 paragraphs, nowhere to be found is any allegation that any of the individuals that Plaintiffs chose to name as Defendants ever

intentionally made statements that they knew to be false or misleading.  Scienter requires fraudulent intent.  Plaintiffs cannot plead fraud simply by pointing to general statements made about how AEP had adequate procedures and then claiming, in hindsight, that AEP could have had better procedures.  Instead, Plaintiffs **must plead facts** showing that Defendants did not believe those statements were true when they were made.  *See, e.g., In re K-Tel Int'l, Inc. Sec. Litig.*, 300 F.3d 881, 891 (8th Cir. 2001) ("What makes many securities fraud cases more complicated is that often there is no reason to assume that what is true at the moment plaintiff discovers it was also true at the moment of the alleged misrepresentation, and that therefore simply because the alleged misrepresentation conflicts with the current state of facts, the charged statement must have been false. . . . [A] plaintiff must set forth, as part of the circumstances constituting fraud, an explanation as to why the disputed statement was untrue or misleading **when made**.") (emphasis in original) (internal citations and quotations omitted);  *Broudo v. Dura Pharms., Inc.,* 339 F.3d 933, 939 (9th Cir. 2003); *see also Mozes* Order*, at 42 (statement must be false or misleading **when issued**.") (emphasis added).

The bulk of the non-particularized allegations of the Complaint here are nothing more than charges of fraud by hindsight, which the Sixth Circuit has repeatedly held are insufficient.  *See, e.g., Comshare*, 183 F.3d at 553; *Sinay v. Lamson & Sessions Co.*, 948 F.2d 1037, 1040 (6th Cir. 1991).  The Seventh Circuit's description of such allegations is particularly apposite:

> The story in this complaint is familiar in securities litigation.  At one time the firm bathes itself in a favorable light.  Later the firm discloses that things are less rosy.  The plaintiff contends that the difference must be attributable to fraud.  'Must be' is the critical phrase, for the complaint offers no information other than the differences between the two statements of the firm's condition.

*DiLeo*, 901 F.2d at 627.  Here, the fact that AEP's subsidiary terminated (and publicly announced the termination of) five traders promptly after discovering that they had been engaging in improper conduct does not show fraudulent intent by any Defendant.  Indeed, it shows the opposite – that AEP responsibly and publicly moved to correct the problem.  As explained above, Plaintiffs are only entitled to the "most plausible of competing inferences," *Helwig*, 251 F.3d at 553, and not the utterly implausible inference of scienter that they here advance.  The Complaint is devoid of a single fact that would even suggest that any Defendant ever made a statement about controls or any other topic with knowledge of the falsity of such statement.

> **(2)     Plaintiffs Have Not Pled Particularized Facts Establishing A "Strong Inference" Of Recklessness**

Clearly unable to plead conscious misbehavior, Plaintiffs appear to be trying to allege that Defendants made statements with reckless disregard for their falsity.  However, here too Plaintiffs fail to cite a single particularized or non-particularized fact that would suggest that any Individual Defendant was reckless in disregarding the falsity of a statement he or she made.  To determine whether a complaint sufficiently pleads a strong inference of recklessness, the Sixth Circuit in *Helwig* laid out a number of factors "probative of securities fraud":

1. insider trading at a suspicious time or in an unusual amount;

2. divergence between internal reports and external statements on the same subject;

3. closeness in time of an allegedly fraudulent statement or omission and the later disclosure of inconsistent information;

4. evidence of bribery by a top company official;

5. existence of an ancillary lawsuit charging fraud by a company and the company's quick settlement of that suit;

6. disregard of the most current factual information before making statements;

7.   disclosure of accounting information in such a way that its negative implications could only be understood by someone with a high degree of sophistication;

8.   the personal interest of certain directors in not informing disinterested directors of an impending sale of stock; and

9.   the self-interested motivation of defendant in the form of saving their salaries or jobs.

*Id*, at 552; *Mozes* Order*,* at 25-26.

Tellingly, **not one of the Helwig factors is present here**.  While the *Helwig* list was not intended to be an exhaustive list of all possibly relevant considerations, the absence of **any** of the factors deemed important by the *en banc* court clearly demonstrates Plaintiffs' failure to plead a strong inference of fraud.

Plaintiffs also do not offer any credible theory of **why** Defendants would have tried to commit securities fraud and cheat their shareholders, risking their careers, their reputations, and personal financial liability in the process.  Strikingly, there is no allegation that any Defendant actually benefited from any purported fraud in this case.  Nor is there any allegation of personal benefits anticipated by the Individual Defendants that could have motivated them to risk their reputations and careers by engaging in a scheme to inflate AEP's share price.

In the majority of securities fraud cases, there are allegations of insider trading. *See* Todd S. Foster, *et al., Recent Trends VII: PSLRA, Six Years Later*, NATIONAL ECONOMIC RESEARCH ASSOCIATES, INC. (2002) (majority of securities fraud claims after the PSLRA allege insider trading) (Attached as Exhibit 9).  Here, the Complaint **does not contain a single allegation** of sales by insiders during the Class Period.  Nor are there any allegations of accounting restatements demanded by the SEC or by AEP's outside auditors, another claim commonly present in securities fraud actions.  *See id.*

The closest Plaintiffs come to alleging motive is their statement that the "trading business helped juice up AEP's profits from $267 million in 2000 to $971 million in 2001." Compl. ¶ 3.  Yet even if this were intended as an allegation regarding the Individual Defendants' state of mind, Plaintiffs cannot raise the required "strong inference" by alleging that the Individual Defendants wanted to raise the price of AEP stock because this sort of motive is common to every single officer and director in America.  "[I]nstead, plaintiffs must assert a **concrete and personal** benefit to the individual defendants resulting from the fraud." *Kalnit v. Eichler*, 264 F.3d 131, 139 (2d. Cir. 2001) (emphasis added).  Scienter cannot be established through allegations that a defendant was motivated by a desire to increase the value of the company's stock.  *See Comshare*, 183 F.3d, at 542 (allegations that defendants were motivated to increase company's share price insufficient to raise a strong inference of scienter); *In re Health Mgmt., Inc. Sec. Litig.*, 970 F. Supp. 192, 204 (E.D.N.Y. 1997) (desire to conclude various acquisitions and obtain financing insufficient motive); *Salinger v. Projectavision, Inc.*, 934 F. Supp. 1402, 1414 (S.D.N.Y. 1996) ("generalized interest in executive compensation tied to stock performance" and desire "to maintain perquisites of corporate rank do[] not support a strong inference of fraud"); *see also Phillips v. LCI Int'l, Inc.*, 190 F.3d 609, 623 (4th Cir. 1999); *San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos., Inc.*, 75 F.3d 801, 813-14 (2d Cir. 1996); *Leventhal v. Tow*, 48 F. Supp. 2d 104, 115 (D. Conn. 1999).  If scienter could be pled so easily, the scienter requirement would become a non-requirement, since the allegation that an officer wished to increase his or her company's stock price can be levied against every company officer in the world at every moment.

> **(3)    Scienter Cannot Be Inferred From The Individual Defendants'
> Corporate Positions**

24

Unable to plead facts to satisfy the "strong inference" standard, Plaintiffs resort to legal drafting sleight of hand – treating (i) the unnamed employees who reported inaccurate information regarding natural gas transactions to Platts and (ii) the Individual Defendants (none of whom is alleged to have had any involvement with this inaccurate reporting), as one and the same.

The Complaint repeatedly asserts that "AEP" – which Plaintiffs define to include all the Individual Defendants – knew its public disclosures were misleading because "AEP" falsely reported trade information to certain trade publications.[6]  But, Plaintiffs do not aver any link between the Individual Defendants and the traders who engaged in the inaccurate reporting, because they know that no link exists.  The traders are not named as defendants in this action, and not one of the Individual Defendants is alleged to have inaccurately reported trade information to anyone, or even to have had any involvement in any inaccurate reporting.

Nor is there any precedent for imputing to the management and board of directors of a public holding company knowledge of improper activities conducted by relatively low-level employees working with an operating subsidiary.  Courts have uniformly rejected arguments that the officers and directors of a company "must have known" certain things by virtue of their positions within a company.  *See, e.g., In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 539 (3rd Cir. 1999) ("[A]llegations that a securities-fraud defendant, because of his position within the company, 'must have known' a statement was false or misleading are precisely the types of

---

[6]     *See, e.g.*, Compl. ¶¶ 63 ("AEP failed to disclose that it had an undisclosed practice of manipulating market information to favor its trading positions."), 71 ("AEP failed to disclose that it had deliberately manipulated the trade data by which [the] growth, volume, and rankings [of its trading operations] were measured."), 81 ("AEP had routinely reported false information to industry trade publications concerning the volume and prices of natural gas trades."), 97 ("AEP had been deliberately and routinely reporting false trade information to *Gas Daily*").

25

inferences which [courts], on numerous occasions, have determined to be inadequate to withstand Rule 9(b) scrutiny.") (internal quotations omitted); *Rosenbloom v. Adams, Scott & Conway, Inc.*, 552 F.2d 1336, 1339 (9th Cir. 1977) ("A director, officer, or even the president of a corporation often has that superior knowledge and information, but neither the knowledge nor the information invariably attaches to those positions."); *In re WRT Energy Sec. Litig.,* Nos. 96 Civ. 3610, 96 Civ. 3611, 1997 U.S. Dist. LEXIS 14009, at *41-42 (S.D.N.Y. Sept. 15, 1997) (Attached as Exhibit 10) ("Fed. R. Civ. P. 9(b) would too easily be thwarted if plaintiffs could plead scienter against individuals holding senior management positions merely by alleging that 'due to their positions with [the company] and access to inside information, they must have known' about the alleged misrepresentations and omissions. Allowing actions to proceed on such a theory, without more, would expose top-level managers to suit merely by virtue of the positions they hold in a corporation which experiences an economic downturn.").

### (4)    Supposed Mismanagement Is Not Actionable Under The Securities Laws

Plaintiffs' theory of liability is based upon their allegation of mismanagement – specifically, that AEP did not have proper controls for ensuring the accurate reporting of trade information to industry publications.  But, this is a securities fraud action.  As the Supreme Court squarely held in *Santa Fe Industries, Inc. v. Green*, 430 U.S. 462 (1977), Section 10(b) does not regulate purported internal corporate mismanagement.  *Id.* at 479; *accord Auslender v. Energy Mgmt. Corp.*, 832 F.2d 354, 357 (6th Cir. 1987);  *In re Craftmatic Sec. Litig.*, 890 F.2d 628, 638-39 (3d Cir. 1989).  This Court "must be alert [to cases like this one] to ensure that the purpose of *Santa Fe* is not undermined by 'artful legal draftsmanship'" seeking to turn claims essentially grounded on corporate mismanagement into ones cognizable under federal law.  *Craftmatic*, 890 F.2d at 638.

26

B.   **BECAUSE PLAINTIFFS HAVE FAILED TO PLEAD THE SCIENTER OF ANY OF THE INDIVIDUAL DEFENDANTS, THEY ARE UNABLE, AS A MATTER OF LAW, TO PLEAD THE SCIENTER OF AEP**

AEP is a corporation and therefore has no will of its own that exists separate and apart from its officers and agents. As the Sixth Circuit has explained, the scienter necessary to support a fraud claim requires that a "specific corporate employee must be found to have the intent." *Dana Corp. v. Blue Cross & Blue Shield Mut. of N. Ohio*, 900 F.2d 882, 886 n.2 (6th Cir. 1990). Thus, in order to plead fraud against AEP, Plaintiffs must show that an individual claimed to be responsible for the allegedly misleading statements had scienter. *See, e.g., Nordstrom, Inc. v. Chubb & Son, Inc.*, 54 F.3d 1424, 1435-36 (9th. Cir. 1995) (rejecting theory of a corporate "'collective scienter' without a concurrent finding that a defendant director or officer also had the requisite intent"); *Martino-Catt v. E.I. duPont de Nemours and Co.*, 213 F.R.D. 308, 321 (S.D. Iowa 2003) (no corporate scienter where plaintiff "does not plead any facts sufficient to infer that individual directors and officers had knowledge adverse to the information disclosed to her or otherwise acted with recklessness or an intent to defraud."); *In re Ramp Networks, Inc. Sec. Litig.*, 201 F. Supp. 2d 1051, 1080 (N.D. Cal. 2002) (no showing of corporate defendant's scienter without allegations sufficient to support the scienter of any officers); *In re Warner Comm. Sec. Litig.*, 618 F. Supp. 735, 752 (S.D.N.Y. 1985) (in order to allege the defendant corporation's scienter, plaintiffs had to show "that one or more members of top management knew of material information indicating an earnings decline, but failed to stop the issuance of misleading statements"); *Computer Sys. Eng'g, Inc. v. Qantel Corp.*, 571 F. Supp. 1365, 1374 (D. Mass. 1983) (a plaintiff must prove the state of mind of a corporation's agents in order to prove the state of mind of the corporation). Here, Plaintiffs cannot vaguely allege that "AEP" knew that it was making false and misleading statements, without providing the slightest

detail on exactly who among the Defendants made the allegedly false statements and how that person supposedly knew that his statements were false or misleading.

Moreover, the knowledge of former employees of an AEP subsidiary – who are not even named as defendants in this lawsuit – cannot be imputed to AEP.  Conspicuously, the only individuals alleged to have inaccurately reported prices are former non-management employees who worked with an AEP subsidiary – AEPES – and are not parties to this lawsuit. Plaintiffs cannot transform the misconduct of these unnamed individuals into the scienter of AEP.  To the contrary, in a case with virtually identical facts, the Second Circuit held that allegations of false recording of fictitious trades by a bond trader employed by the General Electric Company's subsidiary were not sufficient to raise any strong inference of scienter against General Electric, the company.  *See Chill v. Gen. Elec. Co.*, 101 F.3d 263, 269-271 (2d Cir. 1996).  In refusing to impute knowledge of the misconduct of its subsidiary's employee to General Electric, the Court explained that "intentional misconduct or recklessness cannot be presumed from a parent's reliance on its subsidiary's internal controls."  *Id.* at 271 (internal quotation and citation omitted).  Similarly, the plaintiffs in *In re Baesa Sec. Litig.*,  could not raise a strong inference of scienter against Pepsico, Inc., by alleging that it had accepted the misleading financials of its subsidiary at face value and incorporated them into its own disclosures.  969 F. Supp. 238, 243 (S.D.N.Y. 1997); *accord Comshare*, 183 F.3d at 554 ("Indeed, this Court should not presume recklessness or intentional misconduct from a parent corporation's reliance on its subsidiary's internal controls.").  Here, as in *Chill* and *Baesa*, Plaintiffs cannot meet their obligation to plead the required "strong inference" of scienter against AEP by alleging only that an employee working with one of its subsidiaries engaged in certain misconduct.

28

## II. PLAINTIFFS' SECTION 11 CLAIM (COUNT I) AND SECTION 10(B) CLAIM (COUNT III) MUST BE DISMISSED BECAUSE PLAINTIFFS HAVE FAILED TO PLEAD ANY MATERIAL MISSTATEMENT OR OMISSION

Plaintiffs do not adequately plead that there was a material misstatement or omission made by any Defendant.  Essential to claims under Section 11 and Section 10(b) are, *inter alia*, (1) a misrepresentation or omission (2) of a material fact.  *See Comshare*, 183 F.3d at 548; *Oxford Asset Mgmt, Ltd. v. Jaharis*, 297 F.3d 1182, 1188-89 (11th Cir. 2002).  All of Plaintiffs' claims rely on alleged omissions, with only two exceptions discussed below.  The plain language of the statutes highlights the importance of the link between the omission and the allegedly misleading statement:  Section 11 makes it unlawful to "omit[] to state a material fact . . . necessary to make the statements therein not misleading."  15 U.S.C. § 77k(a); *see also Haft v. Eastland Fin. Corp.*, 755 F. Supp. 1123, 1131 (D. R.I. 1991) ("Section 11 . . .concern[s] the omission of a material fact whose absence makes other affirmative statements misleading.") (internal citations omitted).  Similarly, Rule 10b-5 makes it unlawful for "any person . . . to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading."  17 C.F.R. § 240.10b-5(b). *see also Helwig*, 251 F.3d at 561 ("duty to provide complete and non-misleading information [only] with respect to subjects on which [the defendant] undertakes to speak") (internal quotation and citation omitted); *In re Nice Sys., Ltd. Sec. Litig.*, 135 F. Supp. 2d 551, 573 (D. N.J. 2001) ("A statement is false or misleading if it is factually inaccurate, or additional information is required to clarify it.") (quotations and citations omitted); *In re Boston Tech., Inc. Sec. Litig.*, 8 F. Supp. 2d 43, 53 (D. Mass. 1998) ("A statement is not rendered misleading by omission merely because the undisclosed fact bears some relation to the subject matter of the statement.").  Clearly, not just any omission will suffice.

Further, conclusory allegations as to the misleading nature of a statement are insufficient to state a claim.  *See Mozes* Order*,* at 50 (claim not stated where plaintiffs make "conclusory" allegations as to why statement was false and misleading); *Comshare*,  183 F.3d at 553 ("Claims of securities fraud cannot rest on speculation and conclusory allegations.") (internal quotation and citation omitted); *cf. Havenick v. Network Express, Inc*., 981 F. Supp. 480, 526 (E.D. Mich. 1997) ("[T]he law now requires a plaintiff to draw a specific nexus between the allegedly fraudulent statements and the facts upon which the allegation of fraud is dependent, or, at least, a clear statement of why and how the plaintiff has reached the conclusion that a particular statement is fraudulent.").

A.    **PLAINTIFFS' SECTION 10(B) CLAIM (COUNT III) MUST BE DISMISSED FOR THE INDEPENDENT REASON THAT PLAINTIFFS HAVE FAILED TO PLEAD ANY MATERIAL MISSTATEMENT OR OMISSION**

(1)    **Plaintiffs Do *Not* Contend That AEP's Financials Were Inaccurate In Any Respect**

While citing and discussing several of AEP's SEC filings and press releases, Plaintiffs not once allege the inaccuracy of any aspect of AEP's financial statements.  *See, e.g.*, Comp. ¶¶ 68 & 71 (alleging statement that "net revenue from energy trading was $83 million, up 242% from the prior year" and that "higher energy trading volume contributed to earnings" was misleading because of omissions; but no allegations that revenue was inaccurately reported). Plaintiffs have not alleged that AEP had to restate any aspect of its financials, that any of its accountants ever requested or even suggested a restatement of any sort, or that any of the SEC or the myriad of governmental agencies that regulate AEP ever demanded that an accounting restatement be made.   The lack of any allegations concerning AEP's financials is evidence that the data reported to Platts had nothing to do with AEP's financials.

(2)    **The Two Alleged Misstatements Are Each Completely True**

30

Plaintiffs' allegations of misstatements, as opposed to omissions, are limited to two statements about AEP's "conservative approach to finance and reporting" and "prudent accounting, financial disclosure and risk management practices."  *Id.* ¶¶ 93, 94.  Neither of these statements was false or misleading in any way.  *Sinay*, 752 F. Supp. at 833  ("This Court must not lose sight of the purpose behind 10b-5, which is to prevent actual fraud. . . . It is not to prevent the disclosure of true information and [plaintiff] has failed to allege sufficient facts to show that these statements were false.")  As an initial matter, Plaintiffs have not alleged any respect in which AEP did not have either a conservative approach to finance and reporting, or prudent accounting, financial disclosure and risk management practices.  Moreover, both of these topics relate to AEP's financial and other public disclosures, which the reporting to Platts did not.  *See, e.g., K-Tel Int'l*, 300 F.3d at 898 (statement not actionable where omission "was unrelated to the subject matter of the statements").  Thus, whether or not a trader reported inaccurate price or volume data to Platts is wholly irrelevant to these statements.  Furthermore, when read in context, these two statements refer to AEP's broader risk management strategies – *i.e.*, across-the-company strategies that impact a company's overall performance and earnings – not those in relation to the specific act of how a trading desk reports to trade publications.  *See, e.g*., February 27, 2002 Our Chairman's Letter to Shareholders (Attached as Exhibit 11).

### (3)    Plaintiffs' Alleged Omissions Fail As A Matter of Law

The remainder of the statements conclusorily alleged to be false and misleading are premised on supposed omissions – the alleged failure to disclose (i) that certain traders had been reporting inaccurate natural gas price and volume data to Platts and (ii) the supposed lack of controls governing the reporting of natural gas trade data to Platts.  However, in order for an omission to be actionable under the securities laws, there must be some relationship that investors would draw between the statement and alleged omission.  *See Boston Tech.*, 8 F. Supp.

31

2d at 59-73 (statements are not actionable that, for example, are "neither inherently concerned [with], nor implicitly referred to," "did not touch on the subject" or "bear no inherent or logical relation to," or where "there exists no even arguable relationship between [the statement] and any of the omissions of fact raised in the Complaint"); *Nice Sys*. 135 F. Supp. 2d at 578 (fraud not pleaded with particularity where effect of specific problem on entire company not explained); *Stransky v. Cummins Engine Co., Inc*., 51 F.3d 1329, 1334 (7th Cir. 1995) (press releases cannot be basis for liability under Rule 10b-5 where they were not "directly related" to information plaintiffs claim should have been disclosed).  Therefore, Plaintiffs' attempt to allege an omission about natural gas data reporting from statements about unrelated matters is deficient as a matter of law.

Were Plaintiffs' theory to be accepted, all statements that would otherwise be accurate would be transformed into misstatements whenever a company later discovers past wrongdoing by employees and takes corrective action.  Recognizing the absurdity of this result, courts have repeatedly held that a statement can contain a material omission only with respect to the topics being spoken about in the statement.  *See In re Ford Motor Co. Sec. Litig*., 184 F. Supp. 2d 262, 633 (E.D. Mich. 2001) (public statements not actionable where they do not relate to omissions); *Boston Tech*., 8 F. Supp. 2d at 59-73.  Thus, Plaintiffs' creative effort to say that Defendants' statements about financial condition and management controls "failed to disclose" that five traders inaccurately reported natural gas price and volume information is insufficient, as a matter of law, to plead a misstatement or omission.

For example, Plaintiffs repeatedly highlight statements about AEP's wholesale organization's contribution to earnings, *see, e.g.*, Comp. ¶ 68, 69, 80, and then allege that the statement is misleading because AEP failed to disclose the inaccurate reporting and lack of

32

procedures to verify reporting. *See, e.g.*, Compl. ¶ 71, 81.  However, Plaintiffs fail to explain – as

is their burden under the heightened pleading standard – why the inaccurate reporting and lack of

verification makes the earnings reports misleading.  *See Rombach v. Chang*, No. 00-CV-0958,

2002 WL 1396986, at *7 (E.D.N.Y. June 7, 2002) (Attached as Exhibit 12) (claim dismissed

where plaintiffs' "allegations do not sufficiently explain how any of the statements attributed to

Defendants are false or misleading").

   Similarly, Plaintiffs allege that a press release about AEP's responses to FERC's

May 2002 inquiries is misleading because it did not disclose the inaccurate reporting to Platts.

Compl. ¶¶ 107-08.  As explained above (*see* Background, *supra*) however, FERC was **not**

inquiring about inaccurate reporting in May 2002; instead, the inquiries asked specifically about

"wash trades."  Therefore, the fact that AEP discussed wash trades, and not inaccurate reporting

to Platts, was not misleading in any way.  If these types of allegation were deemed sufficient,

plaintiffs would be able to bring a securities fraud action alleging false earnings reports any time

a company does not disclose any type of problem within a division that contributes to that

company's earnings.

   Moreover, the inaccurate reporting of natural gas trade data could have affected,

at most, Platts' price indices, and Plaintiffs do not offer any suggestion as to how or why the

reasonable investor's investment decision would have been affected by any error in natural gas

price indices.  *See generally Cione v. Gore*, 843 F. Supp. 2299, 1205 (N.D. Ohio 1994) (noting

that 1934 Act "was intended to protect investors against unfair manipulation of market price;

dismissing action where "statements at issue . . . are incapable by their nature of effecting any

manipulation of defendant's share price").

   **(4)  "Puffery" Is Not Actionable**

Many of the alleged misstatements amount to, at most, mere puffery.  AEP's exhortations about employees who "set a standard for excellence," Compl. ¶ 83, or that they will "continue [their] record of success," *id.* ¶ 85, are exactly the type of statements that courts have recognized are not relied upon by investors in their decisions about whether to continue investing in AEP.  *See Mozes* Order*,* at 48 ("vague, optimistic statements" are not actionable because "the market price of AEP's stock would not rise or fall on such statements"); *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 869 (5th Cir. 2003) ("The generalized, positive statements about the company's competitive strengths, experienced management, and future prospects are not actionable because they are immaterial."); *In re Royal Appliance Sec. Litig.*, 64 F.3d 663, 1995 WL 490131, at *3 (6th Cir. Aug. 15, 1995) (Attached as Exhibit 13) (allegations that a company engaged in general puffery is insufficient to claim securities fraud; statements such as "[defendant] is on track to have a terrific year" properly dismissed).

Similarly, many of the vague statements about future growth are, at most, immaterial puffery.  For example:

- "By using our rapidly expanding – and successful – electricity and gas marketing and trading operation, we have a unique ability to unleash the value of our generating assets in the competitive marketplace." Compl. ¶ 62.

- "We are going to move aggressively to grow our trading and marketing businesses and expand operations to be a leader in all energy commodities." *Id.* ¶ 66.

- "Our focus for growth moving forward, plain and simple, will be the wholesale business – generation and related energy assets, wholesale marketing and trading . . . With our large generating fleet and very successful trading organization, we are already in an excellent position as our markets move toward deregulation and competition. . . . Our wholesale and trading organization is the best in the business, in my opinion." *Id.* ¶ 70.

34

*See Mozes* Order, at 48 (explaining that statements are inactionable puffery if "no reasonable investor would rely" upon them); *Nice Sys*., 135 F. Supp. 2d at 580 (statement of continued growth in press release announcing earnings is immaterial puffery; no allegations that earnings figures were false); *Raab v. Gen. Physics Corp*., 4 F.3d 286, 289-90 (4th Cir. 1993) (holding that a statement that the defendant "is poised to carry the growth and success of 1991 well into the future" was puffery).  Therefore, AEP's "puffery" cannot be the basis for liability under the securities laws.  As Plaintiffs have failed to allege any materially false or misleading statements, Count III of the Complaint must be dismissed.

B.    **PLAINTIFFS' SECTION 11 CLAIM (COUNT I) MUST BE DISMISSED BECAUSE PLAINTIFFS HAVE FAILED TO ALLEGE ANY MATERIAL MISSTATEMENT OR OMISSION IN A REGISTRATION STATEMENT**

Liability under Section 11 of the Securities Act is limited to false or misleading statements in registration statements and documents incorporated by reference therein.  *See* 15 U.S.C. § 77k.  Plaintiffs' Section 11 claim focuses on three statements.  Compl. ¶¶ 54, 56, 59. All three statements are alleged to have omitted either that (i) traders had reported inaccurate volume and trade information to trade publications or (ii) AEP's supposed lack of procedures to ensure the accuracy of data reported to  Platts.  *Id.* ¶¶ 55,[7] 57, 60.   For the reasons set forth

---

[7]      In paragraph 55, Plaintiffs incorrectly, and with no factual basis, allege that "AEP" instructed its traders to report incorrect information.  As explained in the FERC report and various press releases, one person, the head of the trading desk (an employee who was not an officer or director and who had no authority to bind the company), is alleged to have instructed the traders below him to inaccurately report information.  *See, e.g* ., Compl. ¶ 48 ("AEP traders stated that they were instructed by the head of AEP's trading desk to adjust the price and volumes of trades they had made and, in some cases to report trades that never occurred.").   There have been no allegations that anyone else in AEP took part in the inaccurate reporting.  This is one of many examples of Plaintiffs impermissibly imputing activities by individuals to the entire company.  *See* Point I-A, *supra*.

below, Plaintiffs have not pled particularized facts showing that any of these three statements

was false or misleading in any respect.

> **(1)     The Risk Factor Section Does Not Contain Any False Or Misleading Statements**

The first statement that Plaintiffs allege to be misleading is a lengthy excerpt from

the Risk Factor section of the Registration Statement:

> We sell power from our generation facilities into the spot market
> or other competitive power markets or on a contractual basis.  We
> also enter into contracts to purchase and sell electricity, natural gas
> and coal as part of our power marketing and energy trading
> operations.  With respect to such transactions, we are not
> guaranteed any rate of return on our capital investments through
> mandated rates, and ***our revenues and results of operations are
> likely to depend, in large part, upon prevailing market prices for
> power in our regional markets and other competitive markets.***
> These market prices may fluctuate substantially over relatively
> short periods of time.  It is reasonable to expect that trading
> margins may erode as markets mature and that there may be
> diminished opportunities for gain should volatility decline.  In
> addition, the Federal Energy Regulatory Commission (the
> "FERC"), which has jurisdiction over wholesale power rates, as
> well as independent system operators that oversee some of these
> markets, may impose price limitations, bidding rules and other
> mechanisms to address some of the volatility in these markets.
>
> Our energy trading (including fuel procurement and power
> marketing) activities expose us to risks of commodity price
> movements.  ***We attempt to manage our exposure through
> enforcement of established risk limits and risk management
> procedures.***  These risk limits and risk management procedures
> may not always be followed or may not work as planned and
> cannot eliminate the risks associated with these activities.  As a
> result, we cannot predict the impact that our energy trading and
> risk management decisions may have on our business, operating
> results or financial position.  We routinely have open trading
> positions in the market, within established guidelines, resulting
> from the management of our trading portfolio.  To the extent open
> trading positions exist, fluctuating commodity prices can improve
> or diminish our financial results and financial position.

Compl. ¶ 54 (emphasis in Complaint).

36

Plaintiffs fail to state with particularity any way in which this statement is false. AEP's revenues and results did depend, "in large part, upon prevailing market prices for power," and AEP did "attempt to manage [its] exposure through enforcement of established risk limits and risk management procedures."  *See Cooperman v. Individual. Inc*., 171 F.3d 43, 51 (1st Cir. 1999) (statement not actionable where the allegedly misleading section was "complete and accurate on its face" and omission did not render it misleading).  Further, the sentences emphasized by Plaintiffs are surrounded by cautionary language.  *See Zucker v. Quasha*, 891 F. Supp. 1010, 1014 (D. N.J. 1995) ("[T]he allegations of the complaint are not read in isolation; they cannot be separated from the language of the prospectus, including whatever cautionary language appears in that text."); *Mozes* Order, at 51 (statement not actionable where "a complete reading of the press release dispels the interpretation advanced by plaintiffs").  Indeed, the very next sentence states that "These risk limits and risk management procedures **may not always be followed or may not work as planned** and cannot eliminate the risks associated with these activities."  (Compl. ¶ 54 (emphasis added).)

Plaintiffs strive to transform statements that even they concede to be truthful on their face into false statements by claiming that they "omit" information on a wholly unrelated subject.  Plaintiffs' effort to come up with an actionable omission similarly fails because, in order for an omission to be actionable under the securities laws, there must be some relationship that investors would draw between the statement and alleged omission.  *See In re Ford Motor Co. Sec. Litig.*, 184 F. Supp. 2d at 633 (plaintiffs' theory of case "untenable" where statements are accurate and omissions do not relate to them); *In re Boston Tech. Sec. Litig.*, 8 F. Supp. 2d at 59-66 (comments on "growth in the marketplace in general" and defendants "focus on developing good products for that marketplace" not actionable as they "bear no inherent or

37

logical relation to any of the facts [defendant] is charged with failing to disclose," all of which dealt with very specific areas of business); *Kaufman v. Motorola, Inc*., No. 95-CV-1069, 1999 WL 688780, at *8 (N.D. Ill. Apr. 16, 1999) (Attached as Exhibit 14) ("alleged material omissions should relate directly to the express statements defendant has made" such as "[i]nventory excesses are sufficiently related to product demand") (internal citation omitted). Here, the alleged omission relates to (i) the reporting of natural gas trade data to an industry publication that does not report the data as received separately by company, but only in composite form, and (ii) procedures governing the foregoing. Plaintiffs fail to explain – as is their burden – how the failure to discuss these topics made AEP's statement of macro-level risk factors misleading in any respect. Simply put, where, as here, the alleged omission has nothing to do with the statement in question, there is, as a matter of law, no actionable omission.

### (2) The Platts Gas Daily Ranking Is Not Misleading

Plaintiffs next allege that the following statement that appeared in AEP's 2001 10-K and 2002 First Quarter 10-Q is misleading: "Platts Gas Daily ranked AEP Nos. 14, 10, and 2 in gas sales for the first, second and third quarters, respectively, of 2001." Compl. ¶ 56. As an initial matter, Plaintiffs do not allege – because they cannot – that *Gas Daily* did not rank AEP "Nos. 14, 10 and 2 in gas sales for the first, second and third quarters, respectively, of 2001."

Moreover, Plaintiffs fail to explain how the statement is misleading in any way. *See Oxford Asset Mgmt,* 297 F.3d at 1194 ("The complaint has failed to plead facts that, if true, would constitute a misrepresentation . . . and does nothing more than offer the legal conclusion that the representation in the prospectus was somehow misleading."). As with the previous statement, Plaintiffs merely state the fact that traders inaccurately reported information to *Gas Daily* and conclude that the statement as to AEP's ranking by *Gas Daily* was false because of that fact. However, Plaintiffs skip the crucial step of explaining how that fact is supposed to

38

render the statement misleading. For example, Plaintiffs have not even alleged that the inaccurate reporting altered AEP's *Gas Daily* rankings.

### (3) The FERC Responses Are Not False Or Misleading

The final allegedly false and misleading statement under Section 11 is AEP's statement about its responses to FERC's inquiries. Compl. ¶ 59. AEP stated that, in response to FERC's requests, it had "reviewed its records and 'interviewed relevant personnel,' and based upon that review, informed FERC that it was not aware of any improper activity by AEP personnel." *Id.* Once again, Plaintiffs do not allege that either of the affirmative representations made by AEP was incorrect in any respect, but instead return to their stock of allegations of failure to disclose the inaccurate reporting of trade data to Platts.

Here, Plaintiffs attempt to bolster their case by mischaracterizing FERC's inquiries and distorting AEP's responses thereto, by selectively quoting from AEP's Prospectus. As this Court has pointed out, such a pleading tactic is unacceptable – a plaintiff cannot make allegations contrary to the facts at his or her disposal. *See Mozes* Order, at 58 (plaintiffs cannot cite and quote "from a plethora of AEP's press releases and financial statements in their complaint, but fail[] to cite or quote the three press releases in which AEP informed the public" of the information plaintiffs allege was withheld); *Mozes* Order, at 51 (statement not actionable where "a complete reading of the press release dispels the interpretation advanced by plaintiffs, which was aided by plaintiffs' omission of certain language"); *Leventhal*, 48 F. Supp. 2d at 113 (plaintiff improperly "selectively cites" from documents in order to support claims).

As stated in the Complaint, FERC's February 2002 inquiry concerned short-term price manipulation in the Western System Coordinating Council ("WSCC"). Compl. ¶ 58. That inquiry was initiated in response to the California energy crisis of 2000-2001 and the subsequent discovery of assorted price manipulation practices by Enron, and had nothing to do with the

39

reporting of inaccurate data to trade publications.  *See* Background, *supra*.  Similarly, the May

21, 2002 data request also pertained solely to "wash," "round trip" and "sale/buy back" trading.

*Id.*  This inquiry also was **not** related in any way to the inaccurate reporting of data to trade

publications.

Because the subject matters of FERC's inquiries were (i) conduct in the WSCC

and (ii) wash trades, it is not at all surprising that AEP discussed (i) conduct in the WSCC and

(ii) wash trades, and not the unrelated issue of inaccurate reporting to Platts.

C.  **ANY MISSTATEMENTS OR OMISSIONS THAT MAY BE ALLEGED ARE**
      **IMMATERIAL AS A MATTER OF LAW UNDER SECTIONS 10(B) AND 11**

Even if Plaintiffs had pled a misstatement or omission, they must also adequately

allege that the misstatement or omission was material. *See* 15 U.S.C. § 78j(b); 17 C.F.R.

§ 240.10b-5; 15 U.S.C. § 77k(a).  A misstatement or omission is only material if a reasonable

investor would have viewed the statement or omissions "as having significantly altered the total

mix of information made available." [8]  *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988)

(internal citation omitted); *see also Cione*, 843 F. Supp. at 1205 (claims dismissed where

"statements at issue . . . are incapable by their nature of effecting any manipulation of

defendant's share price").  Where, as here, the "lack of import of the omission is so plain that

reasonable minds cannot differ thereabout [it is] proper for the court to pronounce the omission

immaterial as a matter of law."  *Oxford Asset Mgmt.*, 297 F.3d at 1189.

Further, issuers do not have a duty to detail all material information in their public

disclosures.  Rather, only that information necessary to make the disclosures not misleading must

be disclosed.  15 U.S.C. § 77k; 17 C.F.R. § 240.10b-5(b).  Therefore, there must be an

---

[8]      The same standard of materiality "applies generally" throughout the securities laws.
         *Riedel v. Acutote of Colo.*, 773 F. Supp. 1055, 1063 (S.D. Ohio 1991).  *See also Zucker*,
         891 F. Supp. at 1014 (materiality analysis same for claims under Sections 10(b) and 11).

articulable relationship between the statement and the alleged omission. *See generally Oxford Asset Mgmt.*, 297 F.3d at 1189 ("To hold that section 11(a) imposes liability unless the prospectus includes **all** material facts is simply to wholly ignore and render superfluous the section's qualifying language. . . . [T]o require **all** material information to appear in the prospectus would, like setting the threshold for materiality too low, result in registrants burying the shareholders in an avalanche of trivial information – a result hardly conducive to informed decisionmaking") (quotations omitted); *Greenapple v. Detroit Edison Co.*, 468 F. Supp. 702, 711 (S.D.N.Y. 1979) (omissions not material where they were "little more than piecemeal attacks on individual terms and entries in the defendant's prospectus coupled with assertions that they do not explain all the plaintiff might have wanted to know about [the company]").

Here, Plaintiffs allege that a variety of AEP's public disclosures are false and/or misleading because AEP did not disclose that traders were inaccurately reporting information to the trade press. What Plaintiffs fail to explain is how the allegedly false and/or misleading statements are material to the buyers of AEP's common stock or equity units. Plaintiffs discuss not once why the inaccurate reporting of natural gas prices would in any way alter the investment decisions of purchasers of AEP equity securities. The improper reporting – which was not disclosed because AEP did not know about it – simply had no effect on the "total mix" of information available to investors.

## III. PLAINTIFFS' CONTROL PERSON CLAIMS (COUNTS II AND IV) FAIL AS A MATTER OF LAW

Section 15 of the Securities Act and Section 20(a) of the Exchange Act impose secondary liability on persons who control those who violate Section 11 and Section 10(b), respectively. Under both sections, "control person" liability is secondary only; it does not exist in the absence of a primary violation. *See In re Empyrean Bioscience, Inc. Sec. Litig.*, 255 F.

Supp. 2d 751, 767 (N.D. Ohio 2003). Because Plaintiffs have failed to state a claim under either

Section 11 or Section 10(b), their control person claims must be dismissed as well.

Even if any of Plaintiffs' underlying claims survive, however, Plaintiffs have

failed to adequately allege that any of the Individual Defendants qualify as "control persons." In

order for there to be "controlling person" liability, Plaintiffs must allege specific facts showing

both that (i) each Individual Defendant exercised control over the operations of AEP in general

**and** (ii) that the defendant possessed the power to control the transaction on which the primary

violation rests. *See Sanders Confectionary Prods., Inc. v. Heller Fin. Inc.*, 973 F.2d 474, 486

(6th Cir. 1992), *cert. denied*, 506 U.S. 1079 (1993). Moreover, given that the underlying claims

sound in fraud, the particularity requirements of Rule 9(b) and the PSLRA apply to these

"controlling person" claims. *See Picard Chem. Inc. Profit Sharing Plan v. Perrigo Co.*, 940 F.

Supp. 1101, 1135 (W.D. Mich. 1996).

Plaintiffs' theory is, essentially, that the Control Person Defendants should be

liable as "control persons" primarily because they are, or were, officers of AEP. Plaintiffs'

boilerplate statements that the Control Person Defendants "[b]y virtue of their high-level

positions, their substantial stock ownership, participation in and/or awareness of the Company's

operations and/or intimate knowledge of the Company's true financial condition" (Compl. ¶ 157)

were "controlling persons" is not sufficient to plead "control person" liability. *See Herm v.

Stafford*, 663 F.2d 669, 684 (6th Cir. 1981) ("There must be some showing of actual

participation in the corporation's operations of some influence before the consequences of

control may be imposed."); *Lansing Automakers' Fed. Credit Union v. MCG Portfolio Mgmt.

Corp.*, No. 5:89-CV-52, 1991 WL 238974, at *3 (W.D. Mich. Sept. 12, 1991) (Attached as

Exhibit 15) ("A director or officer is not, simply by virtue of his position, a controlling person

under the federal securities laws.")  These non-particularized allegations of "control" are not sufficient to meet the stringent pleading requirements imposed by the PSLRA.  *See In re WRT Energy Sec. Litig.*, 1997 U.S. Dist. LEXIS 14009, at *42 ("allegations of access [to adverse non-public information], standing alone, do not constitute strong circumstantial evidence of conscious misbehavior or recklessness").  Accordingly, Plaintiffs' "control person" claims should be dismissed.

## IV.    PLAINTIFFS SHOULD NOT BE PERMITTED TO AMEND THEIR COMPLAINT

If the Court dismisses the Complaint, Defendants respectfully submit that the Court should deny Plaintiffs leave to amend.  The strict PSLRA pleading requirements trump the general pleading requirements in the Federal Rules of Civil Procedure.  *See, e.g.*, *In re Champion Enters., Inc., Sec. Litig.*, 145 F. Supp. 2d 871, 873 (E.D. Mich. 2001) ("The plain language of the [PSLRA] does not contemplate amending complaints . . . . The necessary goal of this plain, and strong language, is that it should be dismissed **with prejudice**.") (emphasis in original).  In addition, Plaintiffs have already been granted leave to file an amended complaint, which they did in July 2003.  As this Court recently wrote in dismissing with prejudice another securities class action filed against AEP and certain of its officers and directors, "[t]hese Attorneys are well aware of the pleading requirements under the PSLRA as well as the pleading requirements for fraud in general.  If the attorneys failed to include facts in the complaint, they did so at their own peril."  *Mozes* Order, at 97.  Having filed an initial complaint and an amended complaint, Plaintiffs are not entitled to a third try.

## CONCLUSION

For the reasons set forth above, this Court should dismiss the Complaint in its

entirety and award Defendants such other and further relief as the Court deems just and proper.

Respectfully submitted,

By: /s/ Alvin J . McKenna
Alvin J. McKenna, Trial Attorney (0023145)
Fred. G. Pressley, Jr., Of Counsel (0023090)
PORTER WRIGHT MORRIS & ARTHUR
41 South High Street
Columbus, Ohio 43215
(614) 227-2000 (phone)
(614) 227-2100 (fax)

Of Counsel:

D. Michael Miller (0023117)
Barbara A. Belville (0012206)
AMERICAN ELECTRIC POWER SERVICE
CORPORATION LEGAL DEPARTMENT
1 Riverside Plaza, 29th Floor
Columbus, Ohio 43215
(614) 223-1000 (phone)
(614) 223-1687 (fax)

Michael J. Chepiga, Of Counsel
Joseph M. McLaughlin, Of Counsel.
George S. Wang, Of Counsel
Jennifer T. Barall, Of Counsel
SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
New York, New York 10017
(212) 455-2000 (phone)
(212) 455-2502 (fax)

**Attorneys for Defendants American
Electric Power Company, Inc., E. Linn
Draper, Jr., Thomas Shockley, III, Susan
Tomasky, J.M. Buonaiuto, E. R. Brooks,
Donald M. Carlton, John P. DesBarres,
Robert W. Fri, William R. Howell, Lester
A. Hudson, Jr., Leonard Kujawa, Richard
Sandor, Donald G. Smith, Linda Gillespie
Stuntz, and Kathryn D. Sullivan**

44

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that a true and accurate copy of the foregoing Defendants Motion to Dismiss the Consolidated Amended Complaint (with Exhibits) has been served by United States mail, postage prepaid, this 22nd day of September, 2003 on the following:

> Richard S. Wayne
> William K. Flynn
> Joseph J. Braun
> STRAUSS & TROY
> The Federal Reserve Building
> 150 East Fourth Street
> Cincinnati, OH 45202-4018
>
> Liaison Counsel for Plaintiffs
>
> and
>
> Andrew L. Barroway
> Stuart L. Berman
> Darren J. Check
> Sean M. Handler
> SCHIFFRIN & BARROWAY LLP
> Three Bala Plaza East
> Suite 400
> Vala Cynwyd, PA 19004
>
> Lead Counsel for Plaintiffs

 /s/ Alvin J. McKenna by Jennifer T. Barall
Alvin J. McKenna
