## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| **THE ALBERT FADEM TRUST,** *et al.,* | : | |
| | : | |
| **Plaintiffs,** | : | |
| | : | **Consolidated Case No. C2-02-1045;** |
| **v.** | : | **C2-02-1060; C2-02-1076; C2-02-1087;** |
| | : | **C2-02-1094; C2-02-1104; C2-02-1113;** |
| | : | **C2-02-1132; C2-02-1141; C2-02-1261** |
| **AMERICAN ELECTRIC POWER** | : | **and C2-02-1211** |
| **COMPANY, INC.,** *et al.,* | : | |
| | : | **JUDGE ALGENON L. MARBLEY** |
| **Defendants.** | : | **Magistrate Abel** |
| | : | |
| | : | |
| **THIS DOCUMENT RELATES TO:** | : | |
| **All Actions** | : | |

### OPINION & ORDER

## I.  INTRODUCTION

This case is before the Court on the Motion to Dismiss the Consolidated Amended

Complaint ("CAC") filed by Defendants, American Electric Power Company, Inc. ("AEP"), E.

Linn Draper, Jr., Thomas Shockley, III, Susan Tomasky, J.M. Buonaiuto, E.R. Brooks, Donald

M. Carlton, John P. DesBarres, Robert W. Fri, William R. Howell, Lester A. Hudson, Jr.,

Leonard Kujawa, Richard Sandor, Donald W. Smith, Linda Gillespie Stuntz, and Kathryn D.

Sullivan (the "Individual Defendants," and collectively with AEP, the "Defendants").[1]  For the

---

[1]Plaintiffs make the following allegations about the Individual Defendants:
Defendant E. Linn Draper, Jr. ("Draper") was, at all relevant times, AEP's and American
Electric Power Service Company's ("AEPSC") Chairman, President, and Chief Executive
Officer ("CEO").  Defendant Thomas Shockley, III ("Shockley") joined AEP in June of 2000
and served as AEPSC's Vice Chairman.  In September 2001, Shockley also became AEP's Chief
Operating Officer ("COO") with overall responsibility for AEP's regulated and unregulated
businesses.  Shockley reported directly to Draper.  Defendant Paul D. Addis ("Addis") was, at all
relevant times, the President of American Electric Power Energy Services ("AEPES") and an

following reasons, the Motion to Dismiss is **GRANTED** and the Motion for Leave to file a

Second Consolidated Amended Complaint ("SCAC") is **DENIED**.

Plaintiffs failed to plead Defendants' *scienter* with the particularity required by the

Federal Rules of Civil Procedure Rule 9(b) and the Private Securities Litigation Reform Act

("PSLRA").  Thus, dismissal of their claims under Section 10(b) and Rule 10b-5 is warranted.

Because Plaintiffs fail to allege any actionable omissions or affirmatively misleading material

statements, their Section 10(b) and Rule 10b-5 warrant further dismissal.  This failure also

provides the basis for dismissing Plaintiffs' claim under Section 11.  Finally, without any

primary liability, Plaintiffs cannot state a claim under Sections 15 or 20(a) for control person

liability.

---

Executive Vice President of AEP until his resignation was announced on September 28, 2001.
He was succeeded by Defendant Eric van der Walde.  Prior to September of 2001, van der Walde
also allegedly directed AEP's domestic trading operations, beginning with the company in 1997
as AEPES's Senior Vice President of Trading.  From September 28, 2001, it is further averred
that van der Walde reported directly to Shockley.  Defendant Steven A. Appelt ("Appelt") was at
all relevant times responsible for the administrative functions of AEPES's trading group,
including the middle office and financial accounting functions.  In January 2000, Appelt was
named AEPES's Senior Vice President - Administration and in September 2001, was promoted
to AEP's Executive Vice President - Administration for AEPES.  From September 28, 2001,
Appelt reported directly to Shockley, as well.  Defendant Susan Tomasky ("Tomasky") joined
AEP in 1998 as a Senior Vice President. On January 26, 2000 Tomasky was promoted to
Executive Vice President of Policy, Finance, and Strategic Planning of AEPSC.  Defendant J.M.
Buonaiuto ("Buonaiuto") was the Company's Controller and Chief Accounting Officer.  The
aforementioned people are referred to, collectively, throughout this Opinion & Order as the
"Executive Defendants."
     Defendants Brooks, Carlton, DeBarres, Fri, Howell, Hudson, Jr., Kujawa, Sandor, Smith,
Stuntz, and Sullivan (collectively the "Director Defendants") all allegedly were Directors of
AEP during the Class Period.
     Plaintiffs further allege that the following Individual Defendants all signed the
Registration Statement: Draper, Shockley, Tomasky, Buonaiuto and all of the Director
Defendants (collectively referred to herein as the "Securities Act Defendants").

2

## II.  FACTS[2]

This is a federal securities class action brought under Sections 11 and 15 of the Securities

Act of 1933 (the "Securities Act"), 15 U.S.C. §§ 77k and 77o; Sections 10(b) and 20(a) of the

Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a); and the

rules and regulations promulgated thereunder by the Securities Exchange Commission ("SEC"),

including Rule 10b-5, 17 C.F.R. § 240.10b-5.  The claims under the Exchange Act are brought

on behalf of all persons and entities who purchased or otherwise acquired AEP common stock

between February 10, 2000 and October 9, 2002, inclusive (the "Class Period").[3]  The claims

under the Securities Act are brought on behalf of all persons and entities who acquired shares of

AEP common stock or AEP 9.25% equity units ("Equity Units") in a secondary offering on or

about June 5, 2002 (the "Secondary Offering").[4]  Essentially, Plaintiffs contend that AEP and the

Individual Defendants knew about or recklessly disregarded practices that the company engaged

---

[2]These facts were drawn largely from the Plaintiffs' CAC, along with undisputed facts offered by Defendants in their Motion to Dismiss and the FERC Report, where appropriate to present a true, accurate and/or more comprehensive accounting of the factual background relevant to this Motion.

[3]Lead Plaintiff, Private Asset Management ("Lead Plaintiff"), purchased AEP common stock during the Class Period, as set forth in its certification previously filed with the Court, and allegedly suffered damages.  Lead Plaintiff was appointed by Order of the Court dated April 23, 2003.  In connection with the Secondary Offering, Plaintiff Gary Kosseff purchased Equity Units and Plaintiff Everett W. Holland, Jr. purchased common stock issued pursuant to the Registration Statement and allegedly suffered damages, as set forth in their certifications attached to the Consolidated Amended Complaint as Exhibit A.  By Order on March 30, 2004, the case brought by Plaintiff Phillip C. Kulinski, Jr. against Defendants, 03-CV-412, also was consolidated for all pretrial purposes.

[4]It is alleged that these were acquired pursuant or traceable to the Company's Form S-3 Registration Statement, filed April 11, 2002 and amended Registration Statement (Form S-3/A) filed on May 16, 2002 (collectively the "Registration Statement").

in during the Class Period and concealed the practices to cause the price of the Company's stock to become artificially inflated.

Defendant AEP is a public utility holding company that directly or indirectly owns various public utility companies operating in Arkansas, Indiana, Kentucky, Louisiana, Michigan, Ohio, Oklahoma, Tennessee, Texas, Virginia and West Virginia.  Before 1997, AEP's business consisted of AEP and its wholly-owned subsidiaries, and the company derived operating revenue by selling power from the subsidiaries' generation facilities into the spot market, other competitive power markets, or on a contractual basis.  AEP's many subsidiaries are involved in power engineering and construction services; energy management; the operation of natural gas pipelines, natural gas storage and coal mines; and wholesale energy trading and marketing.  In addition, AEP owns a service company subsidiary, American Electric Power Service Corporation ("AEPSC"), which provides accounting, administrative, information systems, engineering, financial, legal, maintenance and other services at cost to the other AEP companies.

As for AEP's wholesale energy trading venture, in 1997, AEP established another subsidiary, AEP Energy Services ("AEPES"), for the purpose of trading energy on the newly deregulated wholesale markets.[5]  Employees of AEPSC, known as "traders," worked on behalf of AEPES to make these trades.[6]  AEPES quickly grew into one of the biggest traders in the

---

[5]AEPES operated trading desks in Columbus, Houston, London and Oslo.

[6]These energy trading transactions involved the purchase and sale of electricity and natural gas under physical forward contracts at fixed and variable prices and the trading of electricity and natural gas contracts including exchange traded futures and options and over-the-counter options and swaps.

industry, and it is undisputed that AEP touted the success of AEPES and the energy trading business to its investors throughout the Class Period.

The primary government body overseeing the energy trading markets is the Federal Energy Regulatory Commission ("FERC").  The industry came under heightened scrutiny beginning in 2000-2001 because of the California Energy Crisis.[7]  In February of 2002, the FERC started investigating whether energy traders, in particular, had manipulated short-term energy prices in California and the Western United States by engaging in so-called "round-trip" or "wash" trades.[8]  Pursuant to its investigation, the FERC requested data from over 100 companies, including AEP, regarding whether the companies had engaged in such "round-trip trades," "wash" trades, or other manipulative transactions.[9]  Accordingly, AEP undertook an

---

[7]  It has been determined that the crisis resulted from unprecedented price increases in the electricity market and spot gas prices.

[8]According to the SEC, "round-trip" or "wash" trades are, "simultaneous, pre-arranged buy-sell trades of energy with the same counter-party, at the same price and volume, and over the same term, resulting in neither profit nor loss to either transacting party." *Dynegy Settles Securities Fraud Charges Involving SPEs, Round-Trip Energy Trades*, (Sept. 24, 2002), at http://www.sec.gov/news/press/2002-140.htm.  The CAC does not allege, however, that Defendants engaged in such transactions.

[9]It seems clear from the FERC Report that this first request did not seek information about or require the companies to conduct internal investigations specifically into their method or history of reporting to trade publications.  Furthermore, because the FERC investigation was prompted by the California Energy Crisis, it initially focused exclusively on practices and companies that operated in the Pacific Northwest. The FERC, it appears, did not begin investigating publicly reported price data fully and outside of the California market (it is not alleged that AEP operates in California) until after the Dynegy announcement.  According to its Report, the FERC did not make data requests to companies regarding their reporting practices until October 22, 2002.  Final Report on Price Manipulation in Western Markets: Fact-Finding Investigation of Potential Manipulation of Electric & Natural Gas Prices, Docket No. PA02-2-000 (March 2003) (hereinafter "FERC Report"), at III-2.

internal investigation, and on May 13, 2002 and on May 30, 2002, it publicly reported that it did not engage in "round-trip" or "wash" trades, and the CAC does not allege that it did.

On September 25, 2002, however, Dynegy, another major energy company, reported that fifteen of its employees had engaged in another type of manipulative practice – inaccurate reporting to trade publications. Trade industry publishers (the "Trade Press"), such as Platts, compile and publish daily and monthly natural gas price indices, statistics, trading volumes, and other related information[10] in trade publications such as *Inside FERC* (monthly indices) and *Gas Daily* (daily indices). The price indices in these publications are determined, in large part, from information reported by natural gas market participants, primarily traders employed by the various energy companies.

Traders provide "reports" to reporters employed by Platts, who conduct interviews, primarily via phone and facsimile, to get information regarding trades: prices, dates, volumes and sometimes the counterparties with whom the trades were made. Once gathered, all this information, including the source, is kept confidential by Platts. Platts takes the data, "sorts prices from low to high, looks for 'outliers' . . . , cross-checks with counterparties, and calculates descriptive statistics . . . The index price is based on this analysis." FERC Report, at III-3. The

_____

[10]It is interesting to note that in the section of the FERC Report titled, "Staff Reaction to the Admissions of False Reporting" the FERC details the ways in which these reports are compiled, and used and their effects within and outside of the industry. III-15 - III-19. Notably, not once in the discussion of the effects of inaccurate reporting is there any mention of *investors*. Rather, the facts of this case seem to point towards a fraud, or wrong, perpetrated on the *consumer*. *See, e.g.*, FERC Report, at III-18-19; III-55 (discussing how manipulation of price indices "ultimately hurts consumers," because of the resulting misallocation of scarce resources such as natural gas, and that electricity prices are directly and indirectly determined by natural gas prices, such that the manipulation of gas prices also affected electricity prices). In fact, the United States Commodity Futures Trading Commission has filed a case against AEP and AEPES alleging that the companies' actions violate the Commodity Exchange Act.

accuracy of such data seems important because the price indices are used in determining the price of natural gas over time.  Plaintiffs do not contend, however, that Platts and its publications actually set the prices.  Nevertheless, prior to the Dynegy announcement, the FERC discovered that almost none of the companies within the industry had internal controls to regulate reporting.[11]

The lack of internal controls was one of the primary findings of the FERC investigation into the specific issue of false reporting.  From the FERC Report, it appears that this round of the investigation began on October 22, 2002, when the FERC sent data requests to the largest natural gas marketers inquiring about their "past reporting practices, any internal procedures or controls they may have had in place; any changes they have made to those procedures; and any investigations they [had] in progress."  FERC Report, at III-19.  AEP allegedly began

---

[11]"In short, the investigations and responses to the data requests indicate that the companies had little, if any, formal procedures in place to ensure the accuracy of the data reported to the Trade Press."  FERC Report, at III-3.  *See also* FERC Report, at III-29 ("The answers to the questions in the October 22, 2002 Data Request show that the industry lacked systematic reporting procedures and internal verification processes.").

The FERC Report does note one exception (BP Energy), but simultaneously acknowledges that it is "a notable exception."  FERC Report, at III-29, n. 20.  It also is interesting that the FERC concluded that "[i]t is clear from BP's response to the Staff data request that *it recognized the influence a significant trader such as itself could have on the published indices*.  BP put internal controls in place to ensure the accuracy of the reported data and a [sic] employed a system of accountability for the trading desk heads."  The FERC does not allege elsewhere in its Report that any other companies such as Dynegy or AEP understood the influence of their reporting on price indices.  Circumstances, in fact, suggest that they may not have because they all engaged in inaccurate reporting allegedly to "cancel" each other out, so that it may have been that they either did not understand that their reporting had any significant effect beyond cancelling out the inaccurate reporting by others or they simply were unaware of what effect it did have simply because they believed the other companies were doing the same, usually in greater degree (for example, all companies seemed to believe that Enron was the most egregious false reporter and even had undue influence over Platts' composite "calculations").  FERC Report, at III-4, *et al.*  There is a whole section in the FERC Report on "The Effect of Enron and EOL on the Published Price Indices."  III-33 - III-38.

investigating its internal reporting procedures on October 4, 2002, shortly after the Dynegy announcement.  Five days later, on October 9, 2002, AEP announced that five of the AEPES traders had reported inaccurate data to Platts between 1998-2002.  It also announced that it had dismissed the traders and instituted new internal procedures to ensure the accuracy of future reporting, including requiring the company's chief risk officer to verify the information, and only then, report the information to trade publications.

Plaintiffs do not dispute that AEP made these public disclosures, took corrective action against the employees and instituted remedial measures after October 2002.[12]  Plaintiffs, instead, dispute that AEP did not learn of the practice until October of 2002.  In fact, it is the gravamen of Plaintiffs' CAC that AEP and the Individual Defendants knew about or recklessly disregarded the practice of inaccurate reporting during the Class Period and concealed it to cause the price of the Company's stock to become artificially inflated.  They state that the artificial inflation is evidenced by the 22% and 17% decline in the price of Common Stock and Equity Units, respectively, at close on October 9, 2002.

Specifically, Plaintiffs allege that, since 1998, AEP engaged in the inaccurate reporting in an attempt to manipulate the market for natural gas. Plaintiffs contend that AEP reported false prices and volumes of natural gas trades, and, in some cases, reported trades that never occurred. In this way, Plaintiffs argue that AEP portrayed itself as having a greater volume of trading activity in particular trading locations, which in turn moved the indices to favor AEP's trading positions.  According to Plaintiffs' CAC, "AEP had attempted to manipulate the published price

---

[12]They point out, however, that not only did AEP refuse requests by Platts to detail the inaccuracies and/or release the names of the five traders, but AEP also never offered any explanation for how the inaccurate reporting had gone "undetected for four consecutive years."

indices to AEP's advantage, and AEP traders stated that the head of AEP's trading desk had specifically instructed them to submit the false information . . . AEP had no internal procedures in place to ensure the accuracy of the reported data."[13]  ¶ 6.

Finally, Plaintiffs aver that AEP used the trade information in the publications to assess the volume of its trading business in comparison to its peers and thereafter relayed its assessments to investors in press releases and SEC filings.[14]  According to Plaintiffs, amidst the Enron scandal, "AEP issued several statements reassuring investors that AEP's 'longstanding conservative and risk-averse culture' left little room for impropriety."   But, Plaintiffs contend, "as a result of AEP's undisclosed practice of manipulating the market for natural gas, [its] common stock and Equity Units traded at artificially inflated prices at all relevant times, causing significant damages to Plaintiffs, who purchased or acquired such securities during the Class Period."

AEP does not deny that the five AEPES traders did engage in the inaccurate reporting and that before October 2002, it had no internal procedures in place to prevent inaccurate

---

[13]The CAC claims that these findings came from reports published by the FERC after the end of the Class Period.  The only report before the Court is the one provided as an attachment to Defendants' Motion to Dismiss, which is the one cited throughout this Opinion & Order.  That report, however, contrary to Plaintiffs' portrayal did not make the finding that AEP, through its AEPES traders, tried to manipulate the price indices to AEP's advantage.  This appears to be a misrepresentation by Plaintiffs, unless there is another report in which the FERC did make that specific finding.  If that is the case, though, then Plaintiffs should have provided that report to the Court.

[14]For example, on June 15, 2000, AEP issued a press release via Defendant Draper, which stated: "We are already substantial players in the wholesale business and expect to continue to grow.  People who follow our industry know that our energy trading business has quickly grown from a startup two years ago into the second-leading trader of electricity and a top-20 trader of natural gas today."  CAC, ¶ 67.

reporting. Defendants contend, however, that they were not aware that the inaccurate reporting at AEPES was taking place until October of 2002, after the internal investigation following the Dynegy announcement. Defendants argue Plaintiffs are attempting to plead "fraud by hindsight," which is not actionable under the securities laws, making dismissal of the CAC warranted.

The Court heard oral argument on Defendants' Motion to Dismiss the CAC and the propriety of allowing Plaintiffs leave to file their SCAC, such that those issues for now ripe for decision.

### III. STANDARD OF REVIEW

### A. Standards for a Motion to Dismiss in General Cases

In considering the typical Rule 12(b)(6) motion to dismiss, courts are limited to evaluating whether a plaintiff's complaint sets forth allegations sufficient to make out the elements of a cause of action. *Windsor v. The Tennessean*, 719 F.2d 155, 158 (6th Cir. 1983). A complaint should not be dismissed "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957); *Lillard v. Shelby County Bd. of Educ.*, 76 F.3d 716, 724 (6th Cir. 1996). In the usual case, the Court is required to "construe the complaint liberally in the plaintiff's favor and accept as true all factual allegations and permissible inferences therein." *Lillard*, 76 F.3d at 724 (quoting *Gazette v. City of Pontiac*, 41 F.3d 1061, 1064 (6th Cir. 1994)); *see Murphy v. Sofamor Danek Group, Inc. (In re Sofamor Danek Group, Inc.)*, 123 F.3d 394, 400 (6th Cir. 1997) ("All factual allegations made by the plaintiff are deemed admitted, and ambiguous allegations must be construed in the plaintiff's favor.") (citations omitted).

10

**B. Standards for a Motion to Dismiss in Federal Securities Fraud Cases**

The requirements of pleading, the standard of assessment, and the scope of the court's consideration, however, are somewhat different in securities fraud cases. *See*, *e.g.*, *Campbell v. Lexmark Intern. Inc.*, 234 F.Supp.2d 680, 682 (E.D. Ky. 2002) ("[t]hough pleading standards are – as a rule – quite liberal, pleading standards are different in securities fraud cases. In such cases the standard is more rigorous . . ."). In addition to considering the allegations in the complaint, a court can consider the full texts of SEC filings, prospectuses, analysts' reports and other documents referred to in the complaint, regardless of whether they are attached in part or whole. *See Weiner v. Klais & Co.*, 108 F.3d 86, 89 (6th Cir. 1997); *In re Royal Appliance Securities Litigation*, 1995 WL 490131, *2 (6th Cir. Aug. 15, 1995) (unpublished); *see also In re K-tel Intern., Inc. Securities Litigation*, 300 F.3d 881, 889 (8th Cir. 2002) ("The court may consider, in addition to the pleadings, materials 'embraced by the pleadings' and materials that are part of the public record."). By considering such materials, however, the motion to dismiss is not converted into one for summary judgment. *Jackson v. City of Columbus*, 194 F.3d 737, 745 (6th Cir. 1999); *In re Telxon Corp. Securities Litigation*, 133 F.Supp. 2d 1010, 1024 (N.D. Ohio 2000); *In re SCB Computer Technology, Inc., Securities Litigation*, 149 F.Supp.2d 334, 356, n. 13 (W.D. Tenn. 2001).

**1. Rule 9(b)**

Rule 9(b) of the Federal Rules of Civil Procedure requires that the fraud be plead with particularity. Rule 9(b) states: "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally." Fed. R. Civ. P. 9(b). To satisfy

this requirement, the plaintiff must detail specifically the facts and circumstances that are

claimed to constitute the defendant's fraudulent conduct. *See Advocacy Org. for Patients &*

*Providers v. Auto Club Ins. Ass'n,* 176 F.3d 315, 322 (6th Cir.1999) (quoting *Coffey v. Foamex*

*L.P.,* 2 F.3d 157, 161-62 (6th Cir.1993) (plaintiff must "allege the time, place, and content of the

alleged misrepresentation on which he or she relied; the fraudulent scheme; the fraudulent intent

of the defendants; and the injury resulting from the fraud"); *DiLeo v. Ernst & Young*, 901 F.2d

624, 627 (7th Cir. 1990) (pleader must identify "the who, what, when, where, and how: the first

paragraph of any newspaper story").

### 2. Private Securities Litigation Reform Act

Finally, regarding both pleading requirements and the standards of assessment, Congress

changed what is required of plaintiffs alleging an Exchange Act (Section 10(b) and Rule 10b-5)[15]

violation in order to survive a motion to dismiss when it enacted the Private Securities Litigation

Reform Act ("PSLRA").[16]  *Helwig v. Vencor, Inc.*, 251 F.3d 540, 548 (6th Cir. 2001).  The Sixth

---

[15]Plaintiffs' claims under the Securities Act (Sections 11 and 15) regarding the allegedly
false and misleading statements in and incorporated by the Registration Statement do not assert
any *scienter* and are not subject to the heightened pleading requirements under the PSLRA.

[16]The PSLRA amended the Exchange Act.  In relevant part, the PSLRA states:
(b) Requirements for securities fraud actions
    (1) Misleading statements and omissions
In any private action arising under this chapter in which the plaintiff alleges that the
defendant –
        (A) made an untrue statement of a material fact; or
        (B) omitted to state a material fact necessary in order to make the
        statements made, in the light of the circumstances in which they were
        made, not misleading;
the complaint shall specify each statement alleged to have been misleading, the reason or
reasons why the statement is misleading, and, if an allegation regarding the statement or
omission is made on information and belief, the complaint shall state with particularity
all facts on which that belief is formed.

Circuit explained that, "[b]efore 1995, a plaintiff had to allege fraud 'with particularity,' [but] [u]nder the PSLRA, a plaintiff must now 'state with particularity facts giving rise to a *strong inference* that the defendant acted with the required state of mind.'" *Id*. at 548, citing Fed. R. Civ. P. 9(b) and 15 U.S.C. § 78u-4(b)(2) (emphasis added).  Whereas before, a plaintiff only had to "aver generally" the condition of mind, after the PSLRA, as with the circumstances surrounding the fraud itself, the defendants' state of mind must be pled with particularity.  In other words, "Congress heightened the pleading standard for securities fraud."  *Helwig*, 251 F.3d at 548.  A plaintiff, moreover, is required to meet the Rule 9(b) and PSLRA standards as to each defendant against whom securities fraud is alleged.  *See, e.g., In re SCB*, 149 F.Supp.2d at 345.

Now, when assessing whether a plaintiff has offered "facts giving rise to a *strong inference*" of defendants' *scienter*, "plaintiffs are entitled only to the most plausible of competing inferences." *Miller v. Champion Enterprises Inc*., 346 F.3d 660, 673 (6th Cir. 2003), citing *Helwig*, 251 F.3d at 553.  "Thus, if certain factors are not met in the complaint – factual particularity and the most plausible of competing inferences – 'the court shall, on the motion of any defendant, dismiss the complaint.'"  *Miller*, 346 F.3d at 673, citing, 15 U.S.C. § 78u-4(b)(3)(A).

---

> (2) Required state of mind
> In any private action arising under this chapter in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.

15 U.S.C.A. § 78u-4(b).

14

Finally, in all cases, even in the typical case where the 12(b)(6) standard of review is more lenient to plaintiffs, to survive a motion to dismiss, a plaintiff must do more than make bare assertions of legal conclusions.  *In re Sofamor Danek Group*, 123 F.3d at 400;  *In re DeLorean Motor Co.*, 991 F.2d 1236, 1240 (6th Cir. 1993) (citation omitted).  Conclusory statements or legal conclusions need not be considered.  *Papasan v. Allain*, 478 U.S. 265, 286 (1986); *Morgan v. Church's Fried Chicken*, 829 F.2d 10, 12 (6th Cir. 1987).  A court never is "required to accept as true unwarranted legal conclusions or factual inferences," *Davis v. DCB Financial Corp.*, 259 F.Supp.2d 664, 669 (S.D. Ohio 2003), nor must the court "accept as true a legal conclusion couched as a factual allegation."  *Telxon*, 133 F.Supp. 2d at 1024.  *See also In re Federal-Mogul Corp. Securities Litigation*, 166 F.Supp.2d 559, 561 (E.D. Mich. 2001) (in considering a motion to dismiss in securities fraud case, the court warned that it, "will not, however, accord the presumption of truthfulness to any legal conclusion, opinion or deduction, even if it is couched as a factual allegation.").  Under the PSLRA, a plaintiff must plead *facts* giving rise to a strong inference of defendant's *scienter*.  *Helwig*, 251 F.3d at 565.  Complaints that are "too conclusory" properly are dismissed. *Id*.

## IV.  ANALYSIS

### Defendants' Motion to Dismiss

Defendants argue that the CAC should be dismissed for several reasons.  First, they allege that Plaintiffs fail to plead *scienter* with the particularity required by Rule 9(b) and the PSLRA as to any of the Individual Defendants, which further precludes Plaintiffs from making a claim against AEP.  Assuming *arguendo* that Plaintiffs have met the *scienter* requirements, Defendants argue, nevertheless, that dismissal is warranted because the alleged misstatements

and omissions offered in the CAC also fail as a matter of law.[17]  The statements all are either

---

[17]Plaintiffs allege numerous false and/or misleading statements in their CAC.  It is helpful to restate the allegations in this Opinion & Order.  Accordingly, they are as follows:

¶ 62.   On February 10, 2000, the fist [sic] day of the Class Period, AEP issued a press release describing its presentation to financial analysts concerning its planned merger with CSW, which was still awaiting regulatory approval, and the operations of the Company going forward.  With respect to the Company's energy trading business the release stated:

'By using our rapidly expanding -- and successful -- electricity and gas marketing and trading operation, we have a unique ability to unleash the value of our generating assets in the competitive marketplace,' Draper said.  'That asset base also becomes the foundation for expanding and reshaping our generation portfolio, to achieve further fuel diversity and geographic reach into different regional markets.  Our trading organization is already number two in electricity trading volumes and will continue to grow,' Draper said.  'We were early to recognize that value in the energy marketplace is driven by information. ...'

Plaintiffs contend that Draper's statements were materially misleading because "the purported success and rapid expansion of AEP's trading operations were helped in part by AEP's undisclosed practice of reporting false trade information to industry publications.  Moreover, while stating that AEP had recognized 'that value in the energy marketplace is driven by information,' AEP failed to disclose that it had an undisclosed practice of manipulating market information to favor its trading positions."  CAC, ¶ 63.

¶ 64.   On March 24, 2000, the Company filed its Form 10-K405 for 1999 ("1999 10-K"), which was signed by defendant Draper.  The 1999 10-K purported to describe AEP's trading operations:
Energy Marketing and Trading Transactions - The Company makes wholesale electricity and natural gas marketing and trading transactions (trading activities). Trading activities involve the sale of energy under physical forward contracts at fixed and variable prices and the trading of energy contracts including exchange traded futures and options, over-the-counter options and swaps. The majority of these transactions represents physical forward electricity contracts in the Company's traditional marketing area and are typically settled by entering into offsetting contracts. The net revenues from these transactions in the Company's traditional marketing area are included in regulated revenues for ratemaking, accounting and financial and regulatory reporting purposes. The Company also purchases and sells electricity and gas options, futures and swaps, and enters into forward purchase and sale contracts for electricity outside its traditional marketing area and for gas.

> These transactions represent non-regulated trading activities that are included in worldwide revenues.

According to the CAC, "[t]his discussion of AEP's 'Energy Marketing and Trading Transactions' was materially misleading because it failed to disclose that AEP regularly reported information concerning its energy trades to industry publications that compiled indices upon which future contract prices were based.  The 1999 10-K also failed to disclose that AEP did not have procedures in place for the gathering, verifying, and reporting of trade data, and that, as a result, AEP traders had routinely submitted false information concerning trades to the industry trade publications."  *Id*. at ¶ 65.

¶ 66.    On April 26, 2000, AEP issued a press release, in which Defendant Draper stated, "AEP is now the second-largest electricity trader in the United States and our natural gas trading operation is on a similar growth path. . .And just a few years ago we weren't even in the trading business."  Thereafter, Draper detailed AEP's future strategy in saying, "We are going to move aggressively to grow our trading and marketing businesses and expand operations to be a leader in all energy commodities."

¶ 67.    On June 15, 2000, AEP announced that the merger with CSW had been consummated, following the SEC's approval.  In the press release, Defendant Draper stated: "We are already substantial players in the wholesale business and expect to continue to grow.  People who follow our industry know that our energy trading business has quickly grown from a startup two years ago into the second-leading trader of electricity and a top-20 trader of natural gas today."

¶ 68.    AEP issued a press release on July 26, 2000, announcing financial results for the second quarter of 2000, ending June 30, 2000.  It reported that net revenue from energy trading was $83 million, up 242% from the prior year period. The company touted that it "continued to experience solid growth in its energy trading operations" and that "higher energy trading volume contributed to earnings" it posted that second quarter.

¶ 69.    On October 24, 2000, AEP issued a press release announcing financial results for the third quarter of 2000, ending September 30, 2000.  Draper stated, "[t]rading and wholesale marketing of power continues to be an increasing factor in our results, driving our comparative performance for the quarter by 29 cents per share."

¶ 70.    AEP, through Draper, issued another press release on October 30, 2000, detailing its growth strategy, and stating in relevant portion:

> "Our focus for growth moving forward, plain and simple, will be the wholesale business — generation and related energy assets, wholesale marketing and

17

trading, . . . With our large generating fleet and very successful trading organization, we are already in an excellent position as our markets move toward deregulation and competition. We are following a plan to strengthen our position."

[portion omitted by Plaintiffs in the CAC]

"Our wholesale and trading organization is the best in the business, in my opinion. We've grown from start-up to a leading player in about three years. This marketing and trading mentality has changed how we operate our plants, making us much more efficient and more profitable."

[portion omitted by Plaintiffs in the CAC]

"[Eric] van der Walde notes that AEP's wholesale marketing and trading operation goes far beyond the megawatts supplied by the company's plants."

"'We have continued to broaden our base," van der Walde said. 'Our marketing and trading organization is number two in the U.S. in electricity volume, so it's obvious we do more than just move AEP's megawatts.  But we are more than just electricity. We currently trade electricity, natural gas, sulfur dioxide allowances and coal. We are rapidly growing our gas capabilities, and our European trading is also rapidly growing.  AEP's natural gas volumes averaged approximately 4 billion cubic feet per day in the third quarter, up from approximately 2.5 billion cubic feet per day in the third quarter last year. The company's European traders completed as many as 600 transactions a week in September, up from less than 50 a week as recently as June."

[portion omitted by Plaintiffs in the CAC]

"'Our wholesale marketing and trading business is growing rapidly, efficiently and profitably,' van der Walde said."

Plaintiffs aver in the CAC that the statements in the April 26, June 15, July 26, October 24 and October 30, 2000 press releases were materially misleading.  It is Plaintiffs contention that "[i]n its discussion of the rapid growth, volume, and ranking of AEP's trading operations, AEP failed to disclose that it had deliberately manipulated the trade data by which such growth, volume, and rankings were measured.  In addition, while highlighting the trading operations' contribution to the Company's earnings, AEP failed to disclose that its trading operations lacked the proper management controls, thereby exposing the Company to the risk of legal liabilities arising out of the unlawful actions of its electric power and natural gas traders."

18

¶ 72.   "On January 16, 2001, Analyst Credit Suisse Boston Corporation initiated coverage of AEP with a 'Buy' rating, focusing, in part, on AEP's trading and marketing business, which AEP's management stated was expected to achieve double digit growth."

Presumably, Plaintiffs expect the Court to attribute the Analyst Credit Suisse Boston Corporation's "buy" rating solely to the allegedly fraudulent statements by AEP that it expected "double digit growth." Plaintiffs, however, do not make that causal contention explicit in their CAC.  Such expected, implicit attribution would seem to be the case with Plaintiffs' contentions in other, similar paragraphs of the CAC, as well.

In ¶ 78, Plaintiffs simply aver:
Analysts responded positively to AEP's 2001 first quarter results. Following conversations with management, on April 25, 2001, PNC Institutional Investment Service issued a report maintaining its 'Market Perform' rating of AEP.  Analyst Merrill Lynch maintained its 'Neutral' rating of AEP, noting that the key driver in AEP's earnings came from continued strength at AEP's trading and marketing business.  Analyst Lehman Brothers issued a report rating AEP as 'Market Perform', based largely on the favorable outlook for the wholesale power and gas market.  Lehman Brothers raised its 2001 earnings per share estimate for AEP from $3.47 to $3.54 , and its 2002 estimate from $3.68 to $3.82.
In ¶ 89, they state:
Analysts responded positively to AEP's third quarter results. Following conversations with management regarding the Company's significant growth in wholesale operations, (primarily gas marketing and trading), on October 23, 2001, UBS Warburg issued a report recommending a 'Buy' rating for AEP.  The analyst stated: 'Heightened activity in the wholesale power and gas marketing and trading markets led to a 50% increase in third quarter 2001 revenues.'  The analyst further noted that AEP was ranked second among North American power marketers in terms of volume and that for the quarter, domestic wholesale natural gas volumes reportedly rose 265%.'"
Additionally, in paragraphs 98 and 99, respectively, Plaintiffs aver:
"On April 17, 2002, the Global Equity Group of US Warburg issued a report initiating coverage of AEP with a 'Buy' recommendation based largely on the volume of electric and natural gas trading AEP did.  The US Warburg analyst also noted that AEP had solid risk controls in place. Based on conversations with management, the analyst based part of his recommendation on management's expectations that AEP's natural gas and power volumes would continue to grow."
*Id*. at ¶ 98.

"On April 24, 2002, Smith Barney issued a report maintaining its 'Market Outperform' rating of AEP.  The Smith Barney report highlighted the purported value and importance

of AEP's trading desk and stated:

> 'The trading desk provides the company with invaluable information regarding the movements and trends within the market and acts as the control center of the company's logistical operations.  We believe the fill integration of the company's newly established West Coast trading floor and its expanding international desk will play a major part in optimizing the potential of the company's asset network.  Ultimately, trading is the vital 'nerve center' which allows AEP to get maximum value out of its asset portfolio."

*Id*. at ¶ 99.

¶ 73.    The January 23, 2001 press release reporting fourth quarter financial results (ending December 31, 2000) was materially misleading, Plaintiffs aver, because Draper stated:

> "Our trading and wholesale power marketing operations continue to be important contributors to our business.  Wholesale margins were 41 cents per share higher than last year.  This success reflects our commitment to be a leader in wholesale markets and validate our growth strategy announced in October . . . Our 38,000 megawatts of generation, intrastate pipelines, gas storage facilities, our technical and operational expertise, as well as the depth and experience of our trading and marketing staff give us a superior platform for growth."

The Plaintiffs profess that such statements were materially misleading, again, because AEP did not disclose the false reporting and lack of internal controls.

¶ 75.    "On March 30, 2001, AEP filed its Form 10-K405 for 2000 ("2000 10-K"), which was signed by defendant Draper.  Like the Company's 1999 10-K, the 2000 10-K purported to describe the business of AEPES.  In this regard, the 2000 10-K stated:

Wholesale Business Operations
Various AEP subsidiaries, including AEPES, engage in wholesale business operations that focus primarily upon the following activities:
- Trade and market energy commodities, including electric power, natural gas, natural gas liquids, oil, coal, and SO2 allowances in North America and Europe.
- Provide price-risk management services and liquidity through a variety of energy-related financial instruments, including exchange-trade futures and over-the-counter forward, option, and swap agreements.
- Enter into long-term transactions to buy or sell capacity, energy, and ancillary services of electric generating facilities, either existing or to be constructed, at various locations in North America and Europe."

Much like Plaintiffs' prior explanation regarding the alleged misleading nature of the other statements, their sole contention here is that AEP:

> "failed to disclose that AEP regularly reported information concerning its energy trades to industry publications that compiled indices upon which future contract prices were based [and] [t]he 2000 10-K also failed to disclose that AEP did not have procedures in place for the gathering, verifying, and reporting of trade data, and that, as a result, AEP traders had routinely submitted false information concerning trades to the industry trade publications." *Id*. at ¶ 76.

Plaintiffs further aver that AEP's April 24, 2001 press release discussing financial results for the first quarter of 2001, which ended March 31, was materially misleading because it highlighted the "strategic emphasis" on AEP's wholesale business, including growing its energy trading operations, which significantly contributed to the company's earnings. *Id*. at ¶ 77.

¶ 80.   "On July 24, 2001, AEP issued a press release discussing its financial results for the second quarter of 2001 ended June 30, 2001.  The release stated in pertinent part:

> '[AEP], benefiting [sic] from an increased contribution from wholesale natural gas and the continued strong performance of its wholesale business in general, today announced second-quarter ongoing earnings of $0.89 per share, an 85 percent increase from the same quarter in 2000. Revenue increased 78 percent to $14 billion.
>
> The earnings contribution from wholesale increased 116 percent, or $0.44 per share, over the same quarter last year,' said E. Linn Draper, Jr., AEP's chairman, president and chief executive officer.  'Even though wholesale power contributed $0.28 per share, representing a $0.15 improvement from the same quarter last year, the earnings contribution from wholesale natural gas almost matched it. Wholesale natural gas contributed $0.26 a share, a $0.24 improvement from last year's second quarter. This reflects both the improved margins for natural gas in the second quarter as well as the growth of our natural gas trading and wholesale marketing business, which has been boosted by the Houston Pipe Line acquisition completed in June.
>
> AEP's wholesale business, which consists of wholesale sales in the United States, the generation component of domestic retail sales, worldwide trading and other related businesses, contributed $0.82 per share in the quarter, up from $0.38 in second quarter 2000.
>
> Wholesale electric domestic trading volume for the quarter was 121 million megawatt-hours, a 16 percent increase from the second-quarter

21

2000 volume of 104 million megawatt-hours. Wholesale natural gas volume for the quarter was 774 billion cubic feet, a 178 percent increase from second-quarter 2000 volume of 278 billion cubic feet.'"

Plaintiffs go on to allege that:

"AEP's April 24 and July 24, 2001 press releases were materially misleading. While highlighting the growth and contribution to earnings of AEP's wholesale business, including energy trading, and the Company's 'strategic emphasis' on this business, AEP failed to disclose that the Company lacked procedures for gathering, verifying, and reporting trade data and that, in fact, AEP had routinely reported false information to industry trade publications concerning the volume and prices of natural gas trades." *Id*. at ¶ 81.

Plaintiffs allege that a September 25, 2001 press release, quoting Defendant Addis, was materially misleading when, in the process of announcing the promotions of Defendants van der Walde and Appelt, Addis stated, in pertinent part:

"Promotions are typically a time to acknowledge the success of colleagues. However, Steve and Eric's promotions require a fuller elaboration of their contributions because they are unique. It is my strongly held belief that great companies result from the linkage of sound strategies with extraordinary individuals. Steve and Eric have set a standard of excellence which has become a critical guide for others.

Van der Walde has been promoted to executive vice president - marketing and trading. Previously, van der Walde served as senior vice president - energy trading. He will continue to direct AEP's domestic trading activities in the power, natural gas, coal and SO2 allowance markets.

Appelt has been promoted to executive vice president - administration for AEP Energy Services. Appelt, who was named senior vice president - administration in January 2000, is responsible for the administrative functions of AEP's energy trading group, including the middle office, and financial accounting functions."

*Id*. at ¶ 83. Plaintiffs complain that:

The growth and development of AEPES was not based on 'sound strategies,' and defendants van der Walde and Appelt had not 'set a standard for excellence.' The release failed to disclose that, under the leadership of defendants Addis, van der Walde, and Applet, AEPES's strategy for growth and development included the unsustainable and improper practice of reporting false information concerning energy trades to industry publications in order to give AEP the appearance of greater market volume and to otherwise benefit AEP's trading positions.

*Id*. at ¶ 84.

22

———————————

When, according to Plaintiffs, on September 28, 2001, Defendant Addis resigned suddenly, Defendant Draper made materially misleading statements in a press release.  *Id*. at ¶ 85.  He explained therein that "the realignment . . . [would] allow the company's executive team to apply diverse management experience to all of AEP's businesses."  *Id*.  Draper went on to state:

> Thomas V. Shockley III will continue to report to Draper as vice chairman with the additional title of chief operating officer. He will have overall responsibility for AEP's regulated and unregulated businesses as well as its engineering and technical development operations. Shockley was formerly president and chief operating officer of Central and South West Corp. and joined AEP when the two companies merged last year.
>
> Two executives reporting to Shockley will head AEP's marketing and trading operations. Eric J. van der Walde, executive vice president - marketing and trading, for AEP Energy Services, will continue in that role, overseeing the company's trading activities in electricity, natural gas, energy futures and emissions credits. Van der Walde has led the tremendous growth in AEP's trading business since joining the company in 1997 from Enron Capital and Trade Resources.
>
> Steven A. Appelt, executive vice president - administration, AEP Energy Services, will also continue in his role. Appelt, who guided the development and implementation of AEP's trading architecture and trading support functions, joined the company in 1998 from Enron Oil Trading and Transportation, where he was chief financial officer.
>
> [portion omitted by Plaintiffs in the CAC]
>
> AEP remains committed to its wholesale strategy, which has achieved remarkable success in a short time.  We have every confidence that Eric and Steve, who have been integral parts of our competitive wholesale business since day one, will continue that record of success. Our wholesale businesses, together with our substantial regulated businesses, provide a balanced combination of growth and stability for our shareholders.

*Id*.

Plaintiffs argue, "[l]ike the September 25, 2001 press release, the September 28, 2001 press releases was materially misleading.  The release failed to disclose that defendants van der Walde and Appelt had built their 'record of success,' in part, by causing, or at least recklessly allowing, AEP energy traders to manipulate the market for natural gas by reporting false trade information to industry trade publications."  *Id*. at ¶ 86.

23

¶ 88.   "On October 23, 2001, AEP, via Draper, issued a press release announcing its results for the third quarter of 2001 ended September 30, 2001.  The release stated in pertinent part:

> 'Earnings from trading and marketing increased 29 percent from the same quarter last year despite current lower market prices and reduced volatility. That helped offset a decline in earnings from energy sales, which were adversely affected by reduced demand and lower wholesale prices. Domestic wholesale electric trading volume for the quarter was 148 million megawatt-hours, a 66 percent increase from third-quarter 2000 volume. AEP ranks second among North American power marketers in terms of volume.  Domestic wholesale natural gas volume for the quarter was 1,337 billion cubic feet, or 14.5 billion cubic feet per day, a 265 percent increase from third-quarter 2000. AEP's third-quarter gas volume should solidify the company's position as one of the top wholesale natural gas marketers in North America. AEP was ranked 10th in the second quarter.  The increase in natural gas volume and earnings contribution reflects the continued execution of our growth strategy to add value at key points along the wholesale energy chain.'"

This October 23, 2001, press release was materially misleading, Plaintiffs allege, because "AEP highlighted that it was a top ranked wholesale natural gas marketer in North America, but failed to disclose that this ranking was based on information compiled by trade publications and that AEP had manipulated these rankings by submitting false information concerning the prices and volumes of trades executed to the trade publications."  *Id*. at ¶ 90.

¶ 91.   "On December 19, 2001, AEP issued a press release reducing its earnings guidance for 2001 and 2002 and commenting on the collapse of Enron.  The release stated in pertinent part:

> 'Extremely mild weather and the recession hurt earnings in the fourth quarter and will dampen results in what was otherwise an excellent year,' said [Defendant Draper]. 'While continued economic weakness will also likely affect 2002, we remain strongly positioned to grow and build on our energy market leadership. We are a financially strong, asset-rich company with a sound wholesale-focused growth strategy, conservative risk management policies, and a significant regulated business.'"

"Regarding the effect of Enron's collapse on energy markets, Draper said,

> 'Recent events have put our entire industry under tremendous scrutiny. We are confident in the future of our country's energy markets and our ability to meet commitments and deliver value for shareholders over the long term. We expect to remain one of the industry's strongest participants in this market.'"

24

*Id*. at ¶ 91.  Again, Plaintiffs aver that the press release should have mentioned the "undisclosed practice" of false reporting and the lack of internal controls to prevent such.  *Id*. at ¶ 92.  Because Draper did not, Plaintiffs posit, the statements were materially misleading.  *Id*.

Next, in a January 22, 2002 press release announcing its 2001 fourth quarter results and commenting on the Enron scandal, Draper noted, "Enron's bankruptcy has increased Wall Street's scrutiny of companies with energy trading groups."  *Id*. at ¶ 93.  He went on to boast, according to Plaintiffs:

> "'We welcome the increased scrutiny, because those who take a close look at us quickly realize our strengths: a conservative approach to finance and reporting, a strong asset base, a balanced blend of low-risk and higher risk businesses and a valid strategy for growth and stability.'"

*Id*. Plaintiffs again emphasize that it was materially misleading for Draper to emphasize a "conservative approach."

> ¶94.  "Typical of AEP's public statements regarding its business philosophy and practices was a statement by Defendant Draper in his 'Chairman's Letter to Shareholders,' dated February 27, 2002, in which Draper attempted to assuage shareholder concerns about recent crises in the energy business:
>
> > 'Let me alleviate your concerns at the outset.  AEP's wholesale business continues to be viable and profitable. It's producing real cash and real profits.  And our longstanding conservative and risk-averse culture means that we apply prudent accounting, financial disclosure and risk management practices to the business. We evaluate these practices on an ongoing basis to ensure our financial integrity and minimize adverse effects on our business.'"

*Id*.  Plaintiffs argue:

> Contrary to Draper's representations that AEP employed a "conservative" and "prudent" approach to reporting and disclosures, since 1998, AEP energy traders' practice of reporting false information concerning natural gas trades to industry trade publications had gone unchecked. In fact, throughout the Class Period, AEPES lacked any procedure or control for the gathering, verifying, and reporting of energy trade information. Moreover, defendant Draper's statement that AEP evaluated its reporting and risk management practices "on an ongoing basis to ensure our financial integrity and minimize adverse effects on our business" was either materially false or demonstrated that the Executive Defendants were aware of AEPES's lack of procedures or controls for the gathering, verifying, and reporting of energy trade information.

*Id*. at ¶ 95.

¶ 96.  AEP issued its 2001 10-K, signed by Defendants Draper and Shockley, on March 29, 2002.  Regarding its natural gas trading business, the 2001 10-K stated, "Platts Gas Daily ranked AEP Nos. 14, 10 and 2 in gas sales for the first, second and third quarters, respectively,

of 2001."  Plaintiffs contend such information was materially misleading "because since 1998, AEP had been deliberately and routinely reporting false trade information to Gas Daily, thereby manipulating the statistics concerning the volume of AEP's gas sales in relation to its peers."  *Id*. at ¶ 97.

The remaining alleged materially misleading statements were made after the SEC undertook investigations of other energy trading firms, such as Dynegy Inc. and CMS Energy Corp., in May of 2002.  *Id*. at ¶ 100.  According to the CAC, a May 9, 2002 press report indicated that energy company CMS Energy Corp. was being investigated by the SEC for certain transactions between CMS and Dynegy involving simultaneous purchases and sales of power at the same price.  *Id*. at ¶ 101.  Thereafter, on May 14, 2002, in an article that appeared on Bloomberg, AEP denied that it had engaged in such round-trip trades.  *Id*. at ¶ 103.  Then, on May 17, 2002, Plaintiffs claim that AEP:

"took the unusual step of issuing a press release responding to a story appearing in Electric Power Daily and two other trade journals.  The story correctly reported that AEPES employee Rick Snowdon had taken a leave of absence from AEP but incorrectly identified him as leader of AEP's energy-trading operations.  The mistake prompted dozens of calls to AEP from Wall Street analysts, skittish about any bad news in an industry rocked by the collapse of Enron Corp.  The release stated:

'Rick Snowdon, one of our senior traders, requested a leave of absence for personal reasons that have absolutely nothing to do with the current controversies in the energy marketplace,' said [Defendant van der Walde]. 'Rick is a valued member of our Energy Services organization and we hope to have him back working with our group as quickly as possible. Rick will decide when he would like to return to work.

There have been no other changes in our organization or management structure, nor do we anticipate any changes in the foreseeable future,' van der Walde stressed. 'It is unfortunate that we must respond to rumors and hearsay, but we felt it critical to correct the unfounded rumors that are circulating in the marketplace.'"

*Id*. at ¶ 104.  Plaintiffs further aver that this May 17, 2002 press release was materially misleading "because it failed to disclose that AEP traders, like Snowdon, had routinely reported false trade information to Platts and that as a result, the so-called rumors and hearsay concerning AEP's involvement in energy market manipulations would ultimately be confirmed by FERC." *Id*. at ¶ 105.

The next alleged material misstatements pertain to the FERC's investigation of so-called "round trip" or "wash" trades.  AEP issued a press release on May 22, 2002 that reiterated its earlier denial of any involvement in such manipulative tactics pursuant to the FERC investigation.  *Id*. at ¶ 106.  According to the CAC, Defendant van der Walde stated therein, "[f]rom the beginning, we were confident that we had not been involved in the types of activities being investigated by the FERC . . . We have now completed a review of all of our California

true, unrelated to the alleged omissions, mere puffery or immaterial.  Plaintiffs dispute each of

those contentions, and argue that even if the Court dismisses the CAC, Plaintiffs should be

granted leave to amend with the SCAC.

Under the securities laws, companies, and those who speak on their behalf, have a duty to

disclose certain information.  "There is an affirmative duty of disclosure if: (1) created by SEC

statute or rule; (2) there is insider trading; or (3) there was a prior statement of material fact that

---

transactions and can confirm the answers we supplied the FERC are accurate." *Id*.

Over a week later, on May 30, 2002, the same day it announced the Secondary Offering,
AEP issued another press release expressing its intent to respond to fact-finding letters from the
FERC, which sought information on potential "round-trip" or "wash" transactions during 2000
and 2001 in the Western Systems Coordinating Council ("WSCC") for power and in WSCC and
Texas for natural gas.  *Id*. at ¶ 107.  In the press release, AEP stated:

> "AEP completed a review of its trading activities from Jan. 1, 1999, through
> March 31, 2002, a period that included more than 1.2 million trading transactions.
> The company identified and subjected to further review domestic trading
> transactions involving sequential trades with the same terms and counterparties,
> which amounted to approximately one-quarter of 1 percent of the total trading
> transactions.  The total contribution of these transactions to gross revenue is not
> material.  The company believes that substantially all of these transactions
> involve economic substance and risk transference and do not constitute 'round
> trip' or 'wash' sales."

*Id*.

Notably, Plaintiffs do not allege in the CAC that Defendants, in fact, did engage in
"roundtrip" or "wash" trades, rather, they complain that Defendants' representations thereon
were materially misleading because "[w]hile denying its involvement in 'wash trades,' AEP
failed to disclose that it was engaged in other practices specifically designed to manipulate the
natural gas market.  Specific;lly, AEP allowed, and even encouraged, its traders to report false
information to industry trade publications concerning natural gas trades in order to benefit the
Company's trading positions."  *Id*. at ¶ 108.


> ¶ 113.  AEP announced its 2002 second quarter results in a July 25, 2002 press release.
> *Id*. ¶ 113.  Therein, the CAC alleges that Draper stated that AEP expected its
> "energy trading business to be a significant contributor for the year."  *Id*.
> Plaintiffs then point out that, "[l]ess than three months later, AEP would
> announce that it was curtailing its trading operations to 'reduce its exposure to
> speculative energy trading markets.'"  *Id*.

27

is false, inaccurate, incomplete or misleading in light of the undisclosed information." *In re Ford Motor Co. Securities Litigation*, 184 F.Supp. 2d 626, 631 -632 (E.D. Mich. 2001). If a company speaks on a subject, notwithstanding a duty, it still is required to speak truthfully and to provide all information necessary to prevent its statements from being misleading. *See*, *e.g.*, *Stavroff v. Meyo*, 987 F.Supp. 987, 993-994 (N.D. Ohio 1995) ("[i]f a corporation makes a public statement which is reasonably expected to influence the investing public, there is an obligation to disclose sufficient information to prevent the statement from being misleading.").

The securities laws and the SEC do not require, however, the disclosure of so-called "soft information." Soft information consists of "statements of subjective analysis or extrapolation, such as opinions, motives, and intentions, or forward looking statements, such as projections, estimates, and forecasts." *Craftmatic Securities Litigation v. Kraftsow*, 890 F.2d 628, 642 (3d Cir. 1989). If a company does make such statements, it is not immune from the anti-fraud provisions of the federal securities laws, if it neglected to make other statements that were necessary to make the "soft information" non-misleading. *Stavroff*, 987 F.Supp. at 993-994.

### A. Elements of Plaintiffs' Claims

### 1. Section 11 Securities Act Claim

Plaintiffs bring a Section 11 claim, 15 U.S.C. § 77k, against AEP and the Securities Act Defendants (Count I). Under Section 11, purchasers of securities, such as Plaintiffs, can bring a claim against certain enumerated parties in a registered offering if false or misleading information was included in a registration statement.[18] 15 U.S.C. § 77k(a). "To establish a

---

[18]Section 11(a) of the Securities Act states, in pertinent portion:
    (a) In case any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact

prima facie case, a plaintiff need only show that he purchased a security issued pursuant to a registration statement and that the statement made a material misrepresentation or omission." *Picard Chemical Inc. Profit Sharing Plan v. Perrigo Co.*, 940 F.Supp. 1101, 1131 (W.D. Mich. 1996).  Plaintiffs are not required to plead *scienter* regarding their Section 11 claim because the Supreme Court has held that, "[l]iability against the issuer of a security is virtually absolute, even for innocent misstatements."  *Herman & MacLean v. Huddleston*, 459 U.S. 375, 382 (1983).

### 2.  Section 10(b) & Rule 10b-5 Exchange Act Claim

Plaintiffs bring their Exchange Act claim (Count III) against AEP and the Executive Defendants.  Section 10(b) of the Exchange Act makes it unlawful to:

> use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b).  Under Rule 10b-5, promulgated pursuant to Section 10(b), it is illegal to, ". . . make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were

---

> required to be stated therein or necessary to make the statements therein not misleading, any person acquiring such security (unless it is proved that at the time of such acquisition he knew of such untruth or omission) may, either at law or in equity, in any court of competent jurisdiction, sue--(1) every person who signed the registration statement; (2) every person who was a director of ... the issuer at the time of the filing of the part of the registration statement with respect to which his liability is asserted; ... (5) every underwriter with respect to such security....

15 U.S.C. § 77k(a).

made, not misleading . . ." 17 C.F.R. § 240.10b-5.  To establish a claim under Section 10(b) and

Rule 10b-5, Plaintiffs must allege, in connection with the purchase or sale of securities: 1) a

misstatement or omission; 2) of a material fact; 3) made by the defendant(s), with *scienter*; 4)

upon which Plaintiffs justifiably relied;[19] and 5) that proximately caused Plaintiffs' injuries.  *See*

*Helwig*, 251 F.3d at 554; *In re Comshare, Inc. Sec. Litig.*, 183 F.3d 542, 548 (6th Cir. 1999);

*Aschinger v. Columbus Showcase Co.*, 934 F.2d 1402, 1409 (6th Cir. 1991).

### 3.  Control Person Claims

Plaintiffs' claims under Sections 15 (Count II)[20] and 20(a)[21] (Count IV) are similar.  Both

of those statutory provisions impose secondary liability on those persons who "control" the

violators of Sections 11 and 10(b), respectively. *See*, *e.g.*, *Cooperman v. Individual, Inc.*, 171

F.3d 43, 52 (1st Cir. 1999) ("Section 15 of the 1933 Act establishes joint and several liability for

'controlling persons' – that is, those who exercise control over primary violators of § 11.").

"Control person" liability, by its nature, is contingent upon a plaintiff being able to prove a

primary violation under either Section 11[22] or 10(b).  If plaintiffs do not establish the primary

violations, dismissal of their corresponding control person claims would be warranted for that

reason alone.

---

[19]Plaintiffs assert the "fraud on the market" theory; thus, it is not necessary that they prove this element of individual reliance. *Basic Inc. v. Levinson*, 485 U.S. 224 (1988). "The fraud on the market theory is based on the hypothesis that, in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business."  *Peil v. Speiser*, 806 F.2d 1154, 1160 (3d Cir.1986).

[20]15 U.S.C. § 77o.

[21]15 U.S.C. § 78t.

[22]*Cooperman*, 171 F.3d at 52.

31

### B.  *Scienter* Under Section 10(b) and Rule 10b-5

It is appropriate to address the *scienter* element under 10(b) and 10b-5 first because it is the lynchpin of most of Plaintiffs' claims.  Plaintiffs aver that Defendants knew or recklessly disregarded the fact that: 1) AEPES traders were reporting false information to the Trade Press, and 2) AEPES lacked internal controls to prevent inaccurate reporting.  Plaintiffs' contend, furthermore, that Defendants' failure to provide those pieces of information when making other statements rendered the statements Defendants did make misleading.  Hence, if Plaintiffs fail to plead sufficiently Defendants' knowledge or reckless disregard of the inaccurate reporting and lack of internal controls at AEPES, Plaintiffs will be unable to establish that any of Defendants' statements were misleading.  In other words, if Defendants did not know of the inaccurate reporting and had no reason to believe that internal controls were necessary, then it cannot be said that they perpetrated a fraud on Plaintiffs in not disclosing these facts.

Defendants contend that Plaintiffs have not alleged any facts from which it can be inferred that, prior to October of 2002, any Defendant knew or should have known that traders at AEPES had reported inaccurate price information to the Trade Press.  Additionally, Defendants argue that Plaintiffs do not allege that any of the Individual Defendants made statements they knew were false at the time the statements were made, nor have Plaintiffs pled, with the required particularity, facts establishing a "strong inference" of recklessness.

Plaintiffs retort that the "ongoing manipulations and complete lack of any internal controls to prevent such conduct . . . provides strong circumstantial evidence that AEP and the Executive Defendants had actual knowledge, or recklessly ignored, the true condition of the

32

Company's trading operations at the time they made their materially misleading statements."[23]

As that contention suggests, Plaintiffs' allegations of *scienter* are based wholly on inferences to

be drawn from circumstances and Defendants' conduct.  Plaintiffs offer no direct proof of

knowledge by Defendants of the inaccurate reporting prior to October of 2002.

      As the Court already recognized, however, because this is a securities fraud case,

Plaintiffs are not entitled to all inferences in their pleading of Defendants' alleged *scienter*.  As

one court in this Circuit explained,

> [t]hough the new *scienter* pleading standard under the PSLRA remains somewhat
> nebulous, this much is clear: more – much more – is required of plaintiff in order to
> survive a motion to dismiss . . . While under Rule 12(b)(6) all inferences must be drawn
> in plaintiffs' favor, *inferences of scienter do not survive if they are merely reasonable.*

 *Campbell v. Lexmark Intern. Inc.*, 234 F.Supp.2d 680, 683 (E.D. Ky. 2002) (emphasis added).

*See also Helwig*, 251 F. 3d at 553 (noting that after the PSLRA, "plaintiffs are entitled only to

the most plausible of competing inferences.").  The Sixth Circuit acknowledged that, "[t]his

represents a significant strengthening of the pre-PSLRA standard under Rule 12(b)(6), which

gave the plaintiff 'the benefit of all reasonable inferences.'" *Helwig*, 251 F.3d at 553 (citation

omitted).  It then quoted with approval the standard adopted by the First Circuit in *Greebel v.*

*FTP Software, Inc.*, 194 F.3d 185 (1st Cir. 1999):

> Congress has effectively mandated a special standard for measuring whether allegations
> of *scienter* survive a motion to dismiss. While under Rule 12(b)(6) all inferences must be
> drawn in plaintiffs' favor, inferences of *scienter* do not survive if they are merely
> reasonable, as is true when pleadings for other causes of action are tested by motion to
> dismiss under Rule 12(b)(6). *Rather, inferences of* scienter *survive a motion to dismiss*
> *only if they are both reasonable and 'strong' inferences.*

---

[23]Memorandum in Opposition, p. 24.

*Helwig*, 251 F.3d at 551, quoting *Greebel*, 194 F.3d at 195-96 (emphasis added).  "[T]he Court must indulge Plaintiffs' inferences of fraud if 'those inferences leave little room for doubt as to misconduct.'" *In re Federal-Mogul*, 166 F.Supp.2d at 563, quoting *Helwig*, 251 F.3d at 543. Moreover, to meet the *scienter* pleading requirements under the PSLRA, Plaintiffs are required to adduce *facts* showing a *strong inference* of *scienter*; conclusory allegations will not suffice. *Helwig*, 251 F.3d at 565.

It is important for the Court to acknowledge, moreover, that these pleading requirements put it in an unusual posture in this early stage of litigation.  Normally,

> weighing competing inferences is an improper exercise for courts when addressing the typical Rule 12(b)(6) motion to dismiss. . . This is not so, however, where, as here, the PSLRA applies. Under the PSLRA, the pleading standard is heightened; a court is placed in the unusual role of balancing competing inferences.

*Campbell*, 234 F.Supp.2d at 688.  Thus, in considering the allegations that Plaintiffs claim to support the "strong inference" of Defendants' *scienter*, not only is it proper, but this Court is required to consider alternatives, whether suggested by Defendants or the documents referred to in the CAC, such as the FERC Report.  Plaintiffs' inferences will be credited only where they appear from all the allegations and facts before the Court to be the most plausible.

To prove liability under Section 10(b), it is not enough to show that Defendants were negligent in not knowing of the information about which Plaintiffs claim Defendants should have known.  The Supreme Court held long ago that, "10(b) was addressed to practices that involve some element of *scienter* and cannot be read to impose liability for negligent conduct alone." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 201 (1976).  Although the Supreme Court did not consider in *Hochfelder* whether reckless conduct would give rise to liability, the Sixth Circuit

has determined that the *scienter* requirement can be met by alleging either knowing or reckless conduct by defendants.  *Helwig*, 251 F.3d at 550.

## 1. Recklessness as *Scienter*

The bar for liability due to reckless conduct, however, is high.  In securities fraud cases, "recklessness" is defined as, "highly unreasonable conduct which is an extreme departure from the standards of ordinary care. While the danger need not be known, it must at least be so obvious that any reasonable man would have known of it."  *Mansbach v. Prescott, Ball & Turben*, 598 F.2d 1017, 1025 (6th Cir. 1979); *see also In re Comshare*, 183 F.3d at 550; *Miller*, 346 F.3d at 672.  Specifically, the Sixth Circuit has held that a "strong inference" of recklessness cannot be shown merely by averring generalized allegations of motive and opportunity by the defendant.  *See In re Comshare*, 183 F.3d at 550-551 ("Under a plain interpretation of the PSLRA as informed by well-settled law on the contours of the 'scienter' requirement, we hold that plaintiffs may meet PSLRA pleading requirements by alleging facts that give rise to a strong inference of reckless behavior but not by alleging facts that illustrate nothing more than a defendant's motive and opportunity to commit fraud.").  Nevertheless, motive and opportunity are relevant and "facts presenting motive and opportunity may be of enough weight to state a claim under the PSLRA, whereas pleading conclusory labels of motive and opportunity will not suffice."  *Helwig*, 251 F.3d at 551.

Plaintiffs have not pled, however, anything that could lead this Court to conclude that Defendants conduct, even assuming Plaintiffs are correct, that Defendants, at the very least, should have known about the traders' actions, was an "extreme departure from the standards of ordinary care."  In fact, in this context, it appears that the "standards of care," albeit now in

35

hindsight having been shown to be insufficient, were the same through the industry.  Practically all the traders within the companies were doing it.  In addition, it is not reasonable to infer that the dangers of the inaccurate reporting were so obvious to Defendants, when the dangers were not obvious, at all, until, in the aftermath of the California Energy Crisis, the FERC undertook investigations into what caused the Crisis.

### 2. *Helwig* Factors as *Scienter*

Courts have struggled with exactly how much *scienter* is enough and what allegations satisfy the vague requirement of "strong inference."  The Sixth Circuit, fortunately, has provided guidance.  In *Helwig*, the Court adopted the probative factors announced by the First Circuit in *Greebel*.  251 F.3d at 552.  The Sixth Circuit offered:

> Lest parties be adrift in a sea of allegations, we would point to fixed constellations of facts that courts have found probative of securities fraud . . . These have been enumerated as follows:
>
> (1)  insider trading at a suspicious time or in an unusual amount;
> (2)  divergence between internal reports and external statements on the same subject;
> (3)  closeness in time of an allegedly fraudulent statement or omission and the later disclosure of inconsistent information;
> (4)  evidence of bribery by a top company official;
> (5)  existence of an ancillary lawsuit charging fraud by a company and the company's quick settlement of that suit;
> (6)  disregard of the most current factual information before making statements;
> (7)  disclosure of accounting information in such a way that its negative implications could only be understood by someone with a high degree of sophistication;
> (8)  the personal interest of certain directors in not informing disinterested directors of an impending sale of stock; and
> (9)  the self-interested motivation of defendants in the form of saving their salaries or jobs.

36

*Helwig*, 251 F.3d at 552, citing *Greebel*, 194 F.3d at 196.  While the Court qualified that, "[w]e find this list, while not exhaustive, at least helpful in guiding securities fraud pleading," clearly a plaintiff seeking to survive a motion to dismiss should draw upon these factors.  *Id*.  Plaintiffs here, however, do not even make mention of the *Helwig* factors.[24]

Indeed, Plaintiffs have not plead that Defendants engaged in any of this behavior, which serves as the usual indicia of securities fraud.  For example, despite emphasizing the importance of the pending case brought against AEP by the United States Commodity Futures Trading Commission ("CFTC") for the conduct at issue here, Plaintiffs do not allege that AEP has settled that case, which if AEP had done so covertly and in haste would suggest *scienter* under the *Helwig* factors.

Plaintiffs' allegations focus on circumstances and other behavior by Defendants that allegedly show that Defendants knew or recklessly disregarded the inaccurate reporting by traders at AEPES and the lack of internal controls.  Plaintiffs attempt to make the "strong inference" of *scienter* with circumstantial evidence and by averments such as:

> the ongoing manipulations and complete lack of any internal controls to prevent such conduct, as described in ¶¶ 47-50 of the Complaint, provides strong circumstantial evidence that AEP and the Executive Defendants had actual knowledge, or recklessly ignored the true condition of the Company's trading operations at the time they made their materially misleading statements.[25]

---

[24]Despite extensive discussion by Defendants regarding the lack of any allegations going to the *Helwig* factors, in their Memorandum in Opposition, Plaintiffs completely ignore Defendants' arguments in this regard.  Defendants argue this "conspicuous absence" "demonstrates that Plaintiffs have not raised the strong inference of *scienter* required by the PSLRA." While the Court would not go that far, it is telling that none of the usual indicia in the typical securities fraud case is present here.

[25]Memorandum Contra, p. 24.

In  ¶¶ 47-50 of the CAC, Plaintiffs rely on the FERC investigation and Report to support their claims.  Such reliance, however, is misplaced.  Foremost, although Plaintiffs imply throughout the CAC that the FERC investigation took place in one stage, in reality, the FERC Report, published in March 2003, was "the culmination of a yearlong effort . . . to determine whether and, if so, the extent to which California and Western energy markets were manipulated during 2000 and 2001."  FERC Report, at ES-1.

The FERC's investigation began in February 2002 with the narrow focus of investigating "round-trip" or "wash" trading.  It was only after the Dynegy announcement that the FERC, on October 22, 2002, sent data requests regarding price reporting practices to the nation's ten (10) largest gas marketers.[26]  FERC Report, at III-2.  The FERC's investigation and conclusions, then, are not probative of Defendants' *scienter before* October 22, 2002 because, before then, it could not be said that the FERC's investigation could or should have made the Individual Defendants aware of the inaccurate reporting.

Plaintiffs contend in a footnote in their Memorandum in Opposition that, "[b]y January 2002, at the latest, the increased public scrutiny faced by the energy trading firms in the wake of the Enron scandal and its resulting collapse should have caused AEP and the Executive Defendants to determine whether AEPES had the internal controls necessary to prevent market manipulation by its traders."  Plaintiffs fail to allege, however, *how* the Enron scandal should

---

[26]This probe, moreover, was not the impetus for the FERC's investigation into AEPES's reporting practices.  The FERC conducted an investigation, separately, into each of the five companies who admitted that their employees had provided false data to Platts, one of which was AEP.  *See* FERC Report, at III-2-III-5.  This separate investigation was done via an Order issued by the FERC to each of the companies who had admitted that their employees had engaged in false reporting, which was not done until April 30, 2003.  CAC, ¶ 50.

have alerted Defendants to the possibility that traders in AEPES were making false reports to the Trade Press.  Plaintiffs do not contend, for example, that false reporting to the Trade Press was a cause of Enron's collapse and that such was known within the industry as early as January 2002. In addition, Plaintiffs do not allege, and the FERC did not conclude in its Report, that other companies began, as early as January 2002, assessing their internal controls for reporting to the Trade Press.

To the contrary, the FERC concluded after its investigation, which took place between late October of 2002 through April of 2003, that almost none of the companies within the industry had internal controls to ensure accurate reporting.  This context and these additional facts and circumstances demonstrate why Plaintiffs cannot vaguely claim that the "FERC investigation" proves Defendants were or should have been aware of the inaccurate reporting prior to October of 2002.  There is more to the "story."  As explained by the *Campbell* Court,

> Plaintiffs' scienter allegations can be analogized to several strokes of a painting pattern that, considered alone, jump out at the eye. But the context provided by defendants[27] amounts to, literally, the rest of the picture. When the rest of the picture is filled in and the painting is observed as a whole, plaintiffs' individual strokes are rendered no longer distinctive.

234 F.Supp.2d at 686.

Plaintiffs, moreover, cannot equate inaccurate reporting to full-scale "market manipulation," without explanation.  If by "market manipulation" Plaintiffs are referring to "manipulation" of the price indices published by Platts, for example, Plaintiffs' other allegations and the FERC Report, in fact, suggest that it may be impossible to determine the extent to which the inaccurate reporting by AEPES traders had an(y) effect on the published price indices.

----

[27]Or, rather, here a thorough review of the full FERC Report.

According to the CAC, "AEP, *as well as other energy trading participants*, reported daily and monthly natural gas prices and trade volumes to industry publications . . ."  ¶ 45 (emphasis added).  Platts keeps the reported data and its sources confidential, however, even going so far as to assert First Amendment protection against FERC requests to provide the data and its sources.  *See* FERC Report, at III-4.

Thus, even the FERC was unable to determine, in large part, the extent and degree of any *one* company's inaccurate reporting.  Adding to the causality problem is the fact that Platts takes the data it receives from these various sources and *compiles it* to produce the daily and monthly price indices.  Plaintiffs do not purport to know how they could parse AEPES's reporting out of those compilations.  According to the FERC Report, moreover, the practice of inaccurate reporting was so widespread that the determination of any one company's contribution to the resulting skewed price indices seems virtually impossible to discern.  Plaintiffs' claim of "market manipulation," therefore, is pleaded inadequately and must be disregarded.

Plaintiffs' conclusory, factually-unsupported allegation that Defendants knew or should have been aware of the inaccurate reporting because of the *ongoing* manipulation and complete lack of internal controls also does not support the required "strong inference" of *scienter*.  *See, e.g.*, *In re Comshare*, 183 F.3d at 553 ("Although Plaintiffs speculate that it is likely that Defendants knew of the GAAP violations because they occurred over a long period of time, claims of securities fraud cannot rest 'on speculation and conclusory allegations.'") (citation omitted).

### 3. Red Flags & Sources of Duty as *Scienter*

In other cases where plaintiffs have alleged that defendants should have known about some misconduct, courts have found it probative to consider "red flags" and sources of duty. *See*, *e.g.*, *Novak v. Kasaks*, 216 F.3d 300, 308 (2d. Cir. 2000) ("Under certain circumstances, we have found allegations of recklessness to be sufficient where plaintiffs alleged facts demonstrating that defendants failed to review or check information that they had a duty to monitor, or ignored obvious signs of fraud."). Such indices of recklessness particularly are relevant in cases such as this, where Plaintiffs seek to impute conduct that occurred in a subsidiary (AEPES) to Defendants, the parent company (AEP) and its executives (Executive Defendants).

In a factually similar case, plaintiffs brought suit against GE after one of its subsidiaries, Kidder, had discovered that one of its traders had engaged in a scheme to generate false profits over the course of almost three years. *Chill v. General Electric Co.*, 101 F.3d 263, 265 (2d Cir. 1996). Like Defendants here, once Kidder discovered the trader's scheme, it informed GE and the trader was fired; but class actions ensued, nevertheless. *Id*. Also similar to the allegations in the CAC, the *Chill* plaintiffs alleged, "GE recorded hundreds of millions of dollars in profits throughout the Class Period it clearly knew or was wholly reckless in not knowing were manufactured out of thin air . . ." *Id*. at 266.

In reviewing the district court's dismissal of the complaint and denial of leave to amend, the Second Circuit recognized that, "[u]ltimately, whether Kidder defrauded plaintiffs and whether its parent, GE, defrauded plaintiffs are different questions." *Id*. at 264. The Circuit Court agreed with the district court's dismissal, commenting that, "[i]ntentional misconduct or

41

recklessness cannot be presumed from a parent's reliance on its subsidiary's internal controls." *Id*. at 271, quoting *Glickman v. Alexander & Alexander Servs., Inc.*, 1996 WL 88570, *15 (S.D.N.Y. Feb. 29, 1996). The Sixth Circuit agreed with this proposition in *In re Comshare*, where it explained that, "the mere lack of records documenting the finality of sales in Comshare's UK subsidiary could not, without a showing that Comshare normally expected to see such documents from its subsidiaries, imply recklessness. *Indeed, this Court should not presume recklessness or intentional misconduct from a parent corporation's reliance on its subsidiary's internal controls*." 183 F.3d at 554 (emphasis added).

This Court finds that the rule in *Chill* and *In re Comshare* controls here. Plaintiffs have alleged no facts in support of their conclusory allegation that AEP should have known of the inaccurate reporting taking place at its AEPES subsidiary prior to October of 2002. Plaintiffs do not explain why AEP was reckless in relying on AEPES to ensure accurate reporting and maintain its own internal controls.

Throughout the CAC, Plaintiffs make allegations such as, "*AEP's* traders did not surreptitiously engage in the manipulative practices at issue," and ". . . *AEP* had no internal procedures in place to ensure the accuracy of the reported data." Those statements, however, are misleading, as evidenced even by a careful reading of the CAC itself. In ¶ 3, Plaintiffs acknowledge that "AEP created AEP Energy Services to trade energy on the newly deregulated wholesale markets," and that "AEP Energy Services quickly grew into one of the biggest traders in the industry." Plaintiffs admit, in other words, that it is AEP's subsidiary, AEPES, that engages in trading, not the parent company, AEP. Yet Plaintiffs simultaneously make the factually-unsupported, inferential leap that, "*AEP* had been deliberately and routinely reporting

false information to Gas Daily, among other publications, thereby manipulating the statistics concerning the volume of *AEP*'s gas sales in relation to its peers." ¶ 57.

In reality, neither AEP nor any of its management reported the inaccurate data to Platts; the wrongdoers were five traders employed at AEP's subsidiary, AEPES.  *AEP*, itself, never engaged in *any* reporting to Platts; rather, within the industry, it was the traders' responsibility to report their trading information to the trade publications.  Notwithstanding Plaintiffs' misleading representations to the contrary, neither AEP nor AEPES management was involved.

Plaintiffs characterize the head of the trading desk as a person of authority within AEP, but do so, again, without providing factual support.  *See Helwig*, 251 F.3d at 565.  For instance, Plaintiffs allege that, "*AEP* traders stated that the head of *AEP's* trading desk had specifically instructed them to submit the false information." ¶ 6.  Plaintiffs do not, however, also allege that the head of the trading desk was an officer or director at AEP, or that he had any involvement with AEP's SEC filings or press releases.  Indeed, Plaintiffs do not even reveal the identity of the head of the trading desk.

If it is insufficient to infer a parent's *scienter* merely from its subsidiary's bad conduct, it would be even more inappropriate to infer Defendants' *scienter* here, from either the actions of an unidentified "head of the trading desk" or the five traders at AEPES who engaged in the inaccurate reporting.  Plainly, as was the case in *In re Comshare*, "[w]hile Plaintiffs claim Defendants 'were aware of, or were recklessly indifferent to' the revenue recognition errors, they allege no facts to show that Defendants knew or could have known of the errors, or that their regular procedures should have alerted them to the errors sooner than they actually did." 183 F.3d at 553.

Moreover, the totality of the allegations and evidence before the Court contradicts the inference that Defendants knew or recklessly disregarded the inaccurate reporting prior to October of 2002.  Defendants allege, and the FERC Report confirms, that Dynegy publicly disclosed the discovery of inaccurate reporting by its employees on September 25, 2002.  Shortly thereafter on October 4, 2002, was when AEP initiated its own investigation of AEPES's data reporting procedures. When it quickly discovered that five of the AEPES traders had engaged in inaccurate reporting, AEP terminated them and publicly disclosed such on October 9, 2002.

Plaintiffs, on their behalf, have not alleged that any other company was aware of inaccurate reporting before the Dynegy announcement or even that the FERC was aware of the practice before then.  Thus, based upon the factually-supported allegations before this Court, Plaintiffs have failed to plead with sufficient particularity that AEP (or AEPES) recklessly failed to ensure accurate reporting and/or put internal controls into place, despite that all of its competitors had done so.  To the contrary, the FERC Report confirms that prior to its investigation, "the [10 largest natural gas marketers] had little, if any, formal procedures in place to ensure the accuracy of the data reported to the Trade Press."  FERC Report, at III-3.  Such evidence regarding the circumstances under which the inaccurate reporting was taking place belies the inference that AEP either knew about the inaccurate reporting or acted recklessly in relying on AEPES traders to report honestly to the Trade Press.

Plaintiffs' allegations simply do not show "highly unreasonable conduct which is an extreme departure from the standards of ordinary care." *Mansbach*, 598 F.2d at 1025.  Plaintiffs have not alleged "red flags" from which this Court can infer that the inaccurate reporting was so obvious before October 2002 that AEP, especially as the parent company, was reckless in not

knowing about it.  *Id*. (explaining that to allege "recklessness," plaintiffs must allege circumstances from which it can be inferred that "[w]hile the danger need not be known, it must at least be so obvious that any reasonable man would have known of it.").

With regard to duty, Plaintiffs propose that recklessness, when defined as "conscious disregard," can be inferred from the fact that Executive Defendants, especially Addis, van der Walde, and Appelt, had a duty to know that AEPES lacked internal controls to ensure accurate reporting.  Defendant Addis was the President of AEPES and an Executive Vice President of AEP until his resignation in September of 2001.  He was succeeded by Defendant van der Walde, who, prior to September of 2001, directed AEP's domestic trading operations, beginning with the company in 1997 as AEPES's Senior Vice President of Trading.  Defendant Appelt, it is alleged, was responsible for the administrative functions of AEPES's trading group, including the middle office and financial accounting functions.  In January 2000, Appelt was named AEPES's Senior Vice President - Administration and in September 2001, he was promoted to AEP's Executive Vice President - Administration for AEPES.

Plaintiffs' allegations of *scienter* with respect to these Executive Defendants, though more compelling than the allegations against AEP, still are not pleaded with sufficient particularity.  Courts reject the insinuation that officers and directors of a company "must have known" certain information solely because of their positions within the company.  *See*, *e.g.*, *In re Advanta Corp. Securities Litigation*, 180 F.3d 525, 539 (3d Cir. 1999), quoting *Maldonado v. Dominguez*, 137 F.3d 1, 10 (1st Cir. 1998) ("allegations that a securities-fraud defendant, because of his position within the company, 'must have known' a statement was false or misleading are 'precisely the types of inferences which [courts], on numerous occasions, have

determined to be inadequate to withstand Rule 9(b) scrutiny.' Generalized imputations of knowledge do not suffice, regardless of the defendants' positions within the company."). Consequently, it is necessary for Plaintiffs to allege more than just that Addis, van der Walde and Appelt held high level management positions at AEPES.

Plaintiffs fail to allege the specific job responsibilities associated with those titles that might allow the Court to conclude that, even if AEP did not become aware of the inaccurate reporting until October of 2002, the nature of those positions within AEPES made it unreasonable for the Executive Defendants in those positions not to know about the inaccurate reporting. If, for example, Plaintiffs had alleged that the position of AEPES's Senior Vice President of Trading was supposed to monitor the reporting to the Trade Press, then van de Walde might be said to have "consciously disregarded" the inaccurate reporting even if he claimed to be unaware of it.

Plaintiffs, however, have not made such allegations, and "there are limits to the scope of liability for failure adequately to monitor the allegedly fraudulent behavior of others." *Novak*, 216 F.3d at 309 (noting this limit in discussing its "several important limitations on the scope of liability for securities fraud based on reckless conduct"). Plaintiffs have alleged no source of any duty by these Executive Defendants either to monitor the reporting to trade publications or to ensure its accuracy. As the *Chill* court explained, in a statement that seems especially on point here, "[t]he plaintiffs' claim of deliberate blindness is not supported by their allegations." *Chill*, 101 F.3d at 270.

#### 4.  **Motive & Opportunity as *Scienter***

Finally, with regard to Executive Defendants Addis and van der Walde, Plaintiffs

contend that their resignations support a strong inference of *scienter*.  The Court might have

found this argument persuasive if Plaintiffs had proposed any plausible explanation for the

significance of the dates of the resignations, but Plaintiffs have not.  Plaintiffs merely allege that

Addis resigned in September of 2001.  That was almost a year before the alleged discovery and

disclosure of the inaccurate reporting, however, so there is no apparent significance or suspicion

connected with the date of Addis' resignation.  Moreover, while the CAC states that van der

Walde resigned on October 24, 2002, Plaintiffs offer no explanation for why his resignation

almost a month after the public disclosure should be viewed with unusual suspicion.  ¶ 124.  In

fact, van der Walde's resignation seems explainable by AEP's decision to decrease the size of its

trading and wholesale marketing operations because van der Walde was AEP's Executive Vice-

President of *marketing and trading*.  ¶¶ 123, 25.

Another of Plaintiffs' proposed inferences of *scienter* is that AEP "discovered" the

"manipulative practice" "a mere five days after" it announced on October 4, 2002, that it had

begun its internal investigation of AEPES's reporting procedures.  Plaintiffs imply *scienter* by

virtue of the short time it took Defendants to uncover inaccurate reporting by five traders at

AEPES – the insinuation being that Defendants very likely knew about the practice all along but

finally felt forced to disclose it because of the increased scrutiny following the Dynegy

announcement.  Such insinuation, however, is insufficient to make the "strong inference" of

*scienter*.

47

The PSLRA and Sixth Circuit require Plaintiffs to plead *facts* regarding Defendants' *scienter* in order to survive a motion to dismiss, *Helwig*, 251 F.3d at 565, and this Court is not required to accept unwarranted factual conclusions. *Davis*, 259 F.Supp.2d at 669. The most plausible inference from AEP's public disclosure is *not* that Defendants acted recklessly in not knowing about the inaccurate reporting before the announcement. Rather, the most plausible of the competing inferences is that Defendants acted diligently in remedying a problem as soon as they became aware of the possibility that it existed and did not try to hide it from AEP investors. If this Court were to allow Plaintiffs to plead the strong inference of *scienter* in this context, the result would be untenable. Companies would have disincentives to make public disclosures of employee malfeasance, which is antithetical to one of the underlying purposes of the securities laws in encouraging and requiring full disclosure.

Plaintiffs' final attempt to show a "strong inference" of recklessness is to allege two motives that Defendants allegedly had to conceal the inaccurate reporting. According to Plaintiffs, AEP and the Executive Defendants "were highly motivated" to conceal misconduct until after AEP had: 1) gotten FERC approval of its corporate separation, which took place in September of 2002; and 2) made the Secondary Offering that raised nearly a billion dollars in June 2002.[28] As already acknowledged, the Sixth Circuit had held that motive and opportunity

---

[28]Plaintiffs' allegations in this regard are as follows:

[O]n July 24, 2001, AEP announced that it was seeking FERC approval for changes necessary to complete a planned separation of the Company's regulated and unregulated holdings. AEP originally announced its restructuring plan in October 2000 and filed documents with the SEC in November 2000 that outlined the plan to form two wholly owned corporations – one corporation to hold AEP's subsidiaries whose revenues derive from competitive, usually market-based, activities; the second to hold AEP's utility subsidiaries that are subject to regulation by at least one state utility commission or foreign utility subsidiaries

may be relevant to *scienter* and averring recklessness. *Helwig*, 251 F.3d at 551. They usually are not sufficient by themselves, however, to meet the "strong inference" requirement. *In re Comshare*, 183 F.3d at 551. Additionally, "unsupported allegations with regard to motives generally possessed by all corporate directors and officers are insufficient as a matter of law. The 'plaintiffs must assert concrete and personal benefit to the individual defendants resulting from the fraud.'" *In re K-tel*, 300 F.3d at 894, citing *Kalnit v. Eichler*, 264 F.3d 131, 139 (2d Cir. 2001) (other citations omitted). In *Chill*, the Second Circuit noted, "GE obviously would want to justify its investment in Kidder and have that investment appear profitable, but such a generalized motive, one which could be imputed to any publicly-owned, for-profit endeavor, is not sufficiently concrete for purposes of inferring *scienter*." *Id.* at 268.

---

subject to rates or tariffs regulations. ¶ 82.

On September 27, 2002, just twelve days before the last day of the Class Period, AEP announced that it had received FERC approval of its corporate separation plan. With the Secondary Offering completed and FERC approval of the separation plan received, the Executive Defendants no longer had as powerful a motive to conceal the undisclosed adverse information concerning AEPES's lack of trade information reporting procedures and AEPES's continual practice of reporting false trade information concerning natural gas trades to industry trade publications. ¶ 118.

On June 11, 2002, AEP announced the completion of the Secondary Offering – the sale of 16 million new shares of common stock at $40.90 per share and 6 million Equity Units at $50.00 per unit. The Company stated that the net proceeds from the transaction of approximately $926 million would be used primarily to reduce short-term debt. ¶ 109.

Had AEP completed the Secondary Offering after its end-of-Class Period disclosure, the Company would have received more than $370 million less from the common stock component of the Secondary Offering and more than $130 million less from the Equity Units component of the Offering. ¶ 110.

49

Plaintiffs' motive allegations are inadequate in several regards.  First, Plaintiffs do not assert any "concrete or personal benefit" reaped by any of the Executive Defendants.  Plaintiffs do not allege that the Executive Defendants benefitted in any way from either the reorganization plan's approval or the secondary offering.  If Plaintiffs want the Court to imply that the Individual Defendants benefitted from some increase in the value of their stock, even assuming that such were true, that "benefit" does not suffice to make the "strong inference" of *scienter*. *See*, *e.g.*, *Nathenson v. Zonagen Inc.*, 267 F.3d 400, 420 (5th Cir. 2001) ("the allegations that corporate officers and directors would benefit from enhancing the value of their stock and/or stock options . . . are likewise insufficient to support a strong inference of scienter.").  The reason corporate profitability is not sufficient to allege Defendants' *scienter* is that:

> [t]he motive to maintain the appearance of corporate profitability . . . will naturally involve benefit to a corporation, but does not "entail concrete benefits.". . . "If *scienter* could be pleaded on that basis alone, virtually every company in the United States that experiences a downturn in stock price could be forced to defend securities fraud actions."

*Chill*, 101 F.3d at 268, quoting *Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 54 (2d Cir. 1995). Plaintiffs allege only that *AEP* "was able to raise approximately $500 million more in proceeds than if the Company had completed the Secondary Offering after disclosure of the fraud," and that "it is reasonable to infer the FERC approval of AEP's planned corporate separation would have been in jeopardy had AEP disclosed [the inaccurate reporting], prior to receiving FERC approval."[29]

Second, with regard to the FERC's approval of the reorganization plan, Plaintiffs fail to explain how inaccurate reporting would have affected the FERC's approval.  Plaintiffs merely

---

[29]Memorandum in Opposition, p. 28.

conclude that "it is reasonable to infer" that it would have been in jeopardy.  Yet again, these conclusory allegations are insufficient to allege a strong inference of Defendants' *scienter*. Plaintiffs' other allegations, in addition, undermine that conclusion.  It is unreasonable to believe that AEPES would begin inaccurately reporting information to the trade publications in 1998, in anticipation of it having some affect on the FERC's approval of a reorganization plan for AEP four years later.  Plaintiffs, thus, fail to plead the alleged fraud with the particularity required by Rule 9(b) and the PSLRA.

Third, as for Plaintiffs' allegation that the secondary offering was more profitable, courts have rejected that averment as sufficient to allege the required "strong inference" of *scienter*. *Nathenson*, 267 F.3d at 420 ("[T]he allegations that . . . the corporation would benefit by receiving more for its shares to be issued in the July 1997 public offering are likewise insufficient to support a strong inference of scienter.").  *Cf. In re Twinlab Corp. Sec. Litig.*, 103 F.Supp. 2d 193, 206-07 (E.D.N.Y. 2000).  Moreover, the strength of this allegation is dependent upon finding that the Executive Defendants, acting on behalf of the corporation, knew about the inaccurate reporting prior to October of 2002.  Otherwise, the June 2002 timing of the Secondary Offering would not be suspicious because it would have occurred prior to Defendants' discovery of the inaccurate reporting.  As with the problem regarding the FERC's approval of the reorganization plan, Plaintiffs fail to plead the alleged fraud with particularity.  Plaintiffs allege a four-year conspiracy by AEP to engage in inaccurate reporting and cover it up in order for the company to make more money from a Secondary Offering in 2002, when there is no allegation that AEP had planned on making the Secondary Offering in 1998.

The aforementioned illustrates that all of Plaintiffs' attempts at pleading the "strong inference" of Defendants' *scienter* or pleading the circumstances surrounding the fraud with particularity are insufficient to survive Defendants' Motion to Dismiss.  Plaintiffs' pleading technique is "to couple a factual statement with a conclusory allegation of fraudulent intent" without alleging the facts to support the contention.  *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1129 (2d Cir. 1994) (rejecting such a "pleading technique" as insufficient under Rule 9(b)); *see also Southland Securities Corp. v. INSpire Ins. Solutions, Inc.*,  2004 WL 626721, *12 (5th Cir. Mar. 31, 2004) (unpublished) ("The plaintiffs, however, fail to plead facts demonstrating that any of the individual defendants actually knew, or were severely reckless in not knowing, of these alleged infirmities.").

In addition, the most plausible inference from the allegations and facts before this Court is that Defendants, the parent company and its executives, did not know, and were not reckless in not knowing, of the inaccurate reporting prior to October of 2002.  At most, Plaintiffs' allegations suggest AEP, not unlike the other companies within the industry, perhaps should have had controls in place at its AEPES subsidiary to ensure accurate reporting.  AEP's alleged failure, however, is mismanagement at best, which is not actionable under Section 10(b).  *See Auslender v. Energy Management Corp.*, 832 F.2d 354, 357 (6th Cir. 1987) ("Mere mismanagement or inaccurate predictions are not enough [to establish a securities fraud violation]."); *In re Duke Energy Corp. Sec. Litig.*, 282 F.Supp.2d 158, 160 (S.D.N.Y. 2003), quoting *Field v. Trump*, 850 F.2d 938, 948 (2d Cir. 1988) ("'garden-variety mismanagement, such as managers failing to . . . adequately inform themselves' do not state a claim under federal securities laws.").

That also was the finding of the district court in *Chill*.  101 F.3d at 266 ("[The subsidiary] had its own internal control mechanisms and [the parent] had a right to rely on [the subsidiary] to monitor its own financial reporting. To so rely is not evidence of recklessness. It is evidence of mismanagement at most and mismanagement is not necessarily securities fraud.").  In *Chill*, moreover, the Second Circuit rejected defendant's argument that the district court "improperly undertook the role of a jury when it evaluated competing inferences to find that GE's actions were not reckless but instead 'mismanagement at most.'" *Id*. at 268, n. 7.  It acknowledged and approved that, "the court simply refused to credit plaintiffs' argument that an inference of recklessness rationally could be made." *Id*.  This Court adopts and follows the *Chill* rationale here.

### 5.  "Fraud by Hindsight" as *Scienter*

Plaintiffs also have attempted to state a claim of securities fraud under Section 10(b) and Rule 10b-5 by alleging "fraud by hindsight."  Courts, however, consistently have rejected that argument.  *See, e.g.*, *In re SCB*, 149 F.Supp. 2d at 354 (finding plaintiffs' reliance on a press release was an effort to show "fraud by hindsight" which fails under the PSLRA); *Denny v. Barber*, 576 F.2d 465, 470 (2d Cir. 1978) (affirming district court's dismissal of an amended complaint based on failure to plead fraud with particularity and noting, "[i]n sum, the complaint is an example of alleging fraud by hindsight. For the most part, plaintiff has simply seized upon disclosures made in later annual reports and alleged that they should have been made in earlier ones."); *Schwartz v. Novo Industri A/S*, 658 F.Supp. 795, 799 (S.D.N.Y. 1987) ("[T]he complaint is an example of alleging 'fraud by hindsight' and therefore not actionable under § 10(b) and Rule 10b-5.").  As the Second Circuit stated, "[c]orporate officials need not be

clairvoyant; they are only responsible for revealing those material facts reasonably available to them." *Novak*, 216 F.3d at 309.

The "fraud by hindsight" construction is even more apparent when this Court considers the alleged misstatements and omissions. Plaintiffs' theory of liability is similar to the theory advanced by the plaintiff in *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1129 (2d Cir. 1994), which was rejected by the Second Circuit. In *Shields*, the Court explained:

> Nowhere in her Complaint does Shields adduce the kind of circumstantial evidence that would indicate conscious fraudulent behavior or recklessness. Shields records statements by defendants predicting a prosperous future and holds them up against the backdrop of what actually transpired. . . This technique is sufficient to allege that the defendants were wrong; but misguided optimism is not a cause of action, and does not support an inference of fraud. We have rejected the legitimacy of "alleging fraud by hindsight."

*Id*. In a similar vein, the court in *In re Federal-Mogul* explained:

> Pursuant to the strong inference pleading standard, Plaintiffs are entitled to only the best explanation of rival conclusions. The conclusion reached by Plaintiffs is that Defendants knowingly or recklessly misstated material facts about the health of Defendant Federal-Mogul after certain acquisitions.
>
> * * * * * * * *
>
> In these circumstances, the best explanation is that offered by Defendants rather than that offered by Plaintiffs. Even if Defendants made incorrect positive statements about Federal-Mogul's core operations while they were in charge of the day-to-day operations, the best explanation of any inaccuracy is not that they knowingly or recklessly misstated the truth. "Honest optimism followed by disappointment is not the same as lying or misleading with deliberate recklessness."

166 F.Supp.2d at 564, quoting *Ronconi v. Larkin*, 253 F.3d 423, 432 (9th Cir. 2001).

Inescapably, Plaintiffs have failed to plead fraud and Defendants' *scienter* with the particularity required by Rule 9(b), the PSLRA, and the consonant jurisprudence that has considered this issue. Hence, the Court **DISMISSES** Plaintiffs' claims under Section 10(b) and Rule 10b-5 against AEP and the Executive Defendants. *See, e.g., In re Comshare*, 183 F.3d at

54

554 ("Because Plaintiffs have failed to plead facts that show that the revenue recognition errors at Comshare's UK subsidiary should have been obvious to Comshare or that Comshare consciously disregarded 'red flags' that would have revealed the errors prior to their inclusion in public statements, we conclude the Complaint fails to allege facts that give rise to a strong inference of scienter under § 10(b) and Rule 10b-5."); *Chill*, 101 F.3d at 271 (finding the accuracy of plaintiffs' alleged misrepresentations by defendant was irrelevant, and dismissal was appropriate, because plaintiffs failed to allege the requisite *scienter*); *Shields*, 25 F.3d at 1129 ("What is lacking from all of [plaintiff's] allegations are particularized facts to support the inference that the defendants acted recklessly or with fraudulent intent."); *In re Federal-Mogul*, 166 F.Supp.2d at 563.

### C. Misstatements or Omissions Under Sections 10(b) and 11

Although the failure to plead *scienter* is a sufficient basis for dismissing Plaintiffs' Section 10(b) and Rule 10b-5 claims, it is necessary to consider whether Plaintiffs have met the requirement of pleading a misstatement or omission because that also is an element of Plaintiffs' Section 11 claims. Defendants do not contest that Plaintiffs purchased securities, as required to state a claim under Section 11. Instead, as they dispute with regard to Plaintiffs' claim under Rule 10(b) and Section 10b-5, Defendants argue that Plaintiffs fail to plead any material misstatements or omissions. Defendants contend that, for most of the statements, because there is no relationship between the allegedly false or misleading statement made by them and the specific subject of inaccurate reporting to Platts – the information Plaintiffs allege that Defendants also should have been disclosed – the CAC fails to state a claim as a matter of law. Defendants profess that in none of the statements did they discuss the issue of reporting by

55

traders, so there was no duty to disclose inaccurate reporting, even assuming they knew about it prior to October of 2002.  As for the remainder of the statements, Defendants contend that they are inactionable puffery or otherwise immaterial.

Plaintiffs aver that Defendants had a duty to disclose, in various instances, either the procedures for reporting, the lack of internal controls to monitor the reporting and/or the practice of inaccurate reporting by traders.  Such disclosures, Plaintiffs contend, were necessary to make Defendants' statements non-misleading.  In their Memorandum in Opposition, Plaintiffs cite representative, specific examples of allegedly misleading statements from the CAC, so the Court will address each of those statements.  Plaintiffs deal separately with the Registration Statements alleged under Section 11, and the Court will follow their lead.  Essentially, however, all of the statements to which Plaintiffs point fail either because they were not misleading *when they were made* or not material, regardless.

### 1. Alleged Materially Misleading Statements in the Registration Statement and Documents Incorporated by Reference Therein

Section 11(a) of the Securities Act states, in pertinent part:

> (a) In case any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading, any person acquiring such security (unless it is proved that at the time of such acquisition he knew of such untruth or omission) may, either at law or in equity, in any court of competent jurisdiction, sue--(1) every person who signed the registration statement; (2) every person who was a director of ... the issuer at the time of the filing of the part of the registration statement with respect to which his liability is asserted; ... (5) every underwriter with respect to such security....

15 U.S.C. § 77k(a).  As explained above, Section 11 allows purchasers of securities to bring a claim against certain enumerated parties in a registered offering if false or misleading information was included in a registration statement.  *Id*.  "To avoid dismissal of a section 11

omission claim, plaintiffs must properly allege: 1) the prospectus contained an omission; 2) the

omission was material; 3) defendants were under a duty to disclose the omitted material

information; and 4) that such information existed at the time the prospectus became effective."

*Oxford Asset Management, Ltd. v. Jaharis*, 297 F.3d 1182, 1189 (11th Cir. 2002). "The test for

whether a statement is materially misleading under Section 10(b) and Section 11 is 'whether the

defendants' representations, taken together and in context, would have misled a reasonable

investor.'" *Rombach v. Chang*, 355 F.3d 164, 172 n.7 (2d Cir. 2004), quoting *I. Meyer Pincus &*

*Assoc. v. Oppenheimer & Co.*, 936 F.2d 759, 761 (2d Cir. 1991) (internal brackets omitted).

Finally, "[i]n determining whether the statements are actionable, the court must scrutinize the

nature of the statement to determine whether the statement was false when made." *Sinay v.*

*Lamson & Sessions Co.*, 948 F.2d 1037, 1040 (6th Cir. 1991).

In their Memorandum in Opposition, Plaintiffs cite to three statements in the Registration

Statement and incorporating documents that are representative of those they offer in the CAC as

materially misleading "in light of the circumstances under which they were made." First

Plaintiffs aver that AEP's statement in its 2001 10-K that it was ranked by Platts Gas Daily as

Nos. 14, 10 and 2 in gas sales for the first, second and third quarters, respectively, of 2001, was

materially false and misleading. Second, Plaintiffs profess that it was misleading for Defendants

to discuss AEPES's trading activities and AEP's risk management procedures without disclosing

that AEP, nor AEPES, had no internal procedure for verifying the accuracy of reporting to the

trade press. Third, Plaintiffs contend it was misleading for AEP to state that it had reviewed its

records, interviewed personnel in conjunction with the FERC investigation, but found no

improper activity by AEP.

57

### a.  AEP's Statements in its 2001 10-K Regarding Platts' Rankings

Plaintiffs contend that it is reasonable to infer that the rankings were false because the traders at AEPES reported false information to Platts, and that, at any rate, it was misleading for AEP not to disclose that the rankings were based on information reported to Platts, for which there were internal controls to ensure its accuracy.

The causation Plaintiffs allege, however, is belied by the facts.  Plaintiffs cannot allege that AEPES's inaccurate reporting, alone, had any effect on the rankings because the rankings were determined from the price indices that were compiled *over time* by Platts, from reporting by many companies and sources that was kept confidential.  Furthermore, because almost all of those companies also were engaging in false reporting, it is equally likely that the rankings would have been the same or perhaps even better, as opposed to worse, in the absence of false reporting by AEPES and/or the other companies.  Essentially, there is no way for Plaintiffs to know (or to allege in good faith) what effect, if any, the false reporting by the five AEPES traders might have had on those quarterly rankings in 2001; i.e., whether the rankings *actually were false*.[30]

### b.  AEP's Discussion of it Energy Trading Activities & Internal Control Procedures

As for Plaintiffs' contention that AEP had a duty, at least, to disclose: 1) that the rankings were based, in part, on trading data reported by its traders; and 2) that it had no internal procedure for ensuring the accuracy of those reports, "a corporation is not required to disclose a fact merely because a reasonable investor would very much like to know that fact. Rather, an

---

[30]This causality problem also suggests that allowing Plaintiffs leave to amend would be futile.

omission is actionable under the securities laws only when the corporation is subject to a duty to disclose the omitted facts." *In re Time Warner*, 9 F.3d at 267.

Here, the duty would arise if the allegedly omitted information were required to make the rankings non-misleading.  The alleged misleading nature of the rankings, however, is due to *inaccurate* reporting, but that does not give rise to a duty to disclose the *methodology* of the reporting.  Furthermore, Plaintiffs have not alleged that there was a "'substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available.'"  *Duke*, 282 F.Supp. 2d at 160, quoting *Basic Inc.*, 485 U.S. at 231-32.

Rankings, by their very nature, are the result of complicated and often times questionable calculations and processes.  For that reason, a reasonable investor would not rely on such rankings, and even less on the process(es) by which they are determined, in such a way that the methodology can be said to be material information that a reasonable investor would want to know.  *See Gebhardt v. ConAgra Foods, Inc.*, 335 F.3d 824, 829 (8th Cir. 2003) ("Ordinarily, materiality is a question of fact for the jury; however, we have recognized an exception in cases where the false information is so insignificant, in relation to the total mix of data available, that it would not have mattered to a reasonable investor.").  Regarding this statement, Plaintiffs fail to state a *material* misrepresentation or concealment.

The second set of statements Plaintiffs point to as being misleading are found in a section of the Registration Statement headed: "Risks Related to Our Energy Trading and Wholesale Business."  In their Memorandum in Opposition, Plaintiffs pull two statements from this section, which they cite in whole in the CAC, to argue that the statements are misleading because

59

Defendants omitted the inaccurate reporting, lack of internal controls and information about how the market prices for gas were determined, in part, by the data reported to the Trade Press. Following is the full excerpt cited in ¶ 54 of the CAC, with the portions in bold being those Plaintiffs pull out and cite to in their Memorandum in Opposition.

> We sell power from our generation facilities into the spot market or other competitive power markets or on a contractual basis. We also enter into contracts to purchase and sell electricity, natural gas and coal as part of our power marketing and energy trading operations. With respect to such transactions, we are not guaranteed any rate of return on our capital investments through mandated rates, and our **revenues and results of operations are likely to depend, in large part, upon prevailing market prices for power in our regional markets and other competitive markets.** These market prices may fluctuate substantially over relatively short periods of time. It is reasonable to expect that trading margins may erode as markets mature and that there may be diminished opportunities for gain should volatility decline. In addition, the Federal Energy Regulatory Commission (the "FERC"), which has jurisdiction over wholesale power rates, as well as independent system operators that oversee some of these markets, may impose price limitations, bidding rules and other mechanisms to address some of the volatility in these markets.
>
> Our energy trading (including fuel procurement and power marketing) activities expose us to risks of commodity price movements. We **attempt to manage our exposure through enforcement of established risk limits and risk management procedures**. These risk limits and risk management procedures may not always be followed or may not work as planned and cannot eliminate the risks associated with these activities. As a result, we cannot predict the impact that our energy trading and risk management decisions may have on our business, operating results or financial position. We routinely have open trading positions in the market, within established guidelines, resulting from the management of our trading portfolio. To the extent open trading positions exist, fluctuating commodity prices can improve or diminish our financial results and financial position. (emphasis added)

(CAC, ¶ 54).

As becomes clear only from the full context in which the bold, excerpted statements were made, they are surrounded by cautionary language.  Because the whole excerpt is forward-looking in the sense that it warns investors of the volatile nature of the markets and how that may affect the company ("[a]s a result, we cannot predict the impact that our energy trading and risk

management decisions may have on our business, operating results or financial position"), the "bespeaks caution" doctrine applies. *See, e.g., P. Stolz Family Partnership L.P. v. Daum*, 355 F.3d 92, 97 (2d Cir. 2004) ("cautionary language associated with the 'bespeaks caution' doctrine is aimed at warning investors that bad things may come to pass – in dealing with the contingent or unforeseen future.").

Under that doctrine, "[c]ertain alleged misrepresentations . . . are immaterial as a matter of law because it cannot be said that any reasonable investor could consider them important in light of adequate cautionary language set out in the same offering." *Halperin v. eBanker USA.com, Inc.*, 295 F.3d 352, 357 (2d Cir. 2000). *See also Sinay v. Lamson & Sessions Co.*, 752 F.Supp. 828, 833 (N.D. Ohio 1990), quoting, *Isquith v. Middle South Utilities, Inc.*, 847 F.2d 186, 204 (5th Cir. 1988) ("'Whether liability is imposed depends on whether the predictive statement was 'false' when it was made. The answer to this inquiry, however, does not turn on whether the prediction in fact proved to be wrong; instead, falsity is determined by examining the nature of the prediction – with the emphasis on whether the prediction suggested reliability, bespoke caution, was made in good faith, or had a sound factual or historical basis.'"). The cautionary language in the Registration Statement sufficiently warns investors of the volatility and risky nature of the energy trading and wholesale business, such that the Plaintiffs' alleged omissions are immaterial.[31] A reasonable investor would not have been misled into believing

---

[31]Plaintiffs allege (¶ 64) that this statement also violates the Exchange Act (Section 10(b) and Rule 10b-5), so it is relevant to note that such statements are protected by the "safe harbor" provisions of the PSLRA. Under this "safe harbor" provision, forward-looking statements are not unlawful if they are "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement; or [they are] immaterial . . ." 15 U.S.C.A. § 78u-5(c)(A)(i)(ii). Thus, even if the Court determined that Plaintiffs had plead Defendants' *scienter* with sufficient particularity, this

that the energy markets were not inherently risky.  Thus, there was no material misrepresentation.

Perhaps more importantly, Defendants argue that the Registration Statement is not actionable based upon the omission of wholly unrelated pieces of information.  Defendants contend that they had no duty to disclose the information about reporting (whether methodology, inaccuracy or internal controls regarding such) to trade publications because none of the statements they made concerned the specific topic of reporting to the Trade Press.

The principle implied by the plain language of the statutes is that, to be actionable, omissions must be related to the statements made by Defendants.  Section 11 makes it unlawful to "omit[] to state a material fact . . . necessary to make the statements therein not misleading." 15 U.S.C. § 77k(a).  Likewise, under Rule 10b-5, it is illegal for "any person . . . to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading."  17 C.F.R. § 240.10b-5(b); *see also Helwig*, 251 F.3d at 561, citing *Rubin v. Shottenstein*, 143 F.3d 263, 268 (6th Cir. 1998) ("[C]ompanies are required to provide complete and non-misleading information with respect to the subjects on which [they] undertake[] to speak.").  The PSLRA makes this requirement explicit when it provides that "the complaint shall specify each statement alleged to have been misleading, the

---

statement (and others qualifying under the "safe harbor" provisions) would not be actionable under Section 10(b) because it is surrounded by cautionary language.  *See*, *e.g.*, *Miller*, 346 F.3d at 678, citing 15 U.S.C. § 78u-5(c)(1)(A) ("[S]ince we conclude that the statements . . . were both forward-looking within the meaning of the PSLRA, and that they were accompanied by meaningful cautionary language, the statements are subject to the safe harbor provisions of the PSLRA and are therefore not actionable. No investigation of defendant's state of mind is required.").

*reason or reasons why the statement is misleading*, and if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1) (emphasis added).

The necessity of a relationship between the omission and the statements makes sense, additionally, because it would be untenable not to have limits on the scope of "subjects," to use the language of *Helwig*. There has to be some boundaries to the scope and breadth of "subjects," lest the purpose of the securities laws would be thwarted. The laws were enacted to ensure that investors receive pertinent information. To inundate them with more than that ultimately would cause them to ignore even the buried, pertinent information. *See also In re K-tel*, 300 F.3d at 898 ("[T]he requirement is not to dump all known information with every public announcement."). Finally, as Defendants argue, "[w]ere Plaintiffs' theory to be accepted, all statements that would otherwise be accurate would be transformed into misstatements whenever a company later discovers past wrongdoing by employees and takes corrective action."

The *In re Ford Motor Company Securities Litigation* case, which is factually similar to this one, helps illustrate this principle. 184 F.Supp. 2d 626. There, plaintiffs brought suit against Ford and its executives under Section 10(b) and Rule 10b-5 alleging that the company made misleading statements about the quality and safety of its Explorer sport utility vehicles. *Id.* at 628. As with Plaintiffs' theory here, in *In re Ford*:

> Plaintiffs' theory of liability is premised on Ford's omission of material information which allegedly transformed seemingly innocuous and accurate statements into misleading statements. . . By omitting information about this contingent liability, plaintiffs argue, Ford's accurate statements about sales of Explorers and its bolstering statements regarding corporate responsibility became misleading to investors."

*Id*. at 630.

In finding that the plaintiffs had failed to state a claim under Section 10(b) and Rule 10b-5, the Court distinguished *Helwig* by finding the facts before it did not present an instance of a duty to disclose *fully*, as was the case in *Helwig*. *Id*. at 632-33. Instead, the court determined that Ford's statements were general, unlike the specific statements in *Helwig*, and thus Ford's general statements did not give rise to a duty to disclose information about a specific problem that may occur in the future. *Id*. at 633. The court reasoned that, "[u]nlike in *Helwig*, where the company's public statement were [sic] directly related to the withheld adverse information, Ford's public statement [sic] do not relate." *Id*.

Similarly, the statements in the "Risks Related to Our Energy Trading and Wholesale Business" section are general and did not give rise to a duty by AEP to disclose anything about the specific subject of reporting to the Trade Press, *especially* where, as here, the Plaintiffs have alleged no way in which investors either have access to those price indices or use them in their investment decisions. Plaintiffs do not, for example, cite to other energy trading companies' prospectuses or Registration Statements that inform their investors of the process of reporting by traders.

Moreover, although Plaintiffs allege that there was inaccurate reporting since 1998, even assuming that Defendants knew it was occurring all along, there is no way that Defendants could have known that in 2002 the FERC would investigate and determine that "the most widely used published price indices were compiled without adequate standards or controls, were subject to manipulation, [and] could not be independently verified." FERC Report, at ES-4.

The facts of this case also are similar to the facts in *In re Ford*, in that, like Ford, which had knowledge tending to suggest that there was a problem with the tires for many years (Ford

64

began receiving complaints about the Explorer in 1992),[32] even if Defendants are assumed to have known about the inaccurate reporting since 1998, neither company knew with certainty that it would incur "liabilities," due to its conduct, in the future. The *In re Ford* court reasoned, "[c]ompanies are under no duty to disclose predictions that are not substantially certain to hold." 184 F.Supp. 2d at 633. Thus, either because the omissions are unrelated to the statements or because the subject of the omissions was not certain to occur, AEP was under no duty to disclose the information Plaintiffs cite about traders reporting to trade publications.

### c. AEP's Statements about the FERC Investigation

Plaintiffs allege that the prospectuses and the 2002 First Quarter 10-Q made misleading statements about the nature of the FERC investigation and the actions AEP took in response. According to Plaintiffs, it was materially misleading for AEP to represent that it had conducted an internal investigation and found no improper activity when, in fact, "AEP personnel were openly engaging in manipulative practices, unfettered by any internal controls to prevent such conduct." This Court rejects Plaintiffs' arguments because, as explained above,[33] the FERC investigation proceeded in stages and did not involve the specific issue of false reporting to industry publications until after the Dynegy announcement. Defendants' statements on the FERC investigation were not misleading in light of the facts before this Court.

### 2. Other Alleged Materially Misleading Statements

As for the other statements cited in the CAC, they can be categorized and dealt with as follows: 1) statements about AEP's internal practices; 2) statements about AEP's earnings; 3)

---

[32]184 F.Supp. 2d at 629.

[33]*See supra* at 36.

statements about AEP's growth strategies and management changes; and 4) statements made by analysts about the success of AEPES.  It is important to note at the outset, though, that Plaintiffs' remaining allegations still are dependant upon their being able to prove Defendants' knowledge of the inaccurate reporting when all these statements were made.  Otherwise, the statements cannot be rendered misleading in hindsight because of information that came to light after the statements were made.  As the court noted in *In re K-Tel*:

> What makes many securities fraud cases more complicated is that often there is no reason to assume that what is true at the moment plaintiff discovers it was also true at the moment of the alleged misrepresentation, and that therefore simply because the alleged misrepresentation conflicts with the current state of facts, the charged statement must have been false . . . [A] plaintiff must set forth, as part of the circumstances constituting fraud, an explanation as to why the disputed statement was untrue or misleading *when made*.

300 F.3d at 891 (original emphasis) (internal citations and quotations omitted).

The following are examples of statements about AEP's internal practices made by Defendants that Plaintiffs claim are misleading.  In ¶ 93 of the CAC, Plaintiffs quote from a January 22, 2002 AEP press release, where Draper stated:

> "Enron's bankruptcy has increased Wall Street's scrutiny of companies with energy trading groups."  In this regard defendant Draper stated: "We welcome the increased scrutiny, because those who take a close look at us quickly realize our strengths: a conservative approach to finance and reporting, a strong asset base, a balanced blend of low-risk and higher risk businesses and a valid strategy for growth and stability."

In ¶ 91, Plaintiffs cite to a December 19, 2001 press release issued by AEP, where it reduced its earnings guidance for 2001 and 2002 and commented on the collapse of Enron.  The release stated in pertinent part:

> "Extremely mild weather and the recession hurt earnings in the fourth quarter and will dampen results in what was otherwise an excellent year," said [Defendant Draper].  "While continued economic weakness will also likely affect 2002, we remain strongly positioned to grow and build on our energy market leadership. We are a financially

66

strong, asset-rich company with a sound wholesale-focused growth strategy, conservative risk management policies, and a significant regulated business."

As for statements made about AEP's earnings, Plaintiffs contend that statements such as the one made by Defendant Draper in this February 10, 2000 press release were materially misleading:

"By using our rapidly expanding – and successful – electricity and gas marketing and trading operation, we have a unique ability to unleash the value of our generating assets in the competitive marketplace," Draper said. "That asset base also becomes the foundation for expanding and reshaping our generation portfolio, to achieve further fuel diversity and geographic reach into different regional markets.

Our trading organization is already number two in electricity trading volumes and will continue to grow," Draper said. "We were early to recognize that value in the energy marketplace is driven by information . . ."

CAC, ¶ 62. Finally, Plaintiffs argue that Defendants made materially misleading statements and/or did not disclose other information to analysts, which, in turn, caused the analysts to overstate the success of AEPES. In ¶ 89, for example, Plaintiffs aver:

Analysts responded positively to AEP's third quarter results. Following conversations with management regarding the Company's significant growth in wholesale operations, (primarily gas marketing and trading), on October 23, 2001, UBS Warburg issued a report recommending a "Buy" rating for AEP. The analyst stated: "Heightened activity in the wholesale power and gas marketing and trading markets led to a 50% increase in third quarter 2001 revenues." The analyst further noted that AEP was ranked second among North American power marketers in terms of volume and that for the quarter, domestic wholesale natural gas volumes reportedly rose 265%.

*Id.*

Other courts that have been presented with similar statements and averments have rejected them for a myriad of reasons. The general statements made by Defendants simply do not relate to the confidential, non-public reporting of trade information to trade publications by AEPES' traders. *See In re K-tel Intern.*, 300 F.3d at 898 (even where omitted information may

have been material, it is not actionable if it is unrelated to the allegedly misleading statements made).  Moreover, companies are not liable under the securities laws merely for being optimistic, and they are not required to be overly pessimistic.  "[A]s long as the public statements are consistent with reasonably available data, corporate officials need not present an overly gloomy or cautious picture of current performance and future prospects . . . Where plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information."  *Novak*, 216 F.3d at 309 (internal citations omitted).

Next, Plaintiffs do not allege that any of AEP's earnings reports or statements about AEPES's success were false or that Defendants, such as Draper, did not believe the statements *when Defendants made them.  See Mayer v. Mylod*, 988 F.2d 635, 639 (6th Cir. 1993) ("Material statements which contain the speaker's opinion are actionable under Section 10(b) of the Securities Exchange Act if the speaker does not believe the opinion and the opinion is not factually well-grounded."); *see also Sinay*, 752 F.Supp. at 833 ("[P]laintiff has failed to offer any factual allegation to show that the statement was not made in good faith. In hindsight, it is clear that the statement was not true but this Court must examine the statement at the time it was made.").  "When a corporation, through its officers or otherwise, states an honestly held view based on the information currently before it, neither it nor its officers may be held liable pursuant to section 10(b) or Rule 10(b)(5)."  *Sinay*, 948 F.2d at 1040.

Additionally, courts have determined that, "[p]eople in charge of an enterprise are not required to take a gloomy, fearful or defeatist view of the future; subject to what current data indicates, they can be expected to be confident about their stewardship and the prospects of the

business that they manage." *Shields*, 25 F.3d at 1129-30. Regarding statements about AEPES's

extraordinary success, courts have held that, "the failure of a parent company to interpret

extraordinarily positive performance by its subsidiary – specifically, the 'unprecedented and

dramatically increasing profitability' of a particular form of trading – as a sign of problems and

thus to investigate further does not amount to recklessness under the securities laws." *Novak*, 216

F.3d at 309, citing *Chill*, 101 F.3d at 269-70. Here, Plaintiffs point to nothing other than the

success of AEPES and its trading operations that should have alerted Executive Defendants in

high-level positions at AEP and AEPES to the practice of inaccurate reporting.

A further problem with many of the statements to which Plaintiffs point is that they are

immaterial. Courts refer to such statements as "puffery," and have held:

> Allegations that a company engaged in general puffery is insufficient to claim securities
> fraud. "Soft," "puffing" statements ... generally lack materiality because the market price
> of the share is not inflated by vague statements predicting growth. The whole discussion
> of growth is plainly by way of loose prediction .... No reasonable investor would rely on
> these statements, and they are certainly not specific enough to perpetrate a fraud on the
> market.

*In re Royal Appliance*, 1995 WL 490131 at *3, quoting *Raab v. General Physics Corp.*, 4 F.3d

286, 289-90 (4th Cir. 1993). *See also In re Federal-Mogul*, 166 F.Supp.2d at 563 (stating that,

"[s]tatements such as '[w]e continue to demonstrate the viability of our growth strategy ...,'

'[w]e continue to enhance our position as a leader in the automotive industry ...,' and 'the

Company is on target to achieve projected 'synergies' and cost savings' are the sort of 'vague

statements predicting growth' that were dismissed as puffery in *In re Royal Appliance*," in

holding that statements did not meet requirement of materiality). As the *Southland Securities*

court held, "[G]eneralized, positive statements about the company's competitive strengths,

experienced management, and future prospects are not actionable because they are immaterial."
2004 WL 626721 at *11 (emphasis added).

Finally, with regard to statements made by analysis, courts have determined that
companies generally are not liable for forecasts or statements by analysts unless defendants have
"sufficiently entangled [themselves] with the analysts' forecasts [so as] to render those
predictions 'attributable to [the issuers].'" *Elkind v. Liggett & Myers, Inc.*, 635 F.2d 156, 163
(2d Cir.1980); *In re Navarre Corp. Sec. Litig.*, 299 F.3d 735, 743 (8th Cir. 2002). To prove such
"entanglement," plaintiffs must allege that defendants used the analysts as "conduits," making
false and misleading statements to them in hopes that the analysts would take such information
back to the markets and investors would rely on it. *Navarre*, 299 F.3d at 743.

Because entanglement is central to the allegations of fraud, moreover, the plaintiff must
plead such allegations with particularity and state who supplied the information to the analyst,
how the analyst received the information and how the defendant was entangled with or
manipulated the information and the analyst. *Id*.; *see also Raab v. General Physics Corp.*, 4 F.3d
286, 288 (4th Cir.1993). "The pleading should (1) identify the specific forecasts and name the
insider who adopted them; (2) point to specific interactions between the insider and the analyst
which allegedly gave rise to the entanglement; and (3) state the dates on which the acts which
allegedly gave rise to the entanglement occurred." *Southland*, 2004  WL 626721 at *12; *see also
Wool v. Tandem Computers, Inc.*, 818 F.2d 1433, 1439 (9th Cir. 1987).

Plaintiffs fail to plead the circumstances surrounding the required "entanglement" with
sufficient particularity.  Plaintiffs do not, for example, "point to specific interactions between the
insider and the analyst which allegedly gave rise to the entanglement," *Southland*, 2004  WL

70

626721 at *12, regarding the UBS Warburg statement.  Generalized statements such as, "[f]ollowing conversations with management regarding the Company's significant growth in wholesale operations," are insufficient, as a matter of law, to hold Defendants liable for the analysts' opinion.

Even when Plaintiffs identify specific interactions, they nevertheless are dependant upon this Court crediting their theory that Defendants knew about the inaccurate reporting (and, again, that the inaccurate reporting really had some determinable, identifiable effect on the success of the energy trading business) to render the analysts' reports misleading.  Assuming Defendants acted as "conduits," if they were unaware of the inaccurate reporting, they cannot be liable for touting AEPES's success to analysts.  As explained by the *Chill* court:

> [g]iven the significant burden on the plaintiff in stating a fraud claim based on recklessness, the success, even the extraordinary success, of a subsidiary will not suffice in itself to state a claim that the parent was reckless in failing to further investigate. Fraud cannot be inferred simply because [the parent] might have been more curious or concerned about the activity at [the subsidiary].

101 F.3d at 270.

Based upon the allegations set forth in the CAC, the Court cannot conclude that Plaintiffs have alleged any fraud committed upon them.  The data reported to Platts cannot, itself, be the basis for a securities fraud claim because it was not made public.  Plaintiffs merely allege that statements made by Defendants, none of which ever discuss the specific issue of reporting to the Trade Press, somehow became misleading because AEPES traders had been reporting inaccurate data to the Trade Press.  Plaintiffs equate acts by a subsidiary and its employees to acts by the parent company itself (e.g., referring to the conduct as having been engaged in by "AEP"), without justification, and proffer only conclusory allegations about how the inaccurate reporting

71

affected the success of AEP's energy trading business (AEPES).  *See, e.g.*, *In re Comshare*, 183 F.3d at 553, quoting *San Leandro Emergency Med. Plan v. Philip Morris Cos.*, 75 F.3d 801, 813 (2d Cir.1996) ("[C]laims of securities fraud cannot rest 'on speculation and conclusory allegations.'").

The Court's thorough review of the FERC Report, moreover, suggests that Plaintiffs really never could prove any effect that the inaccurate reporting may or may not have had on the success of AEPES.  Even if Plaintiffs could parse out the effect of AEPES's traders' inaccurate reporting on the price indices, Plaintiffs have not alleged that such indices were relied upon by investors, except in that AEP relayed its rankings thereon to investors.  Yet, as discussed above, such information does not meet the definition of materiality, nor did Defendants have a duty to disclose the information.

Undeniably, Plaintiffs' theory of fraud has been routinely rejected by courts.  In *Stavroff v. Meyo*, 987 F.Supp. 987 (N.D. Ohio 1995) the court explained:

> To the extent plaintiffs argue that certain omissions rendered the public statements misleading, this Court is of the view that plaintiffs have merely put together a mosaic of unrelated pieces attempting to create a picture of "fraud by hindsight.". . . Plaintiffs have simply presented no evidence to support a claim that the defendants intended to mislead the market or that their public statements were false or misleading when made.

*Id*. at 1000.  Or, as the Seventh Circuit put it:

> The story in this complaint is familiar in securities litigation. At one time the firm bathes itself in a favorable light. Later the firm discloses that things are less rosy. The plaintiff contends that the difference must be attributable to fraud. "Must be" is the critical phrase, for the complaint offers no information other than the differences between the two statements of the firm's condition.

*DiLeo*, 901 F.2d at 627.

This Court, while acknowledging that some wrongdoing has been alleged in the CAC, can discern no reason why the facts of this case present circumstances that might warrant embracing a finding of liability under the securities law on any theory offered by Plaintiffs. Therefore, Defendants' Motion to Dismiss is **GRANTED** in its entirety against AEP and all of the Individual Defendants.

### Plaintiffs' Motion for Leave to Amend

Even prior to Congress' enactment of the PSLRA, the Supreme Court recognized that "litigation under Rule 10b-5 presents a danger of vexatiousness different in degree and kind from that which accompanies litigation in general." *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 739-44 (1975). In fact, those very concerns are what motivated Congress in passing the PSLRA, as noted by the Sixth Circuit in *In re Comshare*:

> Congress echoed the concerns expressed by the Supreme Court in *Blue Chips*, noting that frivolous securities fraud litigation "unnecessarily increase[s] the cost of raising capital and chill[s] corporate disclosure, [and is] often based on nothing more than a company's announcement of bad news, not evidence of fraud."

183 F.3d at 548, quoting S.Rep. No. 104-98 (1995), reprinted in 1995 U.S.C.C.A.N. 679, 690. The Sixth Circuit has held, "we think it is correct to interpret the PSLRA as restricting the ability of plaintiffs to amend their complaint, and thus as limiting the scope of Rule 15(a) of the Federal Rules of Civil Procedure." *Miller*, 346 F.3d at 691-92, quoting *In re Champion Enters.*, 145 F.Supp. 2d 871, 874 (E.D. Mich. 2001) ("[R]ather than lead to the conclusion that plaintiffs should receive more leniency in amending their pleadings, the stay of discovery procedures adopted in conjunction with the heightened pleading standards under the PSLRA is a reflection of the objective of Congress 'to provide a filter at the earliest stage (the pleading stage) to screen out lawsuits that have no factual basis.'").

This Court especially is wary of allowing this case to proceed where Plaintiffs have alleged nothing more than "fraud by hindsight."  Many courts have denied leave to amend for that reason, including this very court.  In *In re SmarTalk Teleservices Securities, Inc. Litigation*, 124 F.Supp.2d 505, 516 (S.D. Ohio 2000), Judge Sargus explained that,  "[t]he allegations in the Complaints are, for the most part, an example of pleading fraud in hindsight, *the exact type of claims that the Rule 9(b) and the PSLRA were designed to weed out at the pleading stage*." *Id*. at 516 (emphasis added).  The Sixth Circuit and other circuits have upheld their lower courts when the district courts have refused Plaintiffs leave to amend.  *See*, *e.g.*, *Sinay*, 948 F.2d at 1042 (6th Circuit) ("[t]his amendment would not have withstood a Fed.R.Civ.P. 12(b)(6) motion because [plaintiff] is only alleging 'fraud by hindsight.'"); *see also Miller*, 346 F.3d at 690 (6th Circuit) (affirming the district court's denial of leave to amend based on futility)*; Chill*, at 271-72 (2d Circuit) (affirming the district's court denial of leave to amend based upon futility).

The Court has reviewed the SCAC and compared it to the CAC and finds that the additional allegations do nothing to cure the defects of Plaintiffs' claims.  The facts of this case, as gleaned from the CAC, the FERC Report, and the parties' filings, simply fail to state any basis upon which relief can be granted.  Accordingly, Plaintiffs will not be permitted to amend the CAC.

## V.  CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss is **GRANTED**, and this case is **DISMISSED**, with prejudice.

**IT IS SO ORDERED.**

                **s/ Algenon L. Marbley**                    

**ALGENON L. MARBLEY**
**UNITED STATES DISTRICT JUDGE**

**Dated: September 10, 2004**